**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

LAURA SEIDL, individually, derivatively and on behalf of all others similarly situated,

        Plaintiff,

    - against -

AMERICAN CENTURY COMPANIES, INC., AMERICAN CENTURY INVESTMENT MANAGEMENT, INC., JAMES E. STOWERS, JR., JAMES E. STOWERS, III, JONATHAN S. THOMAS, THOMAS A. BROWN, ANDREA C. HALL, DONALD H. PRATT, GALE E. SAYERS, M. JEANNINE STRANDJORD, TIMOTHY S. WEBSTER, WILLIAM M. LYONS, MARK MALLON, WADE SLOME, BRUCE WIMBERLY, and JERRY SULLIVAN,

        Defendants,

    - and -

AMERICAN CENTURY MUTUAL FUNDS, INC., doing business as AMERICAN CENTURY ULTRA FUND,

        Nominal Defendant.

08 Civ. 8857 (DLC)

ECF Case

---

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS

**SIMMONSCOOPER LLC**
Greg Erthal
707 Berkshire Blvd.
East Alton, IL 62024
(618) 259-2222
gerthal@simmonscooper.com

**HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP**
Thomas I. Sheridan, III
Andrea Bierstein
112 Madison Avenue
New York, NY 10016-7416
(212) 784-6400
tsheridan@hanlyconroy.com
abierstein@hanlyconroy.com

*Attorneys for Plaintiff*

August 28, 2009

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTS ......................................................................................................................... 8

    The Parties ......................................................................................................... 8

    Defendants' Investments in PartyGaming ....................................................... 11

    PartyGaming Was an Illegal Gambling Business ............................................ 14

    Defendants Knew that PartyGaming Was an Illegal Gambling Business ......... 16

    The Risk of Loss from Investing in PartyGaming Was Foreseeable ................ 16

    Law Enforcement Actions to Stop Illegal Internet Gambling by Offshore Companies .... 17

    The Losses Caused by Defendants' Wrongdoing ............................................ 18

    The Claims for Relief ....................................................................................... 19

ARGUMENT ............................................................................................................... 19

    I.    PLAINTIFF HAS PROPERLY PLEADED HER COMMON LAW CLAIMS ........................ 19

        A.    Choice of Law .................................................................................... 19

        B.    Maryland Recognizes a Claim for Breach of a Corporate Fiduciary's Duties .... 21

        C.    Plaintiff Has Sufficiently Pleaded That Defendants Acted in Breach of Their Duties .... 22

        D.    Plaintiff Has Properly Pleaded Proximate Cause With Respect to Her Common Law Claims .... 25

            1.    *The Court's Ruling on RICO Proximate Cause Is Not Dispositive of Plaintiff's Common Law Claims* .... 25

            2.    *The Requirements of Proximate Cause Are Satisfied* .... 26

        E.    Plaintiff Has Stated a Claim for Waste ............................................... 32

F.      Plaintiff Has Alleged Culpable Conduct on the Part of the
                Independent Directors ...............................................................34

II.     PLAINTIFF HAS PROPERLY PLEADED THAT SHE IS EXCUSED FROM MAKING A
        DEMAND ON THE DIRECTORS OF THE NOMINAL DEFENDANTS .............................37

        A.      Demand is Excused Because the Directors of ACMF Are Directly
                Conflicted and Committed to Their Decision and Cannot Be Expected
                to Respond in Good Faith .......................................................38

                1.      The Directors Are Conflicted Because They Owe Fiduciary
                        Duties to All 18 Funds Separately Operating within the
                        ACMF Corporate Structure ...........................................38

                2.      The Directors Are Conflicted Because of Their Own
                        Potential Liability .......................................................43

                3.      The Directors Are Committed to Their Decision Not to
                        Pursue Claims Arising from the Fund's Investments in
                        PartyGaming ...............................................................47

        B.      Demand Is Also Excused Because It Would Cause Irreparable Injury
                to the Fund ...........................................................................48

III.    PLAINTIFF HAS PROPERLY PLEADED DIRECT CLAIMS IN THE ALTERNATIVE TO
        HER DERIVATIVE CLAIMS ...............................................................50

IV.     PLAINTIFF HAS PROPERLY ALLEGED RICO PREDICATE ACTS AND A PATTERN
        OF RACKETEERING ........................................................................53

        A.      Plaintiff Has Pleaded Predicate Acts Under RICO ..................................53

        B.      Plaintiff Has Pleaded a "Pattern of Racketeering Activity" .....................56

V.      IF THE COMPLAINT IS INSUFFICIENT, LEAVE TO AMEND SHOULD BE GRANTED .....59

CONCLUSION ...............................................................................60

# TABLE OF AUTHORITIES

Page

## Cases

*ACandS, Inc. v. Asner,* 344 Md. 155, 686 A.2d 250 (1996) ........................................ 27

*Aetna Ins. Co. v. Boon*, 95 U.S. 117 (1877)........................................................... 28

*Agency Rent-A-Car, Inc. v. Gateway Industries, Inc.*, 1980 WL 3040 (Del. Ch. 1980).............. 33

*Ali v. Mukasey*, 529 F.3d 478 (2d Cir.2008) .......................................................... 53

*Anisfeld v. Cantor Fitzgerald & Co., Inc.*, 631 F. Supp. 1461 (S.D.N.Y. 1986)........................ 58

*Argiropoulos v. Kopp,* 2007 WL 954747 (D. Md. March 26, 2007) ............................................ 51

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), *overruled on other grounds*, *Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000) .......................................................................... 46

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .......................................................... 34

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)........................................................ 25

*Beauford v. Helmsley*, 650 F. Supp. 548 (S.D.N.Y. 1986) ............................................... 58

*Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir. 1989) ................................................... 58

*Becker v. Poling Transp. Corp.,* 356 F.3d 381 (2d Cir. 2004) ........................................ 26

*Benitez v. New York City Bd. of Educ.*, 73 N.Y.2d 650 (1989) ........................................ 30

*Blondell v. Littlepage*, 185 Md.App. 123, 968 A.2d 678 (Md.App. 2009)................................. 21

*Bonsignore v. City of New York,* 683 F.2d 635 (2d Cir. 1982)....................................... 28

*Booth v. Robinson*, 55 Md. 419 (1881)................................................................ 22

*Boyle v. United States*, 129 S. Ct. 2237 (2009)...................................................... 53

*Burks v. Lasker*, 441 U.S. 471, 484 (1979)........................................................... 35

*Ceribelli v. Elghanayan,* 990 F.2d 62 (2d Cir. 1993) ................................................ 51

*Connell v. Hayden*, 443 N.Y.S.2d 383 (App. Div. 1981) ................................................ 30

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984)................................................. 38

*DeBartolo v. Coccia*, 276 A.D.2d 663, 714 N.Y.S.2d 742 (2d Dept. 2000) ................................ 26

*DeFalco v. Bernas*, 244 F.3d 286 (2d Cir.2001) ...................................................... 56

*Delmarva Sash & Door Co. of Maryland, Inc. v. Andersen Windows, Inc*., 218 F. Supp.2d
    729 (D. Md. 2002) ................................................................................. 51

*Delta Star, Inc. v. Patton*, 76 F. Supp. 2d 617 (W.D. Pa. 1999)...................................... 32

*Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 314-15, 414 N.E.2d 666, 434 N.Y.S.2d 166 (1980) ................................................................................. 26, 29, 30

*East Hampton Dewitt Corp. v. State Farm Mut. Auto. Ins. Co.*, 490 F.2d 1234 (2d Cir. 1973) .. 28

*Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830 (1996) ................................................ 27

*Foley v. State*, 265 A.D. 682 (4th Dept. 1943) .......................................................... 29

*Froelich v. Senior Campus Living LLC*, 355 F.3d 802 (4th Cir. 2004) ........................ 23

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) .................................... 12

*Gerbino v. Tinseltown USA*, 788 N.Y.S.2d 538 (App. Div. 2004) .............................. 27

*Harashe v. Flintkote Co.,* 848 S.W.2d 506 (Mo.App. 1993) ....................................... 27

*Hausman v. Buckley*, 299 F.2d 696 (2d Cir. 1962) ..................................................... 20

*Hollander v. Breeze Corporations, Inc.*, 26 A.2d 507 (N.J. Ch. 1941) ........................ 33

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) .......................... 25

*Hotel Employees & Restaurant Employees Union, Local 100 of New  Hotel Employees & Restaurant Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Department of Parks & Recreation*, 311 F.3d 534, 539 n.1 (2d Cir. 2002) ........ 12

*I. Meyer Pincus and Assoc. v. Oppenheimer & Co., Inc.*, 936 F.2d 759 (2d Cir.1991) ................. 2

*Ikuno v. Yip*, 912 F.2d 306 (9th Cir. 1990) .............................................................. 58

*In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 597 N.Y.S.2d 904 (1993) ................................. 19

*In re American Express Co. S'holder Litig.*, 39 F.3d 395 (2d Cir. 1994) ...................... 6

*In Re September 11 Litigation*, Slip Op. filed July 16, 2009 at (S.D.N.Y) .................................... 30

*In re Syntex Corp. Secs. Litig.,* 855 F. Supp. 1086 (N.D. Cal. 1994) .......................... 36

*Ingham v. Eastern Air Lines, Inc.*, 373 F.2d 227 (2d Cir. 1967) ................................. 29

*Ingrassia v. Lividikos*, 14 Misc. 3d 1236(A), 836 N.Y.S.2d 499 (Sup. Ct. Richmond Co. 2007) ................................................................................................. 26

*Jarrett v. Jones,* 258 S.W.3d 442 (Mo. 2008) ........................................................... 21

*Jurado v. W. Gear Works*, 619 A.2d 1312 (N.J. 1993) ............................................... 30

*Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90 (1991) .............................................. 37

*Kann v. Kann*, 344 Md. 689, 690 A.2d 509 (1997) ............................................... 21, 22

*Kikis v. McRoberts Corporation*, 225 A.D.2d 455, 639 N.Y.S.2d 346 (1st Dept. 1996) ............. 20

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) ......................................... 12

*Kush by Marszalek v. City of Buffalo*, 59 N.Y.2d 26 (1983) ........................................................ 29

*Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir.1973) .................................................................. 35

*Lapidus v. State*, 2008 WL 4742911 (2d Dept. 2008) ................................................................ 20

*Leavy v. American Federal Sav. Bank*, 136 Md. App. 181, 764 A.2d 366 (Md. App. 2000)....... 21

*Lewis v. Biegel*, 204 S.W.3d 354 (Mo. App. 2006) ..................................................................... 29

*Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209 (2d Cir.2002) ...................................... 30

*Matter of Ideal Mut. Ins. Co.*, 140 A.D.2d 62, 532 N.Y.S.2d 371 (1st Dep't 1988) ................... 27

*McBrearty v. Vanguard Group, Inc.*, 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *appeal
    pending*, No. 09-1444 (2d Cir. Apr. 8, 2009) ..................................................................... passim

*McCullough v. U.S.*, 538 F. Supp. 694 (E.D.N.Y. 1982).......................................................... 27, 29

*Michelson v. Duncan*, 407 A.2d 211 (Del. 1979) ....................................................................... 32

*Mona v. Mona Elec. Group, Inc.*, 176 Md. App. 672, 934 A.2d 450 (Md. App. 2007) ... 21, 22, 23

*Moore v. Myers,* 161 Md. App. 349, 868 A.2d 954 (Md. App. 2005)......................................... 29

*Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 520-21 (1980) ................................................. 29

*Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579 (1994) ......................................... 30

*Parish v. Maryland & Virginia Milk Producers Ass'n*, 250 Md. 24, 242 A.2d 512 (1968)......... 23

*People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc. 2d 852 (N.Y. Co. Sup.
    Ct. 2000) ................................................................................................................................ 14

*Perales v. City of New York*, 711 N.Y.S.2d 9 (App. Div. 2000)................................................... 27

*Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184 (2d Cir. 2003) ............................. 40

*Piazza v. Regeis Care Center, L.L.C.*, 47 A.D.3d 551, 852 N.Y.S.2d 53 (1st Dept. 2008).......... 26

*Pitman v. Aran*, 935 F. Supp. 637 (D. Md. 1996)....................................................................... 21

*Preston v. Cauldwell-Wingate Co.*, 176 F.2d 237, 241 (2d Cir. 1949)....................................... 29

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)......................................................................... 15

*Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007)........................................................................... 46

*Sanabria v. United States*, 437 U.S. 53 (1978)........................................................................... 54

*Sanders v. Wang*, 1999 WL 1044880 (Del. Ch. Nov. 10, 1999) ................................................ 47

*Scalisi v. Fund Asset Management, LP*, 380 F.3d 133 (2d Cir. 2004)......................................... 41

*Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91 (2d Cir.1997) ..................................... 56

*Sekuk Global Enterprises Profit Sharing Plan v. Kevenides*, 2004 WL 1982508 (Md. Cir. Ct.
    May 25, 2004).......................................................................................................................... 46

*SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352, 777 N.Y.S.2d 62 (1ˢᵗ Dept. 2004)................... 20

*Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir.1996) ...................................... 30

*Steiner v. Meyerson*, 1995 WL 441999 (Del. Ch. July 19, 1995)................................... 33

*Storetrax.com, Inc. v. Gurland,* 397 Md. 37, 915 A.2d 991 (2007) ....................................... 21, 22

*Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002) ............................................. 50, 51, 53

*Sweeney v. Bruckner Plaza Associates*, 57 A.D.3d 347 (1st Dep't 2008)....................................... 26

*Tackney v. U.S. Naval Academy Alumni Ass'n, Inc.*, 408 Md. 700, 971 A.2d 309 (2009) .......... 23

*Tafflin v. Levitt*, 92 Md. App. 375, 381, 608 A.2d 817 (1992) ..................................... 51

*Tannenbaum v. Zeller*, 552 F.2d 402 (2d Cir. 1977) ....................................... 35

*Toner v. Baltimore Envelope Co.,* 304 Md. 256, 498 A.2d 642 (1985)........................... 52

*U.S. v. Cohen*, 260 F.3d 68 (2d Cir. 2001) ...................................... 14

*U.S. v. Gotti*, 459 F.3d 296 (2d Cir. 2006)....................................... 14

*U.S. v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989).................................... 58, 59

*United States v. Bridges*, 493 F.2d 918 (5th Cir. 1974)................................ 53

*United States v. Busacca*, 936 F.2d 232 (6th Cir.1991).............................. 58

*United States v. Hawes*, 529 F.2d 472 (5th Cir. 1976) .............................. 54

*United States v. Sacco*, 491 F.2d 995 (9th Cir. 1974).............................. 54

*Vinogradova v. Suntrust Bank, Inc.*, 162 Md. App. 495, 875 A.2d 222 (Md. App. 2002)..... 21, 22

*Wall v. CSX Transp., Inc.*, 471 F.3d 410 (2d Cir. 2006)............................. 19

*Waller v. Waller,* 187 Md. 185, 49 A.2d 449 (1946)............................... 51, 52

*Werbowsky v. Collomb*, 362 Md. 581 766 A.2d 123 (2001) ................................. passim

*White v. Panic*, 783 A.2d 543 (Del. 2001)................................ 33

*Woodling v. Garrett Corp.*, 813 F.2d 543 (2d Cir.1987).............................. 28

## Statutes, Rules, and Regulations

18 U.S.C. § 1955................................................ 1, 53, 54, 55

18 U.S.C. § 1955(b) .................................................. 3

18 U.S.C. § 1961(1)(B)................................................ 3

18 U.S.C. § 1961(5) ................................................. 56

Fed. R. Civ. P. 15(a)(2)............................................ 59

Fed. R. Evid. 201(b)(2) ............................................ 12

Md. Code,  Corporations and Associations § 2-405.1(a)...................... 22, 23

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ............................... 3

**Other Authorities**

Am.Jur.2d, Negligence (1989) ...................................................................................... 27

Commission Guidance Regarding the Duties and Responsibilities of Investment Company
  Boards of Directors With Respect to Investment Adviser Portfolio Trading Practices,
  Investment Company Act Release No. 2763, 93 S.E.C. Docket 2469, 2008 WL 2917621
  (July 30, 2008) ....................................................................................................... 36

K. O'Malley, J. Grenig, W. Lee, Federal Jury Practice and Instructions (5th ed.) ....................... 30

Prosser, Law of Torts (4th ed. 1971) ............................................................................ 29

Restatement (Second) Torts ................................................................................. 29, 30

W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts (5th
  ed.1984) ......................................................................................................... 28, 30

## PRELIMINARY STATEMENT

Plaintiff is an investor in the American Century Ultra Fund (the "Fund"), a mutual fund. Defendants – the fiduciaries responsible for managing and advising the Fund – knowingly caused the Fund unlawfully to invest over $75 million dollars of investors' money in an illegal off-shore gambling company whose principal business violated federal and state anti-gambling laws. The illegal gambling business, PartyGaming Plc ("PartyGaming"), agreed with the United States Department of Justice ("DOJ") in April 2009 to forfeit $105 million in criminal proceeds because its principal business (constituting approximately 87% of its revenue) violated a host of federal criminal statutes, including 18 U.S.C. § 1955 (illegal gambling) ("§ 1955"). One of PartyGaming's founders, Anarug Dikshit, also pleaded guilty to gambling offenses before Judge Rakoff in this District. Dikshit agreed to personally forfeit $300 million in criminal proceeds from PartyGaming and faces a possible two-year prison sentence. The Fund lost millions of dollars as a result of Defendants' illegal "investments."

Defendants contend that their "investment" decisions were lawful, but the illegality of the gambling companies' principal operations was well-established before Defendants made their first "investments" in 2005. For example, in 2003, the DOJ issued public warnings that such companies were criminal organizations – and cautioned the public that supporting such criminal organizations was itself a crime. The DOJ had prohibited Citibank and PayPal from processing financial transactions for off-shore Internet gambling. The federal government had even seized millions of dollars that PartyGaming had paid the Discovery Channel and other media for advertising. There was also a history of successful prosecutions of principals of similar offshore entities that had been widely reported in major newspapers worldwide. All this was public knowledge before Defendants made their "investments."

1

Defendants were well aware of the illegality of the businesses in which they invested. PartyGaming expressly disclosed in its prospectus that it derived almost all of its revenue from gamblers in the U.S. and that law enforcement authorities in the U.S. considered their activities to be criminal. Thus, the prospectus stated:

> The US Department of Justice considers that companies offering online gaming to US residents are in violation of existing US federal laws [and] state gaming laws [which] can serve as a predicate offence for liability under federal statutes.

Amended Verified Class Action and Derivative Complaint ("Complaint" or "AC") ¶ 44. The prospectus also stated in bold-faced letters on the first page that PartyGaming had generated 87% of its revenue in the United States in the first quarter of 2005. Plaintiff's Request for Judicial Notice ("PRJN") Exhibit 1 at 1 (page number citations are to the pages of the original exhibit).[1]

Defendants acted in deliberate defiance of U.S. criminal law by repeatedly purchasing PartyGaming shares in the face of disclosed illegality and prior prosecutions. That PartyGaming shares were only listed on a foreign exchange (even though 87% of the company's revenues was from U.S. gamblers) highlights the illegality. To evade the reach of the U.S. criminal justice system, PartyGaming did not offer its shares for sale to, or for the benefit of, persons in the U.S. *See* PRJN Ex. 1 at 3. Accordingly, Defendants had to purchase shares overseas in order to circumvent U.S. law. Such intentional wrongdoing, in the face of ongoing law-enforcement efforts, demonstrates not only an arrogant defiance of our nation's criminal laws, but also contempt for the interests of investors, like Plaintiff, who had entrusted Defendants with their savings. This case thus presents a stark example of asset managers abdicating their responsibilities to investors while taking for themselves over a hundred million dollars per year

---

[1] This prospectus is referred to in the Complaint and therefore may be relied on for purposes of this motion. *I. Meyer Pincus and Assoc. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir.1991).

in fees from the portfolios they mismanaged. Like other notorious examples of financial industry greed and irresponsibility, Defendants' conduct goes beyond merely reckless. It was criminal.

PartyGaming was an "illegal gambling businesses" as that term is defined in § 1955(b). Section 1955(a) provides that whoever "finances … or owns all or part of an illegal gambling business" is guilty of a felony. By causing the Fund to purchase shares in an illegal gambling business, Defendants caused the Fund to finance and own part of such business in violation of § 1955(a). In making these unlawful investments, Defendants took a foreseeable risk that the investments would lose value when law enforcement authorities forced the illegal gambling business to stop violating anti-gambling laws in the U.S. – cutting off its primary source of revenue (upon which its stock valuation was based). That is exactly what happened. This directly resulted in tens of millions of dollars of losses to the Fund and to the investors, including Plaintiff, who entrusted Defendants with their retirement and investment accounts.

A violation of § 1955 is a predicate crime under 18 U.S.C. § 1961(1)(B), a provision of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"). Therefore, by purchasing shares in an illegal gambling business – repeatedly and over a significant period of time – Defendants engaged in a pattern of racketeering. They were also guilty of negligence, breach of fiduciary duty, and corporate waste.

Plaintiff brings this action under RICO and at common law to recover for the investment and other losses that she and countless other mutual fund investors suffered as the direct and foreseeable result of Defendants' illegal investments. Because Defendants' unlawful conduct most directly injured the mutual fund, Plaintiff asserts each of her substantive claims derivatively on behalf of the fund. (AC ¶ 12) Plaintiff also pleads, in the alternative, direct claims for relief.

Plaintiff brings her direct claims both individually and as a class action on behalf of all others similarly situated. (AC ¶¶ 2, 11-13).

By order entered April 28, 2009, this Court, relying on *McBrearty v. Vanguard Group, Inc.*, 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *appeal pending*, No. 09-1444 (2d Cir. Apr. 8, 2009), dismissed Plaintiff's RICO claims, finding that the plaintiff could not satisfy the requirements of RICO proximate cause. Thereafter, on May 8, 2009, Plaintiff filed her Amended Complaint to plead this Court's diversity jurisdiction over her common law claims. To preserve her RICO claims pending the *McBrearty* appeal, the Amended Complaint asserts those claims as well. On June 25, 2009, Defendants answered the Amended Complaint. They have now moved for judgment on the pleadings on a variety of grounds, none of which has merit.[2]

Regardless of whether Plaintiff, suing derivatively on behalf of ACMF or individually on behalf of herself and other shareholders of the Fund, may recover for the underlying RICO violation, Defendants' investments in criminal gambling companies, in violation of § 1955 and RICO, subject them to common law liability for negligence, breach of fiduciary duty and waste. Defendants knowingly caused the Fund to invest in illegal activities that exposed ACMF and the Fund to criminal liability and improperly risked the Fund's assets. Whatever discretion corporate

---

[2] Defendants filed two separate answers and two separate motions for judgment on the pleadings. One answer and motion was filed by the independent directors and the nominal defendant, American Century Mutual Funds, Inc. ("ACMF") (collectively, "Independent Directors"). (In their motion, for reasons that are not evident, the Independent Directors refer to ACMF as "the Fund," a term more properly used to refer to the specific mutual fund – the American Century Ultra Fund – in which Plaintiff invested. Plaintiff respectfully suggests that this conflation of the registered investment company that includes 18 separate "series" of mutual funds with the one particular fund at issue in this case can only lead to confusion.) The second answer and motion was filed by all of the remaining defendants – American Century Companies, Inc. ("ACC"), American Century Investment Management, Inc. ("ACIM"), and the remaining directors and executives. They style themselves "Defendants," but for greater clarity, Plaintiff will refer to them as the Institutional Defendants. Together, the Institutional Defendants and the Independent Directors are referred to as "Defendants."

officers and directors may have, it does not extend to financing criminal activities, even when those activities hold out the promise of financial reward (and run the risk of financial loss if the criminals are caught). Defendants' investments in PartyGaming were grossly negligent and in breach of their obligations to ACMF, which, at a minimum, required ACMF to invest within the bounds of the law.

Defendants ask this Court to extend *McBrearty's* RICO proximate cause ruling to Plaintiff's common law claims and bar those claims as well. *McBrearty*, however, is not dispositive of Plaintiff's common law claims. The Second Circuit has held that the requirement of proximate cause under RICO may be more difficult to satisfy than proximate cause at common law. However the Second Circuit decides the RICO proximate cause decision in *McBrearty*, the law enforcement crackdown that successfully shuttered the illegal gambling companies' U.S. operations and eliminated their primary source of revenue was not a superseding intervening cause of Plaintiff's injury under established common law principles because it was reasonably foreseeable.

While the *McBrearty* appeal may be dispositive of the RICO proximate cause issue in this case, it is important to clarify a possible factual misapprehension apparent in *McBrearty* concerning Plaintiff's theory of damages. Plaintiff does *not* allege that Defendants' unlawful investments lost value *because of the publicity* concerning PartyGaming's illegal operations or even of the DOJ's enforcement efforts. PartyGaming's share price did *not* plummet approximately 80%, (representing $7.6 billion in market value) because investors suddenly discovered that the company was engaged in illegal gambling. That was a well-known fact that was widely disclosed not only in PartyGaming's prospectus, but by major newspapers all over the world. This included *The New York Times,* which reported in June 2005 that PartyGaming's

illegality was the "centerpiece" of its business plan and was actually a "boost" to its share value – until the law caught up. (Illegal activity tends to have higher profit margins and few institutional competitors.) PartyGaming lost 80% of its value because the company lost 80% of its revenue stream – which disappeared when the DOJ shut down PartyGaming's illegal U.S. operations. Thus, Plaintiff's theory of damages does not place the Court in a position where it would have to guess, for example, whether (and to what degree) a drop in the share price of American Express[3] was attributable to negative publicity surrounding the exposure that its executives were secretly bribing journalists to defame a competitor – as opposed to countless other market conditions that could potentially affect the stock price of a large, diversified company. Any negative publicity or exposure concerning the illegality of PartyGaming's operations or the law enforcement activity directed at it – to the extent that *any* such information was not already publicly-known – had *absolutely no effect* on the share price of PartyGaming.

The Independent Directors also argue that Plaintiff has not sufficiently alleged that they played any part in the unlawful investment decisions. They ignore the special *watchdog role* that directors of mutual funds have, and which Defendants explicitly assumed for themselves as members of the Fund Performance Committee described in ACMF's filings with the SEC. This Court would have to assume that these individuals simply disregarded their duties (an assumption with no factual basis) to exonerate the Independent Directors at the pleading stage.

Defendants contend that Plaintiff cannot bring her claims derivatively because she did not first ask ACMF's directors to bring this action against themselves. As we demonstrate below, making a demand on the directors would have been futile because they are far from independent with respect to the subject matter of this action. They have conflicting duties to the Fund and to

---

[3] *E.g., In re American Express Co. S'holder Litig.*, 39 F.3d 395 (2d Cir. 1994).

ACMF's 17 other funds that did not invest in criminal activities. Defendants also face potential criminal exposure if ACMF's investments in PartyGaming are pursued.

Demand is also excused to avoid irreparable harm to ACMF. The Independent Directors have filed, on behalf of themselves *and* ACMF, an Answer to the Amended Complaint. In their responsive pleading, the Independent Directors and ACMF deny the Complaint's allegations. They also interpose substantive and affirmative defenses on the merits. These, as well as the arguments raised in their pending motion, irrevocably hobble ACMF's ability to ever pursue redress for the injuries alleged in the Complaint, *even if the Independent Directors change their position and decide to do so*. Because the Independent Directors and ACMF chose to take substantive positions on the merits in a responsive pleading – instead of simply moving to dismiss for failure to make a demand – the Independent Directors and ACMF have foreclosed any possibility of redress for the criminal actions alleged in the Complaint except through continuation of this derivative lawsuit. The Independent Directors have thus voluntarily ceded any right to control this litigation, and this Court should not dismiss the Complaint for lack of a demand on the board.

Defendants also say that Plaintiff may not assert individual and class claims, but the Second Circuit has clearly held (in a controlling case that Defendants fail to cite) that, under Maryland law, shareholders may pursue individual claims when the injury they seek to redress is distinct from the injury to the corporation. As described below, because of the structure of American Century's mutual fund complex, Plaintiff and the shareholders of the Fund suffered an injury distinct from the injury suffered by ACMF that Plaintiff seeks to vindicate through her derivative claims.

Defendants also raise additional grounds for dismissal of Plaintiff's RICO claims. Because this Court has already dismissed the RICO claims, these arguments are moot. But even if they were not, they lack merit and provide no additional basis to dismiss. Defendants' argument that their investments in PartyGaming do not constitute RICO predicate acts is borderline frivolous: § 1955 clearly prohibits financing or owning "all or part" of an illegal gambling business, and Defendants just as clearly caused ACMF to own part of PartyGaming, an admitted illegal gambling business within the meaning of § 1955. Further, Defendants' multiple investments in PartyGaming constituted a continuous RICO pattern because they threatened to continue into the future (and would have continued) had the illegal businesses not been prosecuted by the government.

Defendants' motions should therefore be denied in their entirety.

## FACTS

**The Parties**

Laura Seidl ("Plaintiff") is a citizen of New York. She is a shareholder in nominal defendant American Century Mutual Funds, Inc. ("Nominal Defendant" or "ACMF"), through its American Century Ultra Fund (the "Fund"). She first acquired shares in the Fund prior to 2005 for investment purposes. (AC ¶¶ 2, 11) Plaintiff was a shareholder of ACMF at the time of the transactions of which she complains, and she is currently a shareholder. (AC ¶¶ 78, 79)

ACMF is a Maryland corporation with its principal place of business in Kansas City, Missouri. It is registered under the Investment Company Act of 1940 (the "1940 Act") as an

open-end management investment company. (AC ¶ 14; Answers ¶ 14)[4] ACMF is a "series" mutual fund, which means that it has two or more portfolios of securities, each offering a separate series or class of stock to investors. Each series of stock represents a different group of stockholders with an interest in a segregated portfolio of securities. Each portfolio has different investment objectives, policies, practices, and risks. The shareholders of each portfolio do not participate in the investment results of any other portfolio and must look solely to the assets of their portfolio for most purposes, including redemption, liquidation, earnings, and capital appreciation. Each separate portfolio is commonly referred to as a "fund." (AC ¶ 15; Answers ¶ 15)

ACMF offers a "series" of shares representing an interest in a "fund" known as American Century Ultra Fund, which is referred to herein as the "Fund," though it is not a separate legal entity. In addition to the Fund, ACMF also comprises 17 other funds, none of which is a separate legal entity. ACMF has a single board of directors that manages all 18 funds that compose ACMF. (AC ¶ 16; Answers ¶ 16)

Defendant American Century Companies, Inc. ("ACC") is a Maryland corporation with its principal place of business in Missouri. (AC ¶ 18; Answers ¶ 18) ACC is an investment management company that controls ACMF and the Fund through its subsidiary, defendant American Century Investment Management, Inc. ("ACIM"), and through its selection and appointment of the executives and the entire board of directors of ACMF. The Fund does not have a board of directors separate from the board of ACMF. (AC ¶ 19; Answers ¶ 19)

---

[4] The Answers filed by the two groups of defendants appear to be identical. They are cited jointly herein as "Answers." A citation to a paragraph of the Answers in this brief signifies that the Answers admit some, but not necessarily all, of the allegations in the complaint to which it relates.

Defendant ACIM is a Delaware corporation with its principal place of business in Missouri. (AC ¶ 20; Answers ¶ 20) ACIM serves as the investment adviser to dozens of investment companies controlled by ACC, including ACMF and the Fund. ACIM was responsible for management of the Fund and implementing the investment strategy at issue. (AC ¶ 21; Answers ¶ 21)

Defendant James E. Stowers, Jr. ("Stowers Jr.") is Chairman of ACMF, a director and controlling shareholder of ACC, and a director of ACIM. Stowers Jr. was responsible for overseeing the investment strategy at issue. (AC ¶ 22; Answers ¶ 22) Defendant Jonathan S. Thomas ("Thomas") has been the President and Chief Executive Officer of ACMF since January 2007. He was the Executive Vice President of ACMF from November 2005 through February 2007. Thomas exercised operational or managerial oversight over the portfolio holdings of the Fund, including the investment strategy at issue. (AC ¶ 23) Defendants James E. Stowers, III ("Stowers III"), Thomas A. Brown ("Brown"), Andrea C. Hall ("Hall"), Donald H. Pratt ("Pratt"), Gale E. Sayers ("Sayers"), M. Jeannine Strandjord ("Strandjord"), and Timothy S. Webster ("Webster") (collectively and together with Stowers Jr. and Thomas, the "Directors") are members of the board of directors of ACMF. (AC ¶ 24; Answers ¶ 24)

Each of the Directors allowed ACMF, through the Fund, to invest or continue its investments in the illegal gambling business at issue. Each of the Directors had a fiduciary duty to act in the best interests of the shareholders of ACMF and the Fund. To an even greater degree than the directors of corporations that are not mutual funds, the directors of mutual funds are responsible for protecting the funds they serve under a unique watchdog role. (AC ¶ 24)

Defendant William M. Lyons ("Lyons") was President of ACMF from September 2000 through January 2007. Lyons also served as the Chief Executive Officer of ACC from September

2000 through January 2007. He was primarily responsible for the day-to-day management of the Fund and implementing the investment strategy at issue. (AC ¶ 25) Defendant Mark Mallon ("Mallon") was the Executive Vice President and Chief Investment Officer of ACMF. He was responsible for day-to-day management of the Fund and for implementing the investment strategy at issue. (AC ¶ 26) Defendants Wade Slome ("Slome"), Bruce Wimberly ("Wimberly") and Jerry Sullivan ("Sullivan") were the co-portfolio managers of the Fund. They were responsible for developing and implementing the investment strategy at issue. (AC ¶ 27)

**Defendants' Investments in PartyGaming**

Each of the Defendants knowingly developed and implemented (or conspired to develop and implement) an investment strategy pursuant to which ACMF, through the Fund, was caused – repeatedly and over a significant period of time – to purchase shares in PartyGaming. (AC ¶¶ 5, 36) In June 2005, PartyGaming, a Gibraltar company, made an initial public offering ("IPO") of its stock, which was listed on the London Stock Exchange. In the prospectus that PartyGaming issued in connection with its IPO, PartyGaming disclosed that "in many countries, including the United States, the Group's activities are considered to be illegal by relevant authorities." In the same prospectus, PartyGaming disclosed that it "generates most of its revenues from customers in the U.S. (approximately 87 per cent. in the first quarter of 2005)." (AC ¶ 43; *see* PRJN Ex. 1 at 14, 47).

The shares of PartyGaming were not offered for sale to, or for the benefit of persons in the U.S. (PRJN Ex. 1 at 3) Nor were they sold to members of the public in any jurisdiction. Rather, they were only made available to "certain institutional and professional investors who are not US persons." (*Id.* at 18) Because PartyGaming sought to avoid U.S. criminal jurisdiction, it did not list its shares to be traded through American Depository Receipts ("ADRs") or otherwise. Because shares of PartyGaming could not be purchased domestically, Defendants had to

purchase shares overseas to circumvent these restrictions. Beginning in or around June 2005, Defendants caused ACMF, through the Fund, to purchase millions of shares of PartyGaming. (AC ¶ 37) In a quarterly report filed with the SEC dated September 26, 2005, ACMF reported that as of July 31, 2005 it owned 23,771,000 shares of PartyGaming valued at $72,250,000, or $3.04 per share. (PRJN Ex. 2 at 2)[5]

ACMF did not purchase all 23 million shares in a single trade. The daily volume of trading during that period seldom exceeded 5 million shares. (PRJN Ex. 3)[6] This Court may take judicial notice that when institutional investors invest in a security, they often do so in multiple purchases rather than in a large block. *See, e.g.*, Affidavit of Defendant Neil M. Ostrer, dated October 27, 2008, filed in *McBrearty,* ¶¶ 6, 7) (Ostrer caused Vanguard Global to purchase 600,000 shares of PartyGaming over five separate transactions). This is because asset managers do not wish to drive up the price of shares they intend to purchase through a single, large order. They generally accumulate ownership positions over time through many separate transactions. Accordingly, if Defendants' purchases were in line with the practice followed by Vanguard, it would have taken approximately 300 separate purchases to accumulate the ownership stake that the Fund held in PartyGaming between June 2005 and July 2006.

At various times between August 1, 2005 and October 31, 2005, Defendants caused ACMF, through the Fund, to purchase additional shares of PartyGaming. (AC ¶ 37) In its

---

[5] The Court may take judicial notice of ACMF's SEC reports. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). A statement of fact published by defendant on its Web site meets the requirements for judicial notice under Fed. R. Evid. 201(b)(2). *See Hotel Employees & Restaurant Employees Union, Local 100 of New  Hotel Employees & Restaurant Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Department of Parks & Recreation*, 311 F.3d 534 (2d Cir. 2002).

[6] The Court may take judicial notice of the published records of the price and volume of PartyGaming's stock. *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000).

quarterly report filed with the SEC dated December 27, 2005, ACMF reported that as of October 31, 2005, it owned 29,721,000 shares – an increase of 5,950,000 shares over the immediately preceding period – valued at $45,904,000, or $1.54 per share. (PRJN Ex. 4 at 2)

At various times between November 1, 2005 and January 31, 2006, Defendants caused ACMF, through the Fund, to purchase additional shares of PartyGaming. (AC ¶ 37) In its quarterly report filed with the SEC dated March 24, 2006, ACMF reported that as of January 31, 2006, it owned 34,684,000 shares – an increase of 4,963,000 shares over the immediately preceding period – valued at $79,187,000, or $2.28 per share. (PRJN Ex. 5 at 2)   In its semiannual report filed with the SEC on June 30, 2006, ACMF reported that, as of April 30, 2006, it still owned 34,684,000 shares, which it valued at $95,242,000, or $2.75 per share. (PRJN Ex. 6 at 7)

Defendants' investments in PartyGaming were neither passive nor short term. In a report filed with the SEC dated August 30, 2006, ACMF reported that on May 4, 2006, ACMF attended and voted by proxy at the annual meeting for PartyGaming and accepted the full slate of directors up for election and approved the proposed executive compensation packages of its executives. (AC ¶ 49; PRJN Ex. 7 at 3) Based on this, and the other facts alleged in the Complaint, it may reasonably be inferred that Defendants intended to cause ACMF – an open-ended investment company – to continue its ownership of PartyGaming indefinitely.  Only after they became aware of a government crackdown on illegal Internet gambling did Defendants cause ACMF to divest itself of its unlawful investments in PartyGaming. In its quarterly report filed with the SEC dated September 25, 2006, ACMF reported that, as of July 31, 2006, it no longer owned any shares of PartyGaming. (PRJN Ex. 8)

**PartyGaming Was an Illegal Gambling Business**

At the time of Defendants' investments in PartyGaming, it was well-established that gambling businesses operating outside the U.S. violate U.S. criminal law when they take wagers from gamblers in the U.S. For example, Jay Cohen was convicted in February 2000 of running an internet gambling operation. On appeal, the Second Circuit held that Cohen and his organization, an Antiguan corporation that took bets over the Internet from gamblers in New York, violated the Wire Gambling Act, 18 U.S.C. § 1084, whenever there "was a telephone call or an internet transmission between New York and [defendant] in Antigua" that facilitated a bet or wager on a sporting event. *U.S. v. Cohen*, 260 F.3d 68 (2d Cir. 2001). (AC ¶ 39)

At the time of the investments at issue, it was also well-established that gambling businesses operating outside the U.S. violate the criminal laws of individual states when they take wagers from gamblers in those states. For example, in *People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc. 2d 852 (N.Y. Co. Sup. Ct. 2000), the court held that Cohen's company engaged in illegal gambling activity in violation of New York state law. (AC ¶ 40) Similarly, in *U.S. v. Gotti*, 459 F.3d 296 (2d Cir. 2006), the Second Circuit upheld a conviction under § 1955 predicated on a violation of N.Y. Penal Law § 225.00 and held that "[w]hen bets are placed from New York, the gambling activity is illegal under New York law, regardless of whether the activity is legal in the location to which the bets were transmitted." 459 F.3d at 340.

On June 11, 2003, the DOJ issued a public warning letter reminding the public that "Internet gambling and offshore sportsbook operations that accept bets from customers in the United States violate Sections 1084, 1952, and 1955 of [Title] 18 of the United States Code, each of which is a Class E felony. Additionally, pursuant to [18 U.S.C. § 2], any person or entity who

aids or abets in the commission of any of the above-listed offenses is punishable as a principal violator of those statutes." (AC ¶ 41)

On December 16, 2008, one of the co-founders of PartyGaming, Anarug Dikshit, pleaded guilty to engaging, through PartyGaming, in illegal Internet gambling and agreed to forfeit $300 million to the U.S. government. (AC ¶ 42; *see U.S. v. Dikshit*, 1:08-cr-01265-JSR-1 (S.D.N.Y.) (*See* PRJN Exs. 9 & 10))[7]

On April 6, 2009 PartyGaming entered into a non-prosecution agreement with the United States Attorney for the Southern District of New York pursuant to which it agreed to forfeit $105 million, representing a portion of the proceeds of PartyGaming's illegal U.S. Internet gambling operations. (PRJN Ex. 11)[8] Under the terms of the agreement, PartyGaming accepted as accurate the facts set forth in a Statement of Facts attached as Exhibit A to the agreement. (*Id*.) In that Statement of Facts, PartyGaming specifically admitted that (i) its conduct "violated certain U.S. criminal laws, including 18 U.S.C. § 1955" (*id*., Ex. A at ¶ IV(12)) and (ii) "[a]t all times prior to October 13, 2006, most of PartyGaming's customers were located in the United States, including in the Southern District of New York." (*Id*. at ¶ II(4))

The Complaint alleges that, at the time Defendants caused ACMF to invest, PartyGaming (a) violated the laws of one or more of the United States, including, without limitation, the laws of the state of New York; (b) involved five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (c) had been or remained in substantially continuous operation for a period in excess of thirty days or had a gross revenue of

---

[7] Pursuant to Fed. R. Evid. 201(b), the Court may take judicial notice of these filings as public records, *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000).

$2,000 in any single day. (AC ¶ 61) Accordingly, PartyGaming was an "illegal gambling business" as that term is defined in § 1955. (AC ¶ 38)

**Defendants Knew that PartyGaming Was an Illegal Gambling Business**

Defendants conducted or caused to be conducted, or were reckless in failing to conduct or to cause to be conducted, due diligence before ACMF purchased stock in PartyGaming. (AC ¶ 63; Answers ¶ 158) Accordingly, Defendants each knew, or is deemed to have known, that they were causing ACMF to purchase stock of a company that was taking wagers from gamblers in the U.S. and that law enforcement agencies in the U.S. considered its activities to be illegal gambling. (AC ¶¶ 46, 47)

**The Risk of Loss from Investing in PartyGaming Was Foreseeable**

The risk that investments in PartyGaming would lose significant value when law enforcement authorities took steps to enforce the law was not merely foreseeable. PartyGaming specifically *warned against this very risk*. In the "Risk Factors" section of its June 2005 Prospectus, PartyGaming specifically warned prospective investors that:

> An investment in the Shares would involve significant risks. If any of the following risks actually occur, PartyGaming's business financial condition and/or results of operations could be materially and adversely affected. In such circumstances, the trading price of the Shares would decline and an investor could lose all or part of his or her investment. As PartyGaming generates most of its revenue from customers in the US (approximately 87 per cent. In the first quarter of 2005), any action by US authorities that succeeds in prohibiting or materially restricting PartyGaming from offering online gaming in the US would have very serious consequences for [PartyGaming] and could result in investors losing all or a very substantial part of their investment.

(PRJN Ex. 1 at 46)

---

[8] The Court may take judicial notice of this agreement under Fed. R. Evid. 201(b)(2). It is a public record available from the Public Information Office of the Southern District U.S. Attorney.

The prospectus then elaborated on the risk of government enforcement in considerable detail:

> The US Department of Justice considers that companies offering online gaming to US residents are in violation of existing US federal laws . . .

> Online gaming may violate state law and violations of *state gaming laws can serve as predicate offence of liability under federal statutes. At least seven states have specifically outlawed online gaming. Many other states prohibit all gaming* … .

> There are criminal and civil sanctions for breach of these federal and state prohibitions, which include the possibility of significant fines, injunctions, claims for damages and imprisonment of relevant individuals (such as directors), as well as the repayment of losses suffered by US residents.

> In April 2004, [PartyGaming] was informed by Discovery Communications, the television and media company that owns the Travel Channel, that US marshals had seized over $2 million of [PartyGaming's] funds from Discovery Communications… .

> Despite the Department of Justice's stance on advertising of online gaming operations, PartyGaming continues to advertise its real money sites in the US through a number of media, including television, print and sponsorship.

(AC ¶ 44; PRJN Ex. 1 at 47-50 (emphasis added))

Shortly after PartyGaming's June 2005 IPO, but before Defendants caused ACMF to make most, if not all, of its investments in PartyGaming, major media sources widely reported on the legal risks of owning offshore gambling companies. For example, on June 26, 2005, *The New York Times* reported that, for PartyGaming, the "potential illegalities aren't just a secret hidden in its business plan – they are the centerpiece of its business plan." (AC ¶ 45)

**Law Enforcement Actions to Stop Illegal Internet Gambling by Offshore Companies**

On June 1, 2006, a U.S. grand jury indicted London-based BetOnSports Plc ("BetOnSports") – an unlawful Internet gambling business similar to PartyGaming – for racketeering, mail fraud and running an illegal gambling enterprise because it was accepting wagers from U.S. bettors in violation of U.S. law. The indictment was filed under seal, so

investors did not learn about it until July 16, 2006 when its Chief Executive Officer, David Carruthers, was arrested. (AC ¶ 50) As a result of government efforts in the U.S. to put a stop to illegal Internet gambling, PartyGaming eventually exited the U.S. market in or about October 2006. (PRJN Ex. 11, Ex. A at ¶ II(6))

Beginning after the public disclosures of the BetOnSports indictment, the share prices of publicly held gambling companies that had been taking bets from gamblers in the U.S. – including PartyGaming – fell dramatically. (AC ¶ 51)  By the time PartyGaming was forced to withdraw from the US market in October 2006, PartyGaming share price had dropped roughly 80% to approximately $0.60. (PRJN Exs. 3, 12)  Shortly after July 16, 2006, ACMF sold all of its shares of PartyGaming, causing ACMF and its investors to realize millions of dollars in losses. (AC ¶¶ 1, 3, 53; PRJN Ex. 8) There was no other material cause for the drop in PartyGaming's share price other than PartyGaming's anticipated loss of illegal U.S.-based gambling revenue due to law enforcement. That drop was the direct, proximate, natural, probable, and reasonably foreseeable consequence of Defendants' actions in causing ACMF to invest in an illegal gambling business in violation of federal criminal law. (AC ¶¶ 4, 52)  Indeed, it is no coincidence that the 80% drop in PartyGaming share price roughly corresponds to the proportion of PartyGaming's illegal revenue from the United States.

**The Losses Caused by Defendants' Wrongdoing**

Defendants do not publicly report, and Plaintiff does not know, the exact dates, purchase prices, or numbers of shares purchased and sold by Defendants on behalf of ACMF. A reasonable estimate of the loss suffered by ACMF is possible, however, based on the information

that Defendants reported to the SEC.[9] Based on this information, Plaintiff believes that the capital loss suffered by ACMF is unlikely to be less than $15 million.

**The Claims for Relief**

Plaintiff asserts claims under two provisions of RICO, 18 U.S.C. § 1962(c) and 18 § 1962(d), as well as common law claims for breach of fiduciary duty, negligence and waste. The two RICO claims and the claims for breach of fiduciary duty and negligence are asserted both individually and on behalf of the Class (the First through Fourth claims); and also derivatively, on behalf of ACMF (the Fifth through Eighth claims). The claim for waste (Ninth Claim) is asserted only derivatively.

## ARGUMENT

## I. PLAINTIFF HAS PROPERLY PLEADED HER COMMON LAW CLAIMS

### A. Choice of Law

Defendants assume that this Court should apply Maryland law to each of Plaintiff's common law claims, but that is not so. As a federal court sitting in diversity, this Court applies the choice-of-law rules of New York, the state in which it sits. *See Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006). Under New York law, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905 (1993); *accord Wall*, 471 F.3d at 416. If there is no conflict, "then the law of the forum

_____

[9] PRJN Ex. 3 is a report of the daily prices and volumes of trading of PartyGaming's shares from the time of its IPO through the end of 2006. The prices are given in English pence.  PRJN 12 is a report of the historical daily exchange rate of English pounds to the U.S. dollar. The prices obtained by converting the English price in pence to a price in U.S. dollars are consistent with the values reported in ACMF's SEC filings, Exs. 2, 5 & 6. (The values given in the SEC filings are the market values of the shares, in dollars, as of the last day of the reporting period, not the purchase price paid for the shares.)

state where the action is being tried should apply." *SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d

352, 354, 777 N.Y.S.2d 62, 64 (1st Dept. 2004). Here, there are no relevant conflicts among the

laws of Maryland (where ACMF and ACC are incorporated), Missouri (where ACMF, ACC, and

ACIM are located and where much of the conduct at issue took place), and New York with

respect to the elements of Plaintiff's common law claims.[10]

New York also applies the "internal affairs" rule, whereby issues relating to corporate

governance are governed by the law of the state of incorporation. *See Hausman v. Buckley*, 299

F.2d 696, 702 (2d Cir. 1962); *Kikis v. McRoberts Corporation*, 225 A.D.2d 455, 639 N.Y.S.2d

346 (1st Dept. 1996). But Plaintiff's common law claims do not all raise issues of internal affairs

or corporate governance. This is especially true with respect to Plaintiff's negligence claims.

There is no basis to apply the law of the state of incorporation whenever a negligent defendant is

a corporation. Plaintiff's negligence claim on behalf of ACMF against ACIM, for example,

cannot possibly be characterized as pertaining to the internal affairs of either corporation.

Because the laws of Maryland, Missouri, and New York do not discernibly conflict on any issue

relevant to whether Plaintiff has adequately pleaded her common law claims,[11] however, this

Court need not resolve which state has the greatest interest with respect to those claims.[12]

---

[10] Although they do not say so directly, Defendants implicitly contend that there is a conflict between the law of Maryland and the law of New York with respect to Plaintiff's claim for breach of fiduciary duty, in that Defendants assert that this claim does not exist under Maryland law. As discussed below, however, that is a misreading of Maryland law. In the context of the fiduciary duty owed by corporate officers and directors to the corporation, Maryland law recognizes a claim for breach of fiduciary that is not discernibly different from that available under New York law.

[11] The elements of a claim for negligence under New York, Maryland, and Missouri law are the existence of a duty of care; a breach of that duty; and injury proximately caused thereby. *See Akins v. Glens Falls City School Dist.,* 53 N.Y.2d 325, 333, 441 N.Y.S.2d 644, 648 (1981); *Rodriguez v. Budget Rent-A-Car Systems, Inc*., 44 A.D.3d 216, 221, 841 N.Y.S.2d 486, 491 (1st Dept. 2007); *Blondell v. Littlepage*, 185 Md.App. 123, 136 n.11, 968 A.2d 678, 685 n.11 (*footnote continues on next page*)

**B.      Maryland Recognizes a Claim for Breach of a Corporate Fiduciary's Duties**

Defendants claim that Maryland law does not recognize an independent claim for breach of fiduciary duty. Even assuming that Maryland law applies (which Plaintiff does not concede), Defendants are simply wrong: numerous Maryland cases recognize a claim for breach of the fiduciary duty owed by corporate officers and directors. *See, e.g., Storetrax.com, Inc. v. Gurland*, 397 Md. 37, 915 A.2d 991 (2007) (affirming trial verdict in favor of director on corporation's claim for breach of fiduciary duty because evidence showed the director's conduct was not in breach of his duties); *Mona v. Mona Elec. Group, Inc.*, 176 Md. App. 672, 934 A.2d 450 (Md. App. 2007) (affirming directed verdict on shareholder's claim for breach of fiduciary duty because director did not breach duty); *Leavy v. American Federal Sav. Bank*, 136 Md. App. 181, 764 A.2d 366 (Md. App. 2000) (affirming judgment in favor of bank on claim for breach of fiduciary duty against former president and chairman of the board). *See also Pitman v. Aran*, 935 F. Supp. 637 (D. Md. 1996) (affirming summary judgment against officer/director for breach of fiduciary duty).

Although the Maryland intermediate appellate court appeared to say, in *Vinogradova v. Suntrust Bank, Inc.*, 162 Md. App. 495, 875 A.2d 222 (Md. App. 2002), that Maryland does not recognize such a claim, that case must be read in conjunction not only with the authorities cited above, but with *Kann v. Kann*, 344 Md. 689, 713, 690 A.2d 509, 521 (1997), the Maryland Court of Appeals case cited and relied on in *Vinogradova*. The *Kann*, court held that "there is no universal or omnibus tort for the redress of breach of fiduciary duty by any and all fiduciaries."

---

(Md.App. 2009); *Jarrett v. Jones,* 258 S.W.3d 442 (Mo. 2008). *See also infra* at Point I-D (standards governing proximate cause and intervening and superseding causes are the same).

[12] Plaintiff does not dispute that Maryland law governs the questions whether Plaintiff was required to make a demand on the directors before filing her derivative suit, *see* Point II, and whether Plaintiff may maintain bring direct, as opposed to derivative claims, *see* Point III.

The court was concerned that such a generic cause of action, applicable to all fiduciaries, would create conflicts with existing law relating to trusts and to probate, and could have unintended consequences arising from the failure to consider each type of fiduciary relationship to which such a claim might apply. 344 Md. at 712, 690 A.2d at 520. *Vinogradova* applied this holding to a claim against a bank acting as broker and investment advisor, as to which no specific claim for breach of fiduciary duty exists under Maryland law. The *Vinogradova* court thus relied on *Kann* in holding that no generic, over-arching claim, applicable to all fiduciaries, could be invoked. Nothing in *Kann* – or in *Vinogradova* – can be read to alter the specific claim, traditionally recognized in Maryland, against a corporate officer or director for breach of the fiduciary duty owed to the corporation and its shareholders. The *Storetrax* and *Mona* decisions cited above, both decided in 2007 and well after *Kann* and *Vinogradova*, confirm that this specific claim for breach of fiduciary duty continues to exist in Maryland.

### C. Plaintiff Has Sufficiently Pleaded That Defendants Acted in Breach of Their Duties

Defendants treat Plaintiff's claims for negligence and breach of fiduciary duty together and argue that Plaintiff has not sufficiently pleaded a breach of duty with respect to either claim. On the contrary, the Complaint sufficiently alleges a breach of the duties owed by directors and executives to the corporation and its shareholders.

In Maryland, as elsewhere, the directors of a corporation stand in a fiduciary relation to the corporation and to its stockholders. *Storetrax.com, Inc. v. Gurland*, 397 Md. 37, 53, 915 A.2d 991 (2007); *Booth v. Robinson*, 55 Md. 419, 422 (1881). In Maryland, the standard of care a director owes to the corporation, in managing the corporation, is set forth in Md. Code, Corporations and Associations ("CAA") § 2-405.1(a), which states:

> A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves: (1) In good faith; (2) In a manner

22

he reasonably believes to be in the best interests of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

CAA § 2-405.1(a).

This statute is essentially a codification of the common law duties of good faith, undivided loyalty, and care. Defendants rely on *Mona* for their bizarre interpretation that a director is shielded from liability unless he or she acts in bad faith *and* with intent to harm the corporation *and* in an imprudent manner. To the extent that *Mona* can be read to support such an interpretation,[13] the case is at odds with the language of the statute and with the teaching of the Maryland Court of Appeals. The statute itself is clear that the duties of a director or officer are conjunctive, not disjunctive. To claim the protection of the business judgment rule, a corporate fiduciary must act in good faith *and* in a manner he reasonably believes to be in the best interest of the corporation *and* with the care that an ordinarily prudent person would use. A fiduciary fails in his duties if he fails to act consistent with any one of these principles. *See Werbowsky v. Collomb*, 362 Md. 581, 599, 766 A.2d 123, 133 (2001) (corporate fiduciary must act in good faith and best interests of corporation and with due care); *Parish v. Maryland & Virginia Milk Producers Ass'n*, 250 Md. 24, 74, 242 A.2d 512, 540 (1968) (directors liable if they act with gross or culpable negligence); *Froelich v. Senior Campus Living LLC*, 355 F.3d 802, 810 (4th Cir. 2004) ("The business judgment rule simply requires courts to defer to the decisions of

---

[13] The breach of fiduciary duty discussed in *Mona* did not involve an alleged failure to act with due care, but rather an alleged failure to act in good faith. *See* 176 Md.App. at 691, 934 A.2d at 461. The *Mona* court therefore had no occasion to focus on whether the failure to act with due care, by itself, would constitute a breach of duty; its opinion should not be read to contradict the statute on an issue that was not before it. The same is true for *Tackney v. U.S. Naval Academy Alumni Ass'n, Inc.*, 408 Md. 700, 971 A.2d 309 (2009). This is especially true because the *Mona* court elsewhere alluded to the requirement that directors act "*reasonably and* in the best interests of the corporation," 176 Md.App. at 696, 934 A.2d at 464, thus refuting Defendants' assertion that *Mona* eliminates the requirement that corporate fiduciaries act with reasonable care.

23

corporate boards unless a challenger produces evidence establishing that the directors acted fraudulently or in bad faith . . . or with gross or culpable negligence"). Thus, a fiduciary is not free to act imprudently as long as he had no intent to harm the corporation. Such an interpretation would eviscerate the statute. Rather, a failure to satisfy any one of those obligations will support a claim for breach of fiduciary duty.

Here, the Complaint alleges that Defendants were guilty of crimes, bad faith, gross negligence, willful misfeasance, reckless disregard of duty, and violation of defendant Directors' duty of loyalty. (AC ¶¶ 81, 87). These are pleaded in detail and with specificity.  (AC ¶¶ 43-45) Plaintiff also pleads additional detail about the media coverage concerning these illegal businesses, and concerning U.S. government prosecutions arising from them. (*See* AC ¶¶ 39-42; 47) Plaintiff has also pleaded that the Individual Directors acted in breach of their watchdog role as directors of a mutual fund, *see* Point I-E.  Based on these facts, a reasonable trier of fact could conclude either that Defendants acted in bad faith (since they were knowingly violating the criminal laws); or that they did not act in a manner that they *reasonably* believed was in the best interests of the corporation (because they were taking an unreasonable risk by violating the criminal laws); or that they did not act with ordinary prudence.

Defendants argue that they cannot be found to have breached their duty of care because such a claim must be based what was known about the investment at the time it was made, not on hindsight. As alleged in the Complaint, however, Defendants purchased shares from June 2005 through January 2006 and continued to hold shares through the end of July 2006. (AC ¶¶ 37, 53) As the above-quoted allegations make clear, all of the information about the illegality of PartyGaming's business was already known at the time Defendants were investing in this criminal organization. No hindsight was required to know that PartyGaming's business was

illegal or that the U.S. was prepared to prosecute companies like PartyGaming. Nor is the issue whether the risks associated with PartyGaming were appropriate in light of the total portfolio of the Fund – the investments were *illegal* and no amount of upside potential or hedging investments would render them appropriate. As the United States Attorney for the Southern District of New York stated in connection with the prosecution of an illegal gambling business, "[s]upporting illegal gambling is not a business risk, it is a crime." (PRJN Ex. 19 at 4)

For the same reason, the fact that the market price for PartyGaming may have reflected the risks associated with the illegality of the business – and a mere citation to *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), falls far short of establishing that – cannot justify these investments, any more than a really good price on a share of the neighborhood cocaine traffic would justify such an investment by a supposedly reputable mutual fund.

### D. Plaintiff Has Properly Pleaded Proximate Cause With Respect to Her Common Law Claims

#### 1. *The Court's Ruling on RICO Proximate Cause Is Not Dispositive of Plaintiff's Common Law Claims*

Defendants argue that *McBrearty* is dispositive of the issue of proximate cause with respect to Plaintiff's common law claims. This is incorrect. In *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992), the Supreme Court fashioned a specific proximate cause test based on the policy factors relevant to claims under the RICO statute. Although *Holmes* engrafted the common law concept of proximate cause onto RICO, the specific analysis used by courts in this Circuit to determine the scope of responsibility for RICO is different from that used to delimit the scope of responsibility for any particular common law claim. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 283-85 (2d Cir. 2006) (district court's dismissal of common law claims based on the dismissal of the plaintiff's RICO claims on proximate cause grounds was error).

Plaintiff satisfies common law proximate cause if Defendants' investments in PartyGaming "substantially contributed" to the investment losses of which Plaintiff complains. *See Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 314, 434 N.Y.S.2d 166, 169 (1980) ("To carry the burden of proving a prima facie case, the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury"); *Piazza v. Regeis Care Center, L.L.C.*, 47 A.D.3d 551, 554, 852 N.Y.S.2d 53, 56 (1st Dept. 2008) (same); *DeBartolo v. Coccia*, 276 A.D.2d 663, 663, 714 N.Y.S.2d 742, 742-43 (2d Dept. 2000) ("It is well settled that a defendant's negligence does not have to be the sole cause of the injury, but merely a substantial factor in bringing about the injury.").[14]

The question whether proximate cause has been shown is an issue of fact for the jury unless reasonable people could not differ. *Sweeney v. Bruckner Plaza Associates*, 57 A.D.3d 347, 348 (1st Dep't 2008). *See Becker v. Poling Transp. Corp.,* 356 F.3d 381, 392 (2d Cir. 2004); *Ingrassia v. Lividikos*, 14 Misc. 3d 1236(A), 836 N.Y.S.2d 499 (Sup. Ct. Richmond Co. 2007) (collecting New York cases). Here, the question is not whether Plaintiff has established that the investments in PartyGaming substantially contributed to her loss but only whether she has sufficiently pleaded it.

## 2.    *The Requirements of Proximate Cause Are Satisfied*

The facts alleged in the Complaint establish that Defendants' unlawful investments in PartyGaming substantially contributed to Plaintiff's investment losses and were foreseeable. Plaintiff alleges that Defendants knowingly invested in PartyGaming despite warnings in the company's prospectus that the DOJ considered 87% of its revenue to be illegal (AC ¶¶ 43-44). Defendants ignored wide-spread media coverage of actual prosecutions of illegal offshore

---

[14] Maryland and Missouri law are the same. *See ACandS, Inc. v. Asner,* 344 Md. 155, 686 A.2d
(*footnote continues on next page*)

Internet gambling. (AC ¶ 47) The risk that PartyGaming would be shut down or forced to cease accepting bets from U.S. residents was, in all likelihood, the primary and most foreseeable risk associated with Defendants' unlawful investments.

Defendants, however, have interposed as an affirmative defense that "[a]ny alleged damages suffered on the part of Plaintiffs were a direct and proximate result of a superseding intervening cause on the part of third parties and/or the Plaintiff, such that the intervening superseding cause bars any recovery by Plaintiff against these answering Defendants." (Answers ¶ 144)

Defendants are correct to treat this as an affirmative defense. *See McCullough v. U.S.*, 538 F. Supp. 694 (E.D.N.Y. 1982); *Gerbino v. Tinseltown USA*, 788 N.Y.S.2d 538, 540-41 (App. Div. 2004) (trial court properly dismissed comparative negligence and superseding cause defenses); *Perales v. City of New York*, 711 N.Y.S.2d 9, 10 (App. Div. 2000); *Matter of Ideal Mut. Ins. Co.*, 140 A.D.2d 62, 532 N.Y.S.2d 371 (1st Dep't 1988).

Certain intervening events – also called "superseding causes" – may sever the causal nexus between a defendant's wrongdoing and a plaintiff's injury for liability purposes. *See Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996) ("'The doctrine of superseding cause is ... applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of *independent origin that was not foreseeable*'") (emphasis added); 57A Am.Jur.2d, Negligence § 790, p. 701 (1989) ("The intervention, between the negligence of the defendant and the occurrence of an injury to the plaintiff, of a new, independent, and efficient cause, or of a superseding cause, of the injury renders the negligence of the defendant a remote cause of the injury, and he cannot be held

---

250 (1996); *Harashe v. Flintkote Co.,* 848 S.W.2d 506 (Mo.App. 1993).

liable, notwithstanding the existence of some connection between his negligence and the injury"). "The general rule is that if a defendant is negligent and his negligence combines with that of another, or with any other independent, intervening cause, he is liable, although his negligence was not the sole negligence or the sole proximate cause, and although his negligence, without such other independent, intervening cause, would not have produced the injury." *Sundermeyer v. SSM Regional Health Services*, 271 S.W.3d 552, 555 (Mo. 2008) (*en banc*) (quotations and citations omitted).

For a later cause to *supersede* the original cause, it must be *independent* of the original cause. As the Supreme Court long ago explained,

> The proximate cause is the efficient cause, the one that necessarily sets the other causes in operation. The causes that are merely incidental or instruments of a superior or controlling agency are not the proximate causes and the responsible ones, though they may be nearer in time to the result. *It is only when the causes are independent of each other that the nearest is, of course, to be charged with the disaster.*

*Aetna Ins. Co. v. Boon*, 95 U.S. 117, 130 (1877) (emphasis added).

For a cause nearer in time to be an "independent" cause it must be neither foreseeable nor part of the risk created by the defendant's wrongful act. As Judge Friendly explained:

> not every new force insulates a negligent defendant from liability or a plaintiff guilty of contributory fault from the consequences. The principle is limited to "intervening causes which could not reasonably be foreseen, and which are no normal part of the risk created."

*East Hampton Dewitt Corp. v. State Farm Mut. Auto. Ins. Co.*, 490 F.2d 1234, 1240 (2d Cir. 1973) ), *quoting* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 44, p. 281 (5th ed.1984) (hereinafter Keeton). *Accord Woodling v. Garrett Corp.*, 813 F.2d 543, 556 (2d Cir.1987); *Bonsignore v. City of New York,* 683 F.2d 635, 638 (2d Cir. 1982) ("'[a]n intervening act may not serve as a superseding cause, and relieve an actor of responsibility, where the risk of the intervening act occurring is the very same risk which renders

the actor negligent'"), *quoting Derdiarian,* 51 N.Y.2d at 316, 414 N.E.2d at 671, 434 N.Y.S.2d at 170.

Put simply, "the doctrine has no application when the intentional or criminal intervention of a third party or parties is reasonably foreseeable." *Kush by Marszalek v. City of Buffalo*, 59 N.Y.2d 26, 33 (1983), *citing Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507 (1980); Restatement (Second) Torts §§ 448, 449). *Accord McCullough v. U.S.*, 538 F. Supp. at 699 ("if the intervening cause, whether negligent or not, is foreseeable, it cannot supersede the original negligence"), *citing Ingham v. Eastern Air Lines, Inc.*, 373 F.2d 227, 237 n.11 (2d Cir. 1967); *Preston v. Cauldwell-Wingate Co.*, 176 F.2d 237 (2d Cir. 1949) (L. Hand, J.); *Derdiarian,* 51 N.Y.2d at 315; Prosser, Law of Torts, s 44 (4th ed. 1971).[15] To avoid liability, "an intervening cause must 'so entirely supersede (the first actor's) negligence that it alone without his negligence contributing thereto in any degree produces the injury.'" *McCullough v. U.S.*, 538 F. Supp. at 699, *quoting Foley v. State*, 265 A.D. 682 (4th Dept. 1943).

A leading treatise on federal jury instructions recommends the following jury instruction with respect to intervening actions by third parties:

> If you find that defendant was negligent but that the plaintiff's injuries were caused by the act of a third person, defendant may be liable for such injuries, if you further find that a reasonably prudent person, situated as defendant was prior to the happening of the incident, *would have foreseen an act of the kind committed by the third person* as a probable consequence of defendant's negligence.

---

[15] The laws of Maryland and Missouri are the same. *See Moore v. Myers,* 161 Md. App. 349, 868 A.2d 954 (Md. App. 2005) (intervening event not a superseding cause when it "might, in the natural and ordinary course of things, be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of causation"); *Lewis v. Biegel*, 204 S.W.3d 354, 362-63 (Mo. App. 2006) ("an intervening or superseding act will only be considered to have severed the causal connection when it is independent of the original actor's negligence and eclipses the role of the original actor's negligence in the plaintiff's injury).

3 K. O'Malley, J. Grenig, W. Lee, Federal Jury Practice and Instructions § 120.62 (5th ed.) (emphasis added). *See also Stanford v. Kuwait Airways Corp.*, 89 F.3d 117, 127 (2d Cir.1996); *Benitez v. New York City Bd. of Educ.*, 73 N.Y.2d 650, 659 (1989).

Here, as noted above, the risk of government enforcement was not merely within the scope of the risk created by Defendants' conduct. It was the single most obvious risk associated with their illegal investments. The illegality of Internet gambling was well established and had been widely publicized in the news media. The risk of law enforcement (and resulting investment loss) had been painstakingly spelled out in the PartyGaming prospectus – and Defendants were aware of it.

This Court cannot properly resolve Defendants' affirmative defense of intervening cause *against* Plaintiff on a motion addressed to the pleadings. "[F]oreseeability and causation ... are issues generally and more suitably entrusted to fact finder adjudication." *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 216 (2d Cir.2002) (*quoting Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579 (1994)). *Accord Derdiarian*, 51 N.Y.2d at 315 ("[b]ecause questions concerning what is foreseeable and what is normal may be the subject of varying inferences, [whether the plaintiff's actions supersede the defendant's negligence] generally [is] for the fact finder to resolve"). *See generally*, Restatement (Second) of Torts §§ 440; Keeton § 44.

If anything, this issue must be resolved in Plaintiff's favor as a matter of law because no reasonable jury could conclude that enforcement of the criminal law was unforeseeable. The *In Re September 11 Litigation*, 621 F. Supp.2d 131, 148 (S.D.N.Y. 2009), court rejected a superseding intervening cause defense as a matter of law, saying:

> Just as an employer should foresee that his employee may perform negligently, *see, e.g., Connell v. Hayden*, 443 N.Y.S.2d 383, 395 (App. Div. 1981), and a product designer should foresee that a user may misuse a designed product, *see, e.g., Jurado v. W. Gear Works*, 619 A.2d 1312, 1319 (N.J. 1993), so the Aviation

>Defendants had to have foreseen that government-supplied intelligence and warnings might have been incomplete, insufficient, or not heeded.

Likewise, in this case, the Defendants must be deemed to have foreseen as a matter of law that the government would seek to enforce the criminal laws against off-shore Internet gambling companies taking wagers from gamblers in the U.S. Indeed, Defendants do not argue that government enforcement was unforeseeable.

Instead, Defendants argue that if it was "already common knowledge among the general public … that PartyGaming's activities were potentially illegal, then it cannot be the alleged illegality of those operations that caused the stock price to drop – *it was the enforcement activity related thereto*. These new allegations thus forcefully drive home the clear application to this case of the Court's [*McBrearty*] conclusion." (Institutional Defendants' Memorandum of Law in Support of Motion for Judgment on the Pleadings ["Inst. Def. Br."] at 17) (emphasis added) Instead, the opposite is true. Their argument demonstrates a crucial shift by Defendants away from the rationale of *McBrearty*. In *McBrearty*, this Court held that there was no RICO proximate cause because it viewed the plaintiffs' damages as the "reaction of the stock price to the *publicity following* the government's investigation of those operations." 2009 WL 875220, at *3 (emphasis added). This Court also based its proximate cause ruling on its view that the plaintiffs' damages in *McBrearty* resulted from the mere "exposure" of RICO violations through law enforcement, as opposed to the RICO violations themselves. *Id.*

Defendants' argument here recognizes that, as a factual matter, Plaintiff does *not* allege that Defendants' unlawful investments lost value *because of the exposure of or publicity surrounding* PartyGaming's illegal operations or the DOJ's enforcement efforts. PartyGaming did not lose market value because law enforcement exposed the illegal nature of its activities. As Defendants grant in their argument, it was *already* public knowledge that the DOJ considered

PartyGaming's primary operations to violate U.S. law. Government law enforcement should not have come as a surprise to any investor. Contrary to the implicit assumption of this Court in *McBrearty*, PartyGaming's market value dropped because the market factored in the imminent loss of PartyGaming's illegal revenue stream following law enforcement efforts. PartyGaming's illegal revenue stream in fact disappeared when the U.S. government finally succeeded in enforcing the law against the company. The loss of illegal revenue following enforcement of the criminal laws is a foreseeable risk of investing in an illegal business, and this is sufficient to establish proximate cause. Plaintiff therefore agrees with the premise of Defendants' argument and respectfully submits that it demonstrates why the holding in *McBrearty* should not be dispositive of *any* proximate cause issues here.

### E.        Plaintiff Has Stated a Claim for Waste

Plaintiff has adequately pleaded waste because using Fund assets to illegally purchase shares of unlawful gambling organizations constitutes a waste of assets. Defendants argue that the Complaint does not allege waste because there are no allegations that the Funds "received no consideration at all" for their investments, or even that they paid too much. (Inst. Def. Br. at 24). But while asserting that Maryland land governs and that Maryland courts look to Delaware law on the issue of waste, Defendants read Delaware law too narrowly as to the scope of a claim for waste. In *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979), the Supreme Court of Delaware stated that "[t]he essence of a claim of waste of corporate assets is the diversion of corporate assets for *improper or unnecessary* purposes." (Emphasis added). Thus, in *Delta Star, Inc. v. Patton*, 76 F. Supp. 2d 617 (W.D. Pa. 1999), the court, applying Delaware law, found that the corporate plaintiff's former president committed corporate waste by awarding himself salary increases and bonuses that bore no reasonable relationship to his services or contributions to the

financial performance of the company. The Court did not require the plaintiff to prove that the services and contributions of the executive had been worthless.

Similarly, in *Hollander v. Breeze Corporations, Inc.*, 26 A.2d 507 (N.J. Ch. 1941), shareholders brought a derivative action alleging that directors of the corporation were liable to them for permitting corporate funds to be withdrawn by the corporation's president without supporting documentation. The president used corporate assets for personal travel, entertainment and incidentals. The court found the directors had committed waste of corporate funds, mismanagement and dereliction of duty. *Cf. Agency Rent-A-Car, Inc. v. Gateway Industries, Inc.*, 1980 WL 3040 (Del. Ch. 1980) (plaintiff alleged evidence of corporate waste and mismanagement so as to be permitted to make inspection of corporate records where the president of the defendant used corporate credit cards for personal reasons).

Defendants' reliance on *White v. Panic*, 783 A.2d 543 (Del. 2001), is misplaced. In that case, corporate assets were not used for an *ultra vires* purpose. *See McQuillen v. National Cash Register Co.*, 112 F.2d 877, 884 (4th Cir. 1940) (applying Maryland law and finding that challenged contract did not constitute waste where, *inter alia*, "there was nothing in the charter of the corporation or the corporation laws of the State of Maryland which would render this contract illegal or ultra vires.") The court merely declined to "weigh the 'adequacy' of consideration" for a lawful corporate transaction. *Id.* at 554. Here, Plaintiff does not argue that Defendants paid too much for the PartyGaming stock. Nor do they ask this Court to "second guess" the business judgment of Defendants. Use of corporate proceeds in violation of federal and state criminal laws requires no such balancing because it is *per se ultra vires* and outside the realm of business judgment. For similar reasons, *Steiner v. Meyerson*, 1995 WL 441999, at *1 (Del. Ch. July 19, 1995), is inapposite.

### F.  Plaintiff Has Alleged Culpable Conduct on the Part of the Independent Directors

The Independent Directors argue that the Complaint fails plausibly to allege their involvement in the wrongdoing by the other defendants. Their argument seems to be that because they are "independent" directors, it is not plausible to believe that they were culpably involved in the scheme to invest in illegal gambling companies, in the absence of specific allegations of their individual participation in the scheme. They liken this case to *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), where the Supreme Court rejected as conclusory allegations that the Attorney General had been involved in the plaintiff's torture.

In making their argument, these directors conveniently ignore key factual allegations of the complaint:

> To an even greater degree than the directors of ordinary corporations, mutual fund directors, including the Directors, are responsible for protecting a mutual fund's investors under a unique *watchdog role*. Thus, each of the Directors had a special duty to ensure that ACMF did not invest in criminal activities and enterprises, including illegal gambling businesses.

(AC ¶ 88 (emphasis added). *See also* AC ¶ 89 ("[t]he Directors also had a duty to ensure that ACMF had proper control mechanisms to ensure that it did not make any investments in any illegal gambling businesses.")) The complaint also alleges that each of the Defendants "had operational or managerial control over ACMF" (AC ¶ 59) and "actually exercised operational or managerial control over ACMF." (AC ¶ 60) Indeed, Independent Directors even ignore their own affirmative defense that they performed due diligence. (Answer ¶ 158) Not only do these defendants ignore the "watchdog" and "control" allegations, they assert, without any factual or legal support, that the role of independent directors is somehow limited to merely providing "oversight of the management process." (Ind. Dir. Br. at 1 n.1. *See also id.* at 6)

The allegations that these defendants ignore are neither "implausible" nor "conclusory." The watchdog role of these directors is well established as a matter of law:

> Thus what was then section 10 of the Investment Company Act of 1940, 54 Stat. 806, required that at least 40 percent of a mutual fund's board of directors not be officers or employees of the investment company or "affiliated" with its investment adviser. This key provision was designed to place the unaffiliated directors in the role of "independent watchdogs" who would assure that, in accordance with the preamble of the Investment Company Act, mutual funds would operate in the interest of all classes of their securities holders, rather than for the benefit of investment advisers, directors, or other special groups.

*Tannenbaum v. Zeller*, 552 F.2d 402, 406 (2d Cir. 1977), *quoted with approval* in *Burks v. Lasker*, 441 U.S. 471, 484 (1979).

According to its SEC filings, in 2006, ACMF had a "Fund Performance Review" committee of the Board of Directors, which included all of the directors sued in Paragraph 18 of the Complaint who are not defined as an interested person under the 1940 Act. (PRJN Ex. 17 at 32) That Committee reviewed on a quarterly basis the "investment activities and strategies used to manage fund assets[, and it] regularly receive[d] reports from portfolio managers and other investment personnel concerning the funds' investments." (*Id*.)

Because of the legal responsibilities of these defendants and the reports they received, it is at least plausible that they knowingly participated in the scheme and reasonable to expect that discovery will reveal evidence to support the claim. Furthermore, if, as these defendants would have this Court *implausibly* imagine, they were ignorant of the investments at issue, they would nevertheless be liable as if they had knowledge. Given their legal responsibilities and the reports they received, ignorance would be tantamount to recklessness, which is the legal equivalent of actual knowledge. *Lanza v. Drexel & Co*., 479 F.2d 1277, 1301 (2d Cir.1973) (en banc).

The Independent Directors' reliance on Commission Guidance Regarding the Duties and Responsibilities of Investment Company Boards of Directors With Respect to Investment

Adviser Portfolio Trading Practices, Investment Company Act Release No. 2763, 93 S.E.C. Docket 2469, 2008 WL 2917621 (July 30, 2008), is misplaced. In that release, the SEC observed that, "[a]lthough directors are not required or expected to monitor each trade, they should monitor the adviser's trading practices and the manner in which the adviser fulfills its obligation to seek best execution when trading fund portfolio securities." In their brief to this Court, Defendants quoted only the first clause of that sentence: "directors are not required or expected to monitor each trade." They misleadingly omitted the second clause, which makes clear that directors have a responsibility to monitor investment advisers' trading practices. Read as a whole, the SEC's Release is entirely consistent with Plaintiff's position: the independent directors are supposed to be "watchdogs" who have (i) all of the common law duties of directors of ordinary corporations under state law, (ii) all of the duties of mutual fund directors generally, and (iii) all of the additional duties of independent directors.  If these "watchdogs" were aware of these investments and allowed them to continue, then they are liable. If they were ignorant of them, then they may be slightly less culpable, but they are equally liable.

The Independent Directors also rely on *In re Syntex Corp. Secs. Litig.,* 855 F. Supp. 1086, 1100 (N.D. Cal. 1994), but *Syntex* was a securities fraud case governed by the particularity requirement of Rule 9(b). As *Syntex* recognizes, even in cases governed by Rule 9(b), group pleading is permitted if the members of the group have day-to-day responsibilities "or if they otherwise have a *special relationship or status* with the corporation." 855 F. Supp. at 1100 (emphasis added). *Syntex* involved outside directors of an ordinary corporation. It did not involve independent mutual fund directors who were supposed to be "watchdogs" and who were members of the "Fund Performance Committee" that was explicitly charged with monitoring investment activity. Where, as here, (i) the pleading is governed by Rule 8(a)(2) not Rule 9(b),

(ii) the defendants are mutual fund directors charged with a "watchdog" role and other responsibilities as members of a special committee overseeing investments, and (iii) the claims involve facts solely within the defendants' knowledge, group pleading is allowed.

## II.   PLAINTIFF HAS PROPERLY PLEADED THAT SHE IS EXCUSED FROM MAKING A DEMAND ON THE DIRECTORS OF THE NOMINAL DEFENDANTS

Defendants claim that Plaintiff may not pursue any of her claims as derivative claims because she failed to make a demand on the Board of Directors of the Nominal Defendant. Contrary to Defendants' arguments, however, Plaintiff is excused from making a demand.

A derivative suit is an equitable device that allows shareholders to protect corporations from misfeasance and malfeasance by faithless directors and managers. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95-96 (1991). Fed. R. Civ. P. 23.1 requires that a derivative plaintiff make a pre-suit demand on the board of directors to commence the action or state with particularity the reasons why such efforts were not made.

Because the nominal defendant is a Maryland corporation, demand futility is governed by Maryland law. *Kamen*, 500 U.S. at 108-109. Under Maryland law, demand on the board of directors of the nominal defendant is excused when plaintiff alleges

> either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

*Werbowsky v. Collomb*, 362 Md. 581, 620, 766 A.2d 123, 144 (2001). In this case, demand is excused under either prong.

A.     **Demand is Excused Because the Directors of ACMF Are Directly Conflicted and Committed to Their Decision and Cannot Be Expected to Respond in Good Faith**

1.     *The Directors Are Conflicted Because They Owe Fiduciary Duties to All 18 Funds Separately Operating within the ACMF Corporate Structure*

Plaintiff has sufficiently alleged that the directors of ACMF have direct and specific conflicts so as to excuse her from making what would clearly be a futile demand. These conflicts arise not, as Defendants suggest, from Plaintiff's general allegations that the directors participated in the wrongdoing, but rather from the specific structure of ACMF and its mutual funds. As the Supreme Court has explained:

> unlike most corporations, an investment company is typically created and managed by a pre-existing external organization known as an investment adviser … . Because the adviser generally supervises the daily operation of the fund and often selects affiliated persons to serve on the company's board of directors, *the relationship between investment advisers and mutual funds is fraught with potential conflicts of interest*.

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984) (emphasis added). This conflict situation is particularly acute in the case of American Century and its mutual funds. As alleged in the Complaint:

> ACMF is a "series" mutual fund. A series mutual fund is one that has two or more portfolios of securities, each offering a separate series or class of stock to investors. Each portfolio of a series mutual fund generally has different investment objectives, policies, practices, and risks. The shareholders of each portfolio do not participate in the investment results of any other portfolio and must look solely to the assets of their portfolio for most purposes, including redemption, liquidation, earnings, and capital appreciation. Each series of stock represents a different group of stockholders with an interest in a segregated portfolio of securities. Each separate portfolio is commonly referred to as a "fund."

(AC ¶ 15) Here, the Fund is just one of 18 "series" of shares offered by ACMF. None of the 18 "funds" is a separate legal entity. (*Id.* at ¶ 16) Moreover, "ACMF has a single board of directors,

38

which manages all 18 of its funds." (*Id. See also id.* at ¶ 19 ("The Fund does not have a board of directors separate from the board of ACMF."))

The defendants in this case (besides the individual directors) include the parent company of ACMF and the investment advisor (ACIM). As alleged in the Complaint, ACIM serves as investment advisor to *all* of the series funds offered by ACMF. (*See* AC ¶¶ 21, 84) It is from these overlapping relationships that the directors' conflict of interest arises.

The directors of ACMF have fiduciary obligations to *all 18* of the funds offered by ACMF, not only to the Fund at issue here. (*See* AC ¶ 82) The directors' conflict arises because although the assertion of the claims at issue are in the best interest of the Fund, their prosecution are not in the best interests of the other 17 funds that did not invest in illegal gambling activities. Any significant judgment against ACC or ACIM could adversely affect those 17 funds. As the Complaint explains:

> The interests of the investors in the other funds that constitute ACMF are antagonistic to those of the investors in the Fund because the fees paid directly or indirectly to ACC and ACIM by ACMF and allocated by Defendants to the Fund help cover the expenses or losses of the other funds that compose ACMF.
>
> According to ACMF's official filings with the United States Securities and Exchange Commission ("SEC"), ACIM is responsible for providing or arranging for all services necessary for the operation of all the separate funds that compose ACMF. ACIM obtains the funds to pay for all such operation expenses in part from the fees allocated to the Fund.
>
> Were the Plaintiffs to prevail in this litigation, ACIM would be liable to forfeit an amount equal to three times all of the fees it has received on account of its management of the Fund's portfolio from the time that Defendants first caused ACMF to purchase shares in illegal gambling businesses. In that event, ACIM would be unable to continue covering the operational expenses of the other funds that compose ACMF as well as funds to which the board of directors also have fiduciary duties. As a result, it is contrary to the interests of investors in the other funds for Plaintiff to succeed in this action. All of the directors therefore have an irreconcilable conflict of interest with respect to this action because they owe a duty of undivided loyalty to multiple groups of investors whose interests directly and irreconcilably conflict.

(AC ¶¶ 83-85)

These detailed allegations sufficiently allege the directors' conflict of interest. Contrary to defendants' characterization, these allegations of conflict are neither conclusory nor lacking in factual detail. Indeed, ACMF's filings with the SEC confirm the allegations in the Complaint. In ACMI's Annual Report as of October 31, 2006, Defendants disclosed that the Fund shouldered *half of all the fees* that ACMF paid to ACIM – the investment advisor for all of the "series" mutual funds that compose ACMF. Because of the large amount of fees that ACIM allocated to the Fund, Defendants were able to subsidize the fees and expenses of at least two underperforming funds operating under the ACMF corporate entity in 2006 (*e.g.,* the Mid Cap Growth Fund and the Small Cap Growth Fund); and at least one fund in 2004 (*i.e.,* the Giftrust Fund for over $4 million in subsidized management fees). (PRJN Ex. 21)

The fees that the Fund paid to ACIM on behalf of ACMF from the time that Defendants first breached their fiduciary duties to Plaintiff are subject to forfeiture in this action. *See Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 199-200 (2d Cir. 2003). Forfeiture of ACIM's fees would adversely affect the shareholders of all the other series funds that compose ACMF because those funds were subsidized by, and have a reasonable expectation of continued subsidies from, the large amount of fees that the Fund pays to ACIM on behalf of ACMF. Were Plaintiff to prevail in this litigation, the subsidies would cease and prior subsidies may be liable to reallocation. This presents an irreconcilable conflict of interest between (a) the Fund and (b) all the other 17 funds in ACMF with respect to the outcome of this litigation. The Independent Directors are therefore disqualified from determining, on behalf of Nominal Defendant ACMF, whether to pursue claims against ACIM.

ACMF's directors here are interested as a matter of law because they are faced with an even greater conflict than in *Freeport*. The ACMF directors owe duties of undivided loyalty to the shareholders of all 18 funds that make up ACMF. Accordingly, they face an irreconcilable conflict because they cannot serve the competing interests of the Fund and the remaining 17 funds within the ACMF corporate structure.

The conflict of interest faced by ACMF's board with respect to the claims in this litigation are therefore of an entirely different character than the typical allegations of director conflict that courts sometimes reject. With respect to the conflict of interest presented by the claims in this litigation, Plaintiff does not ask this Court to assume that the directors of ACMF will be unwilling or able to put aside their personal considerations and honor their fiduciary commitments. On the contrary, Plaintiff asks this Court to assume that these individuals would take their fiduciary obligations seriously, but *their fiduciary obligations to the 18 different funds create an insoluble conflict*, because the interests of the different funds themselves conflict here. Demand is futile here because no amount of good faith or fair-mindedness or independence can overcome the directors' obligation to act in the best interest of the other 17 funds, which may prevent them from acting in the best interests of the one Fund at issue here.

Defendants cite *Scalisi v. Fund Asset Management, LP*, 380 F.3d 133 (2d Cir. 2004), but *Scalisi* is of no help to their arguments. In that case, the court found that mere service on the boards of multiple funds offered by the same company, with the attendant compensation for each one, did not *by itself* render demand futile as a matter of law. Thus, the conflict alleged in *Scalisi* was, purportedly, between the interest of the fund in question and the directors' self-interest in maintaining their positions with the various funds, not between the interests of the various funds. The *Scalisi* court had no occasion to consider whether the board members' conflicting duties of

loyalty to the various funds would affect their ability to address a specific issue that could benefit a single fund, but damage the rest, as is specifically alleged here.

The primary argument raised by Defendants against this irreconcilable conflict of interest is that Plaintiff's reference to treble damages would not apply upon dismissal of the RICO claim. (Inst. Def. Br.at 17) Even without treble damages, ACC and ACIM face substantial liability on the state law claims, and forfeiture of management fees charged to the Fund would still constitute more than half of all the fees that ACIM receives from ACMF. This liability would be contrary to the interests of the other funds that are part of ACMF, and to which the directors owe equal fiduciary duties. Therefore, the irreconcilable conflict is heightened by, but is not dependent on, the trebling of those damages. In addition, as the Maryland Court of Appeals has recognized, at this stage of the case, Plaintiff need only plausibly *allege*, not prove, the conflict that demonstrates the futility of demand; after discovery, plaintiff may be put to her proof on the issue of demand futility as well as on other issues. *Werbowsky*, 362 Md. At 620-22, 766 A.2d 144-45. Because the issue of futility remains in the case even after the pleading stage, there is no basis to hold plaintiff to a higher standard in pleading futility than is applicable to any other element of her case. Finally, even if Defendants are correct in their argument, this Court should await the decision of the Second Circuit in *McBrearty* because the viability of the RICO claims (and treble damages) by Defendants' own arguments would have substantial bearing on the issue of demand futility.

The Individual Directors also claim that their conflict of interest did not render demand futile because, they argue, the Court should examine the extent to which the conflict commits the directors to the underlying investments in illegal gambling – and not to whether they can independently determine to pursue the litigation *via* demand. This argument is nonsense.

Defendants have already sold the precise investments at issue in this case by the end of July 2006. Although the potential threat of future unlawful investments by Defendants still exists, *the only decision still in dispute is Defendants' failure to pursue claims against ACIM and ACC* for having made those investments in the first place. It is *this* decision that the directors' overlapping positions preclude them assessing in a fair and independent manner, because it is this decision that may adversely affect the other 17 funds to which these directors owe a fiduciary duty of undivided loyalty.

Moreover, unlike in *Werbowsky*, 362 Md. 581, 766 A.2d 123, where the plaintiff sued on the very next day after the challenged decision, Plaintiff here did not act so precipitously as to deny the directors the opportunity to act if they were inclined to do so. This action was commenced more than two years after the indictment of BetOnSports highlighted the illegal nature of these investments and caused the Fund to suffer its losses. *See* AC ¶¶ 50-53. During that time, the directors took no steps to recoup the Funds' losses from those responsible for it. Their inaction after learning of the losses and its cause is relevant to show that a demand would have been futile.

### 2. *The Directors Are Conflicted Because of Their Own Potential Liability*

Plaintiff has also sufficiently alleged that ACMF's directors are conflicted because of the potential that they themselves would face civil or criminal liability. (*See* AC ¶¶ 81, 87) This is not the usual circular allegation Defendants parody, whereby a plaintiff asserts that the directors are wrongdoers and then asserts demand futility based on the directors' presumed wrongdoing. The issue here is not so much that the directors might have had to sue themselves *as that they faced (and face) the potential for criminal liability.* This is not fanciful, given the criminal prosecutions that have already occurred:

- Jay Cohen, the CEO of World Sports Exchange, was convicted and sent to prison for operating an illegal gambling business, because his company, although perfectly legal in Antigua where it was based, solicited bets from U.S. residents (AC ¶¶ 39-40);

- Peter Dicks, the independent, non-executive chairman of Sportingbet was arrested in New York on gambling charges (PRJN Ex. 18);

- David Carruthers, the chief executive of BetOnSports, was arrested in Dallas and charged with racketeering fraud, tax evasion, and conspiracy (AC ¶ 50);

- Anurag Dikshit, a major shareholder, director, and officer of PartyGaming (the company that ACMF invested in) pleaded guilty to charges of illegal gambling (AC ¶ 42);

- On January 15, 2007, NETeller's founders, Stephen Lawrence and John Lefebvre, were arrested and charged with conspiracy to violate various anti-gambling laws, including § 1955. Lawrence and Lefebvre pleaded guilty to various felonies in connection with operating NETeller, including § 1955. They also agreed to personally forfeit an additional $100 million (PRJN Ex. 19);

- Gary Kaplan, the founder of BetOnSports, pleaded guilty to RICO charges arising from illegal internet gambling; he agreed to serve 41 to 51 months in prison and forfeit $43.65 million (PRJN Ex. 20).

When CEOs and directors are being sent to prison for violating RICO in connection with offshore Internet gambling companies, it would only natural for the directors of ACMF to be

concerned about whether they, too, might face prosecution were the circumstances surrounding ACMF's investment in these activities – itself a violation of RICO – fully aired.

In this respect, it is entirely irrelevant that Plaintiff's civil RICO claims have been dismissed. First, the dismissal of civil RICO charges *for lack of proximate cause* has no bearing on whether the directors might face criminal liability for the same conduct; no causal connection between the criminal acts and any particular plaintiff's or company's injury must be shown in order to sustain criminal charges. Second, the RICO claims had not been dismissed at the time plaintiff commenced her lawsuit, the point at which she determined that demand would be futile.

The Independent Directors assert that the prospect of criminal liability cannot, as a matter of Maryland law, excuse the demand, but they cite no authority for that proposition. Rather, they rely on the absence of any Maryland case dealing with these precise facts. That argument ignores, however, that under *Werbowsky*, demand is excused when "a majority of the directors are so personally and directly conflicted … that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." 362 Md. 581, 766 A.2d 123. The Independent Directors fail to explain why the prospect of personal criminal liability would not constitute such a direct and personal conflict under *Werbowsky*.

The Institutional Defendants argue that, under *Delaware* law, potential criminal liability does not excuse demand. Even if Delaware law applied – which it doesn't – Defendants are wrong.

Defendants justify their resort to Delaware law by the relative paucity of Maryland cases applying the *Werbowsky* standard. *See* Inst. Def. Br. at 17 n.10. But the assumption that Maryland courts would look to Delaware law for guidance as to how to apply *Werbowsky* cannot be correct, for the simple reason that in *Werbowsky*, the Maryland Court of Appeals rejected the

Delaware approach to demand futility. Because the states apply different standards, it makes no sense to look to the law of Delaware to construe the Maryland standard.[16]

But even if Delaware law did provide appropriate guidance, Defendants' argument would still fail because, under Delaware, the directors' potential criminal liability also excuses demand futility. Under Delaware law, demand is excused when "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). The Delaware Chancery Court's opinion in *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007) – a case not cited by Defendants – applies this standard and demonstrates why demand is excused in this case. In *Ryan*, the plaintiff filed a derivative action on behalf of Maxim Integrated Products, Inc. The plaintiff alleged that the members of Maxim's compensation committee, which included three members of the six then current members of Maxim's board of directors, had approved back-dated options for Maxim's chairman and CEO. The court held that the challenged conduct satisfied *Aronson*. In particular, the directors had "a disabling interest for pre-suit demand purposes when 'the potential for liability is not a mere threat but instead may rise to a substantial likelihood.'" *Ryan*, 918 A.2d at 355. The court noted

---

[16]   The one case cited by Defendants in support of their claim that Delaware law provides guidance on the *Werbowsky* standard, *Sekuk Global Enterprises Profit Sharing Plan v. Kevenides*, 2004 WL 1982508 (Md. Cir. Ct. May 25, 2004), is a five-year old, unreported trial court decision. According to Westlaw, not a single Maryland case has cited *Sekuk* for this proposition. Defendants also seek to justify their resort to Delaware law by suggesting that Maryland law is more stringent, so that if the Delaware standard is not met, the Maryland standard, *a fortiori*, is not met. But legal frameworks are not laid out on a yardstick, with one consistently "greater" than another. The Delaware and Maryland analyses are *different*, which is not to say that one is always more lenient than the other, but only that they consider different factors and reach different results on some facts.

that because backdating options violated the express grant of power provided under a shareholder-approved compensation plan, a "director who approves the backdating of options faces at the very least a substantial likelihood of liability." 918 A.2d at 355. *See also Sanders v. Wang*, 1999 WL 1044880 (Del. Ch. Nov. 10, 1999).

The facts alleged in the present Complaint raise an even more compelling case for demand futility. Instead of mere violation of a shareholder compensation plan, Plaintiff here alleges that the Directors were members of a RICO conspiracy, that they breached their fiduciary duties, that they were negligent, and that they committed waste.

Moreover, the *Ryan* court specifically noted that "[w]ere the board to pursue a derivative suit, it might unearth facts that would subject directors to further civil and criminal liability." 918 A.2d at 356, n.38. The threat of unearthing additional facts that could expose the Directors to criminal and civil liability is particularly strong in this case. We note that arguably less culpable third-parties – including, for example, The Discovery Channel – have been subject to large asset seizures by the DOJ merely for taking advertising money from the gambling companies in which Defendants invested. (AC ¶¶ 44, 47) And the Directors cannot be indemnified for their personal financial liability under RICO or for other serious wrongdoing because that would be contrary to public policy.

> 3.    *The Directors Are Committed to Their Decision Not to Pursue Claims Arising from the Fund's Investments in PartyGaming*

In addition, all of the directors are so committed to their position that the investments were legal and the claims at issue have no merit, that they cannot be expected to respond in good faith to a demand. Although in most cases defendants move to dismiss before answering the complaint, here, Defendants – including the inside and the independent directors – answered and then moved for judgment on the pleadings. Moreover, directors have not limited their arguments

to the absence of a demand or other procedural arguments, but have attacked the substance of Plaintiff's claims. In their Answers, the directors assert that any damages suffered were the result of an intervening superseding cause (Answer ¶ 144); that the "companies" in which ACMF invested operated legally in the states in which they conducted business, so that investment in them cannot constitute a predicate act under § 1955 (Answer ¶ 157); and that the directors "performed due diligence to the extent required by applicable law" (Answer ¶ 158). Their briefs on this motion argue vehemently that any claims asserted on behalf of ACMF lack merit.  The Answers and the motion papers indicate that the directors are entirely committed to these positions – indeed, that may be legally bound by them.

When coupled with the passage of time between ACMF's losses from its investments in PartyGaming and the filing of this action – a span of nearly three years – it is clear that the directors have already made up their minds that they, along with ACC and ACIM, behaved properly; that their investments were legal; and that ACMF has no valid claims. They cannot reasonably be expected to respond to a demand in good faith or within the ambit of the business judgment rule given that they have obviously already made up their minds *and* committed themselves to a course of (non) action. Under these circumstances, demand is excused.  *See Werbowsky*, 362 Md. at 620, 766 A.2d at 144.

### B.     Demand Is Also Excused Because It Would Cause Irreparable Injury to the Fund

Demand should also be excused because, in light of the affirmative steps the directors have taken to attack the substance of the Complaint, the Nominal Defendant ACMF is no longer capable of asserting these claims on its own behalf. Accordingly, ACMF will be irreparably harmed if Plaintiff is not allowed to pursue these claims on a derivative basis. *See Werbowsky*, 362 Md. at 620, 766 A.2d at 144.

Along with the ACC, ACIM, and the directors, ACMF answered the Complaint before moving for judgment on the pleadings. As was true for the other defendants, ACMF has not limited its arguments to the absence of a demand or other procedural arguments, but has attacked the substance of Plaintiff's claims and asserted the same defenses (Answers ¶¶ 144, 157, 158). ACMF would, in all likelihood, be precluded from taking the opposite position in any litigation the directors brought on its behalf; at the very least, these assertions would be damaging, if not fatal, to ACMF's claims.

The damage done in the Answer has been aggravated by the arguments made on ACMF's behalf by the Independent Directors on this motion. The Independent Directors have moved for judgment on the pleadings not only because of the lack of demand but also on the asserted basis that the Complaint fails to state any claim as a matter of law. They have joined in the motion filed by the Institutional Directors and adopted the arguments asserted by them, and have made additional arguments of their own. These arguments flesh out the defenses asserted in the Answer, elaborating on Defendants' positions that their investments were legal, that the government crackdown on off-shore illegal gambling was a superseding cause of any injury suffered by the Fund, and that the directors behaved properly at all times. In light of the extent to which Defendants have asserted and developed these arguments, it would be impossible for the ACMF now to seek redress against any of the Defendants in a separate action, for it would be obliged to take positions directly contrary to those asserted in the Answer and in the briefing submitted to this Court. Moreover, the damage to ACMF's claims was gratuitous. ACMF and the Independent Directors could have made a motion pursuant to Fed. R. Civ. P. 23.1 or moved for judgment on the pleadings solely on the basis of the absence of a demand. They could have left the substantive arguments to the other defendants, whose assertions would not be binding on

ACMF itself should it wish to pursue its claim on its own, or committed the Independent Directors to a position that renders them unable to determine any subsequent demand to redress the wrongs in the Complaint.

Having caused ACMF to invest the Fund's money in illegal gambling, the directors have now hobbled its ability to seek redress against them, or against ACC or ACIM. At this point, a derivative action is the *only* vehicle through which ACMF can be made whole. Because (a) ACMF would be irreparably injured, losing any chance of recovery on these claims, if demand were required here; and (b) the directors, by submitting pleadings that commit them to substantive positions contrary to the claims in the Complaint, are "so personally and directly conflicted or committed" against prosecution of the Complaint, demand is excused under *Werbowsky*.

## III. PLAINTIFF HAS PROPERLY PLEADED DIRECT CLAIMS IN THE ALTERNATIVE TO HER DERIVATIVE CLAIMS

If Plaintiff is prevented from prosecuting her claims derivatively, then she has standing to prosecute her claims individually and on behalf of a class of similarly situated investors.[17]

Plaintiff's standing to pursue direct claims is governed by Maryland law. *Strougo,* 282 F.3d at 167-69, 176-77. Defendants claim that Maryland courts have failed to address the issue and that this Court should, therefore, look to Delaware law, *see* Inst. Def. Br. at 13 n.7, but this is not so. As the Second Circuit has recognized, *see Strougo*, 282 F.3d at 169-176, Maryland has a well-developed body of law on the precise question at issue here: When may a shareholder

---

[17] As demonstrated above, Plaintiff has properly pleaded each of her substantive claims derivatively on behalf of the Nominal Defendants; she would prefer to proceed with derivate claims only, but asserts her individual and class claims in the alternative.

pursue direct, as opposed to derivative, claims? There is, accordingly, no basis for this Court to look to Delaware law.

Under Maryland, law, shareholders may sue directly when they "suffer an injury that is distinct from that of the corporation. . . ." *Strougo*, 262 F.3d at 171[18]; *Argiropoulos v. Kopp,* 2007 WL 954747, *5 (D. Md. March 26, 2007) ("Where a shareholder alleges an injury that is distinct from the corporation . . . the individual shareholder has standing to redress that injury); *Delmarva Sash & Door Co. of Maryland, Inc. v. Andersen Windows, Inc.*, 218 F. Supp.2d 729 (D. Md. 2002) (same); *see also Waller v. Waller,* 187 Md. 185, 49 A.2d 449 (1946) (shareholders may not sue for injury to the corporation itself); *Tafflin v. Levitt*, 92 Md. App. 375, 381, 608 A.2d 817, 820 (1992) (depositors could not sue directly where their alleged injury was not "distinct" from the injury to the savings & loan).

Because of the structure of the ACMF "series" funds, Plaintiff is essentially a minority class of shareholders of the Nominal Defendant. The injury suffered by the holders of the shares of the Fund was not inflicted on holders of the other 17 series of shares issued by the Nominal Defendant. Plaintiff's interests are thus different from the interests of the holders of other series of shares.[19] As noted above, moreover, Maryland law recognizes that officers and directors owe a duty to the shareholders of the corporation, as well as to the corporation itself. *Strougo*, 282

---

[18] Given that *Strougo* is binding precedent in this Court and that the Second Circuit in that case addressed the precise question at issue here (when a shareholder of a Maryland corporation may assert a direct, as opposed to a derivative claim), the failure of either the Defendants or the Independent Directors even to cite the case is inexplicable.

[19] The same is true for Plaintiff's RICO claims, to the extent those claims are not barred by this Court's decision in *McBrearty. See Ceribelli v. Elghanayan,* 990 F.2d 62, 63 (2d Cir. 1993) (shareholder who was fraudulently induced into purchasing shares of the cooperative could bring an individual suit for harms to the corporation). While this Court is, of course, bound by Second Circuit precedent, Plaintiffs respectfully preserve for future appellate review, if necessary, the

*(footnote continues on next page)*

F.3d at 173 ("Maryland courts have clearly established the proposition that directors and officers owe fiduciary duties to both the corporation and the shareholders."), *citing Toner v. Baltimore Envelope Co.,* 304 Md. 256, 268-69, 498 A.2d 642, 648 (1985) (collecting cases)*; Waller, 187* Md. at 194, 49 A.2d at 454. Shareholders thus may sue for breach of this independent duty.

Relying on Delaware law, Defendants claim that Plaintiff may not assert her claims directly because she alleges that all of the Fund's shareholders "were injured in exactly the same way," *see* Inst. Def. Br. at 14. To make this assertion, Defendants must not only ignore the law, they must also muddle the facts as alleged in the Complaint. Throughout their papers, Defendants fail to distinguish between ACMF and the Fund. The Fund is just one of 18 series mutual funds offered by ACMF. Plaintiff does *not*, of course, allege that all shareholders of *ACMF* were injured in exactly the same way; nor does she seek to represent a class consisting of all of ACMF's shareholders. Rather, Plaintiff asserts that all of the shareholders of the one particular *fund* at issue here were injured in the same way, and that is the class she seeks to represent. It is precisely because the shareholders of the Fund are a minority class of the shareholders of ACMF that Plaintiff's injury is distinct from the injury of ACMF.

But even if it were not, in *Strougo,* the Second Circuit specifically rejected the argument asserted by Defendants and held:

> We thus reject the "undifferentiated effect on shareholders" standard, which the district court articulated in *Scudder* and relied upon in its decision in this case. . . . *To sue directly under Maryland law, a shareholder must allege an injury distinct from an injury to the corporation, not from that of other shareholders.*

---

argument that *Manson v. Stacescu,* 11 F.3d 1127 (2d Cir. 1993), and *Rand v. Anaconda-Ericsson, Inc.*, relied on by Defendants, were wrongly decided.

*Strougo*, 282 F.3d at 171 (citations omitted, emphasis added). That Defendants make their argument in the face of this clear and binding holding, and without even a citation to it, shows how little basis they have for their position.

## IV. PLAINTIFF HAS PROPERLY ALLEGED RICO PREDICATE ACTS AND A PATTERN OF RACKETEERING

By order entered April 28, 2009, this Court, relying on *McBrearty*, dismissed Plaintiff's RICO claims for lack of RICO proximate cause. While Plaintiff has since filed an amended complaint, there was no amendment that would change this Court's analysis of the RICO proximate cause issue. Accordingly, Plaintiff recognizes that this Court's prior order is the law of the case. *See Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir.2008). Defendants nonetheless present two alternative arguments for dismissal of Plaintiff's RICO claims, neither of which has merit.

### A. Plaintiff Has Pleaded Predicate Acts Under RICO

Without citation to authority, Defendants claim that their investments in illegal gambling businesses do not constitute predicate acts under RICO, because they say 18 U.S.C. § 1955 does not apply to investments made through public companies, even when those investments are made abroad in companies whose shares are not – cannot be – offered for sale in the United States. But there is no basis to resort to this narrowing construction when the statute itself is neither unclear nor ambiguous. *See Boyle v. United States*, 129 S. Ct. 2237, 2246-47 (2009). Nor is there any basis in the language or purpose of the statute to distinguish between illegal gambling businesses that are closely held and those whose shares are publicly traded. To the contrary, "the legislative history … indicates that § 1955 was aimed at *large scale* gambling businesses," *United States v. Bridges*, 493 F.2d 918, 922 (5th Cir. 1974) (emphasis added), which suggests that public companies (which tend to be larger than private companies) are more likely, rather than less likely, to be within the scope of the legislative purpose of stamping out large-scale illegal

gambling operations. Defendants cite *Bridges*, *see Inst.* Def. Br. at 9 n.5, but fail to appreciate its import: PartyGaming was not a "small gambling operation." On the contrary, it was a large gambling enterprise, posing precisely the kind of threats § 1955 was designed to address – as the federal prosecution of Anurag Dikshit demonstrates.

Defendants argue that § 1955 requires active involvement in the gambling business at issue. This flies in the face of the explicit language of the statute, for financing and owning are both inherently passive. Thus, two of the six types of conduct specifically referred to in § 1955 do not require active involvement in the illegal gambling business. Ownership and financing were both expressly identified by Congress as functions that play an integral part in maintaining an illegal gambling business. Nothing in any case or in any legislative history even remotely suggests that Congress intended to exempt "passive" ownership or financing of illegal gambling businesses from the scope of § 1955. On the contrary, an exception for passive ownership or financing would eviscerate the statute, since ownership and financing are inherently passive. Indeed, Defendants' interpretation would effectively exonerate the participant in the illegal gambling business who is most culpable: the owner. Indeed, in *United States v. Hawes*, 529 F.2d 472, 481 (5th Cir. 1976), the Fifth Circuit rejected virtually the same argument made by Defendants here, saying, "We are unable to agree with this strained interpretation of an 'illegal gambling business.' Even upon a strict construction of the statutory language … we find no requirement that defendants must themselves engage in the act of illegal gambling." *See also Sanabria v. United States*, 437 U.S. 53, 70 n.26 (1978) ("[n]umerous cases have recognized that [§ 1955] proscribes any degree of participation in an illegal gambling business, except participation as a mere bettor."); *United States v. Sacco*, 491 F.2d 995, 1002-03 (9th Cir. 1974) ("[e]ach person, whatever his function, who plays an integral part in the maintenance of illegal

gambling, conducts an 'illegal gambling business' and is included within the scope of § 1955. The sole exception is the player or bettor.") In any event, as alleged in the Complaint, Defendants were *not* strictly passive investors: they caused ACMF to vote at the annual meeting of PartyGaming on May 4, 2006. (AC ¶ 49) ACMF thus actively participated in governance.

Defendants further claim that ownership in a public company cannot violate § 1955 because it would lead to what they characterize as the "absurd" result that the statute would impose criminal liability on someone who purchases even one share in such a company. Separate and apart from the fact that Defendants purchased far more than a single share, so that the question of whether ownership of a single share would subject an investor to liability is not before this Court, this argument fails for at least three reasons. First, it ignores important words in the statute. The statute prohibits ownership of "all or part" of an illegal gambling business. Congress contemplated that there might be fractional owners of such a business, such as partners, limited partners, or shareholders. Congress might have prohibited ownership of "X% or more" of, or "a controlling interest in," an illegal gambling business. It did not do so because it manifestly intended to prohibit any ownership percentage. Second, a single "share" is not a fixed amount of a company and could, in some instances, represent a substantial investment or substantial ownership. Third, while a single investment in a single share might well violate § 1955, it is unlikely that it would satisfy the requirements of RICO (which require at least two predicate acts, as well as a pattern); it would be solely up to the federal government, in the exercise of its prosecutorial discretion, whether prosecution under § 1955 of such a small owner would be warranted.

Defendants also suggest that anyone who invests in *any* "publicly-traded gaming company" would be criminally responsible under Plaintiff's theory, *see* Inst. Def. Br. at 9, but

that is plainly not so. Not all "gaming companies" operate illegally; indeed, not even all Internet gambling companies violate U.S. law by taking bets from gamblers in the U.S. There is nothing illegal about investing in Internet gambling companies that confine their activities to countries where those activities are legal. For example, now that PartyGaming has withdrawn from the U.S. market, there is no prohibition on purchasing or owning its stock. Second, the shares of PartyGaming were offered only to institutional investors outside the U.S., and neither was listed to trade domestically through ADRs or otherwise. PRJN Ex. 1 at 3, 18. The shares were not traded within the U.S. precisely because PartyGaming sought to avoid subjecting itself to jurisdiction in the U.S. Therefore, there has never been any danger that unwitting individual investors in the U.S. would be rendered felons. Finally, liability under § 1955 requires proof of knowledge that the gambling company is taking wagers from gamblers in the U.S. Where, as here, sophisticated institutional investors purchase stock in illegal Internet gambling companies knowing that those companies derive most of their revenue from the U.S. market, their conduct does indeed violate § 1955.

### B.      Plaintiff Has Pleaded a "Pattern of Racketeering Activity"

Contrary to Defendants' arguments, the Complaint properly pleads a pattern of racketeering activity, alleging an open-ended conspiracy to violate § 1955 that Defendants discontinued only after they became aware of the government crackdown.

A RICO plaintiff must plead at least two acts constituting a pattern of racketeering activity. 18 U.S.C. § 1961(5); *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir.2001). He must also "show that the predicate acts are related, and that they amount to, or pose a threat of, continuing criminal activity." *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97 (2d Cir.1997).

Here, the purchases of shares plainly constituted more than one act, and they probably constituted hundreds of separate acts. Each separate purchase caused the Fund to own part of an

illegal gambling business and is therefore a separate RICO predicate act. The purchases also satisfy the "relatedness" requirement, because they all constituted a strategy to own part of an illegal gambling business.

Defendants' investments in illegal gambling also plausibly allege a threat of continuing criminal activity such as to amount to open-ended continuity. That Defendants sold the shares of PartyGaming does not preclude a finding of open-ended continuity where, as here, they only discontinued their ongoing criminal activity in the face of the government's law enforcement crackdown and the opportunities to invest in illegal activities have not been exhausted. In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 243 (1989), the Supreme Court explained that open-ended continuity is satisfied "where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business. . . ." Here, the allegations of the Complaint suggest that Defendants regular way of conducting their business was to invest the mutual funds' money without regard to the legality of the investments, so long as the expected rate of return was sufficiently high.

Indeed, Defendants' arguments to this Court – for example, that investments in illegal activities (presumably including drugs and prostitution as well as gambling) cannot constitute RICO predicate acts and are not even really illegal, so long as the investment is made through a publicly-traded company listed on a foreign exchange – confirm that there is a threat that Defendants will continue to operate the ACMF mutual funds without regard to the legality of the enterprises in which they invest. There is no reason to indulge Defendants in the assumption that they will now cease putting shareholders' money in the service of criminals who carry on illegal activities, so long as the promise of profit is deemed sufficient to outweigh the risk that the criminals in whom Defendants invest may get caught. *See Ikuno v. Yip,* 912 F.2d 306, 309 (9th

Cir. 1990) ("there is no evidence that [the defendant] would have stopped [filing false annual reports] if [the company] had not ceased to do business"); *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir.1991) ("lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict"). Moreover, it is clear that, prior to the crackdown, there was a "threat" that the illegal ownership of PartyGaming would continue.

*Anisfeld v. Cantor Fitzgerald & Co., Inc.*, 631 F. Supp. 1461 (S.D.N.Y. 1986), on which Defendants rely, has not been good law in this Circuit for over twenty years. In *Beauford v. Helmsley*, 650 F. Supp. 548 (S.D.N.Y. 1986), the district court dismissed a RICO complaint relying on *Anisfeld*, which the court said was "directly on point." 650 F. Supp. at 551. In *Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir. 1989) (*en banc*), the Second Circuit, vacated the judgment based on *Anisfeld* and held that allegations that defendants had mailed fraudulent documents to thousands of persons and that there was reason to believe similar mailings would be made in the future were sufficient to meet RICO's requirements of relatedness and continuity.

*U.S. v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989) (*en banc*), is the better precedent. In that case, the court held that nearly simultaneous shooting and killing of three people to effect a single goal constituted more than one predicate act and sufficiently established a pattern:

> [W]e have little difficulty in concluding that Indelicato's participation in the three Bonanno family murders as a representative of the Commission constituted a pattern of racketeering activity within the meaning of RICO. There were three persons targeted for assassination. Though the murders were virtually simultaneous, they plainly constituted more than one act. Further, the three murders were indisputably related since the purpose for each was facilitation of the desired change in leadership of the Bonanno crime family. Though the murders themselves were quickly completed, both the nature of the Commission, which was the alleged RICO enterprise, and the criminal nature of the Bonanno family, control of which the murders were designed to achieve, made it clear beyond peradventure that there was a threat of continuing racketeering activity.

> The evidence was plainly ample to permit the jury to infer that the murders were part of a RICO pattern.

*Indelicato*, 865 F.2d at 1384. Here, as in *Indelicato*, it is up to a jury to decide whether the purchases of PartyGaming were part of a RICO pattern.[20]

## V.   IF THE COMPLAINT IS INSUFFICIENT, LEAVE TO AMEND SHOULD BE GRANTED

Plaintiff has amended her complaint only once. That was done, with leave of the Court, to plead diversity jurisdiction. Because that amendment was made prior to Defendants' motions, prior to any indication by Defendants of what issues they would raise in their motions other than proximate cause, and prior to any ruling by the Court on any issue other than RICO proximate cause, Plaintiff has had no prior opportunity to cure any pleading deficiency claimed by Defendants. In these circumstances, if the Complaint is in any way insufficient, leave to amend should be freely granted. Fed. R. Civ. P. 15(a)(2)

---

[20]  The *McBrearty* defendants did not challenge the plaintiffs' "pattern" or "continuity" allegations. When Plaintiff amended her Complaint in this case to allege diversity jurisdiction, Defendants had not challenged the pattern or continuity allegations; nor had they indicated any intention to do so. Therefore, Plaintiff had no reason to attempt to supplement those allegations when she amended the complaint. Such supplementation is possible, should the Court hold that it is necessary. For example, in their role as fiduciaries to one of ACMF's other funds, American Century VP Ultra, Defendants caused that fund to own shares in PartyGaming as well. (PRJN Exs. 13-16)

## CONCLUSION

For the foregoing reasons, Defendants' motions for judgment on the pleadings should be denied. If the motions are in any respect granted, Plaintiff should be granted leave to amend.

Dated:  August 28, 2009

      /s/  Thomas I. Sheridan, III
Thomas I. Sheridan, III
Andrea Bierstein
HANLY CONROY BIERSTEIN
SHERIDAN FISHER & HAYES, LLP
112 Madison Avenue
New York, NY 10016-7416
Telephone: 212-784-6400
tsheridan@hanlyconroy.com
abierstein@hanlyconroy.com

- and -

Gregory P. Erthal
Rosalind M. Robertson
SIMMONS BROWDER GIANARIS ANGELIDES &
BARNERD LLC
707 Berkshire Blvd.
East Alton, Illinois 62024
(618) 259-6479
gerthal@simmonsfirm.com
rrobertson@simmonsfirm.com

*Attorneys for Plaintiff*