## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

LAURA SEIDL, individually, derivatively and on behalf of all others similarly situated,

        Plaintiff,

   vs.

AMERICAN CENTURY COMPANIES, INC., AMERICAN CENTURY INVESTMENT MANAGEMENT, INC., JAMES E. STOWERS, JR., JAMES E. STOWERS, III, JONATHAN S. THOMAS, THOMAS A. BROWN, ANDREA C. HALL, DONALD H. PRATT, GALE A. SAYERS, M. JEANNINE STRANDJORD, TIMOTHY S. WEBSTER, WILLIAM M. LYONS, MARK MALLON, WADE SLOME, BRUCE WIMBERLY and JERRY SULLIVAN,

        Defendants.

     and

AMERICAN CENTURY MUTUAL FUNDS, INC., doing business as AMERICAN CENTURY ULTRA FUND,

        Nominal Defendant.

INDEX No. 08-CV-8857 (DLC)
ECF Case

**INSTITUTIONAL DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................... 1

I.    PLAINTIFF'S COMMON LAW CLAIMS MUST BE DISMISSED AS A
      MATTER OF LAW ............................................................. 2

      A.    Maryland Law Governs Plaintiff's Common Law Claims .................................. 2

      B.    Plaintiff Has Not Properly Pled Breach of Duty ..................................... 3

      C.    Plaintiff Has Not Properly Pled Proximate Cause ................................. 7

      D.    Plaintiff Has Not Stated a Legally Sufficient Waste Claim ................................ 11

II.   PLAINTIFF HAS FAILED TO PROPERLY PLEAD DEMAND ................................. 12

III.  PLAINTIFF HAS NO STANDING TO PURSUE DIRECT CLAIMS ......................... 12

IV.   PLAINTIFF CANNOT ESTABLISH RICO LIABILITY ............................... 14

      A.    Plaintiff Has Failed to Allege a Predicate Act ..................................... 14

      B.    Plaintiff Has Failed to Allege a RICO Pattern as a Matter of Law..................... 15

            1.    Plaintiff Has Only Alleged One Predicate Act ........................................ 15

            2.    Plaintiff Has Not Alleged the Required Continuity to Establish a
                  RICO Pattern........................................................................... 17

CONCLUSION...................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agency Rent-A-Car, Inc. v. Gateway Indus., Inc.*,
   No. 6109, 1980 WL 3040 (July 21, 1980) ............................................................................11

*Anisfeld v. Cantor Fitzgerald & Co., Inc.*,
   631 F. Supp. 1461 (S.D.N.Y. 1986).....................................................................................16

*Basic, Inc. v. Levinson*,
   485 U.S. 224 (1998)...............................................................................................................8

*Beauford v. Helmsley*,
   865 F.2d 1386 (2d Cir. 1989)................................................................................................16

*Delta Star, Inc. v. Patton*,
   76 F. Supp. 2d 617 (W.D. Pa. 1999).....................................................................................11

*H. J. Inc. v. Nw. Bell Tel. Co.*,
   492 U.S. 229 (1989)...............................................................................................................16

*Hausman v. Buckley*,
   299 F.2d 696 (2d Cir. 1962)....................................................................................................2

*Hollander v. Breeze Corps.*,
   26 A.2d 507 (N.J. Ch. 1941) .................................................................................................11

*Ikuno v. Yip*,
   912 F.2d 306 (9th Cir. 1990) ..........................................................................................18, 19

*In re BP PLC Derivative Litig.*,
   507 F. Supp. 2d 302 (S.D.N.Y. 2007)....................................................................................3

*In re MasterCard Int'l Inc. Internet Gambling Litig.*,
   313 F.3d 257 (5th Cir. 2002) ..............................................................................................5, 6

*Kowal v. MCI Commc'ns Corp.*,
   16 F.3d 1271 (D.C. Cir. 1994) ...............................................................................................8

*Kramer v. W. Pac. Indus., Inc.*,
   546 A.2d 348 (Del. 1988) ................................................................................................13, 14

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ...........................................................................................9

*Law v. Law*,
    753 A.2d 443 (Del. 2000) ..................................................................................6

*McBrearty v. Vanguard Group, Inc.*,
    No. 08 Civ. 7650, 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009)..................................7

*Michelson v. Duncan*,
    407 A.2d 211 (Del. 1979) ................................................................................11

*Mutchka v. Harris*,
    373 F. Supp. 2d 1021 (C.D. Cal. 2005) ..............................................................12

*O'Donnell v. Sardegna*,
    646 A.2d 398 (Md. 1994) ................................................................................14

*Pollio v. MF Global, Ltd.*,
    608 F. Supp. 2d 564 (S.D.N.Y. 2009)..................................................................4

*Struogo v. Bassini*,
    282 F.3d 162 (2d Cir. 2002).............................................................................13

*Teachers' Ret. Sys. of La. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ............................................................................9

*Texas v. Cobb*,
    532 U.S. 162 (2001).......................................................................................17

*United States v. Busacca*,
    936 F.2d 232 (6th Cir. 1991) ...........................................................................18

*United States v. Indelicato*,
    865 F.2d 1370 (2d Cir. 1989)...........................................................................16

*United States v. Sacco*,
    491 F.2d 995 (9th Cir. 1974) ...........................................................................15

*Wall v. CSX Transp., Inc.*
    471 F.3d 410 (2d Cir. 2006)..............................................................................2

*Walton v. Morgan Stanley & Co. Inc.*,
    623 F.2d 796 (2d Cir. 1980).............................................................................3

*Werbowsky v. Collomb*,
    766 A.2d 123 (Md. Ct. App. 2001).....................................................................11

*White v. Panic*,
    783 A.2d 543 (Del. 2001) ................................................................................11

**STATUTES**

Fed R. Civ. P. 12(c) ....................................................................................................1

Fed. R. Evid. 201(b) ..................................................................................................4

Fed. R. Evid. 802 .......................................................................................................4

Md. Corps. & Assocs. Code § 2-405.1(a)(3) ............................................................6

Md. Corps. & Assocs. Code § 2-208.2 ....................................................................13

18 U.S.C. § 1511 .......................................................................................................15

18 U.S.C. § 1955..........................................................................................5, 14, 15, 17

**OTHER AUTHORITIES**

Omnibus Crime Control Act of 1968.........................................................................14

Unlawful Internet Gambling Enforcement Act of 2006 ...........................................10

H.R. Rep. No. 91-1549 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007 ...................14

H.R. Rep. No. 109-711 (Sept. 29, 2006) ..................................................................10

Pursuant to Fed R. Civ. P. 12(c), defendants American Century Companies, Inc. ("ACC"), American Century Investment Management, Inc. ("ACIM"), James E. Stowers, Jr., James E. Stowers, III, Jonathan S. Thomas, William M. Lyons, Mark Mallon, Wade Slome, Bruce Wimberly, and Jerry Sullivan (together, "Institutional Defendants"), respectfully submit the following reply to Plaintiff's Memorandum of Law in Opposition to Defendants' Motions for Judgment on the Pleadings ("Opposition").

## <u>Preliminary Statement</u>

Plaintiff's Opposition misses the mark in several critical respects.  It strings together a few facts, together with citations from disparate, unrelated cases, to try to build a case that these defendants were involved in some grand conspiracy to violate the nation's criminal racketeering laws.  Nothing could be further from the truth.  Taking a step back, all that can be said of Plaintiff's allegations regarding the Institutional Defendants' behavior (as set forth in the amended complaint ("Complaint")) is that one or more of these defendants made a decision to invest mutual fund money in publicly-traded shares of a company that was being touted on Wall Street as a good investment, albeit one with significant risks attached.  Those risks were that, at some point, the U.S. government might either try to enact new laws or attempt to enforce existing laws to demonstrate that the company's off-shore Internet gambling activities were illegal—an uncertain proposition about which there was much debate and vastly differing opinions (*see* various analyst reports attached to Institutional Defendants' Request for Judicial Notice ("IDRJN"), filed herewith).

The American Century Ultra Fund (the "Ultra Fund") (in which Plaintiff invested) owned but one such stock over a limited period of time, hardly the stuff of which racketeering allegations requiring multiple acts of continuing illegal activities are made.  Nor can such short

term ownership of a single stock form the basis of breaches of common law duties, especially absent allegations of the type of knowing or reckless activities not present here.  When one pierces through the rhetoric in the Complaint and the Opposition, it becomes readily apparent that—simply stated—the defendants have done nothing actionable.  In sum, Plaintiff's Complaint should be dismissed with prejudice.

**I.      Plaintiff's Common Law Claims Must Be Dismissed as a Matter of Law**

**A.      Maryland Law Governs Plaintiff's Common Law Claims**

The parties agree that Maryland law governs the questions of whether Plaintiff is required to make a demand and whether Plaintiff may bring direct, as opposed to derivative claims.  (Opp. at 21 n.12.)  Plaintiff argues, however, that because the laws of Maryland, Missouri, and New York do not conflict on any issue relevant to this motion, the Court need not resolve, for choice-of-law purposes, which state has the greatest interest with respect to those claims.  (Opp. at 20.)

The Institutional Defendants disagree.  As a federal court sitting in diversity, this Court applies the choice-of-law rules of New York, the state in which it sits.  *See Wall v. CSX Transp., Inc.* 471 F.3d 410, 416 (2d Cir. 2006).  New York applies the "internal affairs" rule, which requires the Court to apply the law of the state of incorporation to any issues relating to corporate governance.  *See Hausman v. Buckley*, 299 F.2d 696, 702 (2d Cir. 1962).  Plaintiff has brought common law actions for negligence, breach of fiduciary duty, and waste against directors and officers of a corporation.  Despite her protestations to the contrary, in support of which she cites no case law, Plaintiff's claims absolutely pertain to the internal affairs of a corporation.  She has brought suit claiming that defendants have breached their duties of care and fiduciary duties to the corporation and its shareholders and mismanaged corporate assets (Compl. ¶¶ 113, 120, 130,

137), which duties are at the heart of a corporation's internal affairs.  *See In re BP PLC Derivative Litig.*, 507 F. Supp. 2d 302, 307-09 (S.D.N.Y. 2007) (applying law of country of incorporation to breach of fiduciary duty and corporate waste claims); *Walton v. Morgan Stanley & Co. Inc.*, 623 F.2d 796, 798 n.3 (2d Cir. 1980) (applying law of state of incorporation to breach of fiduciary duty claim).

Accordingly, because American Century Mutual Funds, Inc. ("ACMF") is incorporated in Maryland, the Court should apply Maryland law to Plaintiff's common law claims.

**B.       Plaintiff Has Not Properly Pled Breach of Defendants' Duties.**

Plaintiff contends that defendants breached their duties to shareholders because they were aware of the risk surrounding investment in online gambling companies but chose to invest nevertheless.  Plaintiff contends that a reasonable trier of fact could conclude either that (i) defendants acted in bad faith because they knowingly violated criminal laws, (ii) they did not act in a manner that they reasonably believed was in the best interest of the corporation, or (iii) they did not act with ordinary prudence.  (Opp. at 22-25.)  This contention, however, is supported neither by the facts alleged in the Complaint nor by applicable law.

Plaintiff does not dispute that a claim involving a breach of duty must be based on what was known about the investment at the time it was made, not in hindsight.  (Opp. at 24-25.)  But despite Plaintiff's allegations and arguments, at the time of the investments (June 2005 through January 2006 (Compl. ¶ 37)), the legality of PartyGaming's business was still unknown.

While there were risks acknowledged regarding the investments, numerous established and well-respected investment advisors issued statements[1] recommending the purchase of

---

[1] In apparent recognition of the inadequacy of the allegations in her Complaint, Plaintiff seeks in essence to amend her Complaint once again through her request that the Court take judicial notice of hundreds of pages of documents.  Her reliance on such documents is improper for numerous reasons.  First, it represents an impermissible attempt to amend her Complaint through

PartyGaming shares and concluding that the risk of government enforcement was not a concern.

For example, in June 2005, CitiGroup issued an analyst report noting the concerns about U.S.

government regulation with the following recommendation:

> Despite the considerable risks and uncertainties, we find PartyGaming's business and its stock's valuation attractive and have initiated coverage with a rating of Buy/Speculative Risk (1S) and a price target of 185p, which represents a prospective total return of 40%.

*See* IDRJN, Ex. 1, at 2.  Five months later, on December 8, 2005, Deutsche Bank issued an

analyst's report on PartyGaming noting, "We remain confident of the investment case on

PartyGaming . . . . [t]he main risk to our stance and valuation would be the successful enactment

and enforcement of effective anti-online gambling legislation in the US, which we do not expect

to happen . . . .  "  *See* IDRJN, Ex. 29, at 5.

---

her opposition to the motions to dismiss.  *See, e.g.*, *Pollio v. MF Global, Ltd*., 608 F. Supp. 2d 564, 568 n.1 (S.D.N.Y. 2009) ("'[P]arties cannot amend their pleadings through issues raised solely in their briefs,' and such facts are thus irrelevant for purposes of determining whether plaintiff's Complaint should be dismissed for failure to state a claim . . . .") (citation omitted). Second, facts may be judicially noticed only if they are "not subject to reasonable dispute." Fed. R. Evid. 201(b).  Many of the "facts" that Plaintiff seeks to put before the Court through such documents are not subject to reasonable dispute – they are demonstrably incorrect.  And, to the extent that the documents themselves can be judicially noticed, that does not mean they can be used for all purposes.  Plaintiff's reliance on such documents for the truth of matters asserted therein is impermissible and violates the hearsay rule.  Fed. R. Evid. 802.  Third, many of Plaintiffs' factual assertions are utterly irrelevant, starting with the discussion in the first paragraph of their brief of criminal proceedings that took place in 2008 and 2009, more than two years after the Ultra Fund had sold all of its PartyGaming shares, as Plaintiff admits.  *See infra*, n.8 (listing post-July 2006 events referenced by Plaintiff).  For all of these reasons, Plaintiff's wide-ranging request for the Court to take judicial notice should be rejected.

Should the Court be inclined to consider any of such material, however, the Institutional Defendants respectfully request that the Court take judicial notice of the additional materials they are submitting in order to provide necessary context for Plaintiff's submission.  The materials submitted by the Institutional Defendants, by contrast, are not submitted for the truth of matters asserted therein; they are offered to rebut Plaintiff's broad statements that imply, if not state unequivocally, that all publicly available information was in agreement that PartyGaming's activities were illegal.  That is hardly the case.  As shown by the matters submitted by the Institutional Defendants for judicial notice, the vast majority of credible information that was written and publicly available called into serious question whether PartyGaming's activities (as opposed to BetOnSports' activities) violated any laws at all.

Therefore there was more than a reasonable basis to believe, at the time defendants allegedly authorized investment in PartyGaming, that the company's business was not illegal. As noted in the first Deutsche Bank "buy" recommendation noted above, at least some analysts believed that before companies in PartyGaming's business could be found guilty of anything, it would have required both (i) enactment of new laws prohibiting such activities and (ii) the government's determination to prosecute such activities.[2]  Even the heavily featured New York Times article Plaintiff relies upon in her Complaint and Opposition, makes it clear that the legality of PartyGaming's business was very much undecided in June 2005.  IDRJN Ex. 17 at 3. (describing competing views on the legality of online gambling, comparing statements from the DOJ and the Fifth Circuit's *Mastercard* opinion).  These facts fly in the face of Plaintiff's allegations that defendants breached their duties to ACMF, the Ultra Fund, and shareholders when they authorized purchase (and ownership) of PartyGaming shares.[3]

Plaintiff's examples of indictments and cases purportedly showing that it was common knowledge that online gambling sites violate U.S. law are mostly not applicable to PartyGaming. For example, Plaintiff repeatedly references the Wire Act in her allegations (*see* Compl. ¶¶ 39, 44).  But in *In re MasterCard Int'l Inc. Internet Gambling Litig.*, 313 F.3d 257 (5th Cir. 2002),

---

[2] For example, Morgan Stanley issued an analyst report on November 29, 2005 providing in-depth analysis of the regulatory regime for online gambling.  IDRJN Ex. 7, at 17-19.  The report acknowledges the uncertainty as to the legality of online gaming, discusses the DOJ's focus on the Wire Act, describes both direct and indirect prohibition efforts by the government, and notes the DOJ's enforcement attempts.  *Id*.  The report goes on to say, "[t]his all makes for fairly sobering reading.  However, legal opinion is very divided on both the legality of online gambling in the US, and what can realistically be done about it."  *Id*. at 18.  Morgan Stanley goes on to list a number of reasons why PartyGaming can take some comfort, including a citation to the *MasterCard* case, expectation that the congressional efforts will fail, the unwillingness of the authorities to bring action against businesses with no physical presence in the US, and jurisdictional issues.  *Id*.  On the issue of government regulation, the report concludes, "Given the current obstacles . . . it appears likely that the status quo will persist for some time." *Id*. at 19.

[3] Moreover, as discussed with respect to whether Plaintiff has pled a RICO predicate act, *see infra*, Section IV(A), mere ownership of publicly traded stock in PartyGaming cannot constitute a violation of 18 U.S.C. § 1955.

the Fifth Circuit held that the Wire Act only applies to sports gambling and does not apply to

non-sports gambling (such as poker or blackjack). *Id.* at 263. Most of Plaintiff's allegations of

prior prosecutions involve online sports-gambling companies and the Wire Act (*e.g.*, *US v.*

*Cohen*, *People ex rel. Vacco v. World Interactive Gaming Corp*., *U.S. v. Gotti*, plus the

Sportingbet, Gold Medal Sports, and the BetOnSports prosecutions (*see* Compl. ¶¶ 39-40, 47,

50)), and thus the applicability of such cases and prosecutions to PartyGaming was (and is) far

from clear, since PartyGaming's business is not sports-based gambling (*see* Pl.'s RJN, Ex. 1 at

28 (PartyGaming prospectus, describing PartyGaming's business)). It is telling, therefore, that

even after the BetOnSports indictment, institutional investors remained optimistic about

PartyGaming's prospects. For example, on July 20, 2006, in light of the BetOnSports

indictments, Deutsche Bank reiterated that PartyGaming was a "Buy."[4] (*See* IDRJN Ex. 15, at

1.)

　　　　Furthermore, as argued in the Institutional Defendants' moving brief (Inst. Defs.' Br. at

20-21), to the extent that Plaintiff's allegations of breach of duty rests upon the assumption that

PartyGaming was a bad investment because it was risky and had the potential for a severe loss in

value, Plaintiff's claim must be denied as a matter of law. Plaintiff does not (and cannot

plausibly) allege that the investment was risky in light of the Ultra Fund's overall investment

portfolio, objectives and performance. *See* Md. Corps. & Assocs. Code § 2-405.1(a)(3); *Law v.*

*Law*, 753 A.2d 443, 449 (Del. 2000) (noting that propriety of investment decision must be

determined at the time of investment and in light of the performance of the portfolio as a whole).

---

[4] In fact, Deutsche Bank's July 20, 2006 analyst report contains an extensive analysis of the
potential impact of the BetOnSports indictment on PartyGaming's business. IDRJN Ex. 15, at 6.
It noted that BetOnSports (1) had assets on US soil, (2) was founded and run primarily by US
citizens, (3) was involved in sportsbetting, and (4) took phone bets from the US. Deutsche Bank
concludes, "[n]one of these points are true for PartyGaming . . . . The indictment appears to
focus on sports betting, and not casino or poker, and this is clearly significant for PartyGaming
given their focus." *Id*. at 6-8.

### C.   Plaintiff Has Not Properly Pled Proximate Cause

Not only has Plaintiff failed to establish a breach of duty, she also cannot adequately plead proximate cause.  First, Plaintiff argues that this Court's decision in *McBrearty* is not dispositive of her common law claim of negligence.  However, while courts have acknowledged that the proximate cause standard under RICO is stricter than at common law, *McBrearty* is dispositive here because of the rationale behind the Court's decision.  The Court explicitly held that the government's investigation of allegedly illegal gambling operations constituted an intervening act that broke the causal chain.  As the Court stated, "[p]roximate causation is lacking here because the shareholders were injured not by the ownership of or investment in the illegal gambling operations, but by the reaction of the stock price to the publicity following the government's investigation of those operations."  *McBrearty v. Vanguard Group, Inc.*, No. 08 Civ. 7650, 2009 WL 875220 at *3 (S.D.N.Y. Apr. 2, 2009).[5]

Second, Plaintiff argues that common law proximate cause exists because the risk of government regulation and enforcement was disclosed in PartyGaming's prospectus prior to the Institutional Defendants' decision to invest.  Because of these prior disclosures, she argues, her losses were a foreseeable consequence of the Institutional Defendants' investment decision.  This argument is untenable.  Plaintiff cites no case law to support this dangerous proposition that simply reading risk factors contained in a prospectus is sufficient to conclusively establish that the losses were "foreseeable" for the purposes of pleading proximate cause.  If this were true, the purchase of stock by any investment firm or financial institution that received a prospectus or

---

[5] Plaintiff's attempts to reargue *McBrearty* are of no consequence.  The distinction drawn by Plaintiff that it was not the *publicity* but the anticipated *drop in revenues* that caused the stock drop is a meaningless difference.  It was the publicity of the federal prosecutions that caused the market to realize that there could be a drop in revenues.  Thus, as this Court correctly concluded in *McBrearty*, publicity of the enforcement actions was at the heart of the cause of the drop in the stock prices.

SEC filing containing a statement of risk factors would automatically be the proximate cause of any one of those risk factors coming to fruition and the stock suffering a corresponding decline in price.  It is simply not enough that Plaintiff alleges that defendants were aware of a risk of loss based on PartyGaming's prospectus and related news articles.

Furthermore, even if the Court attempted to apply the boundless foreseeability test urged by Plaintiff here, Plaintiff still would not be able to plead proximate cause.  Plaintiff contends that the decline in the share prices of PartyGaming was foreseeable because of executive branch position statements and enforcement actions against other Internet gaming companies.  As the Institutional Defendants noted in their moving brief, however, if the information regarding the potential risks of government enforcement was as widely known as Plaintiff alleges, then the market would already have taken those risks into consideration when valuing the stock.  This is the nature of an open market.  The Supreme Court accepted this "efficient market" doctrine in *Basic, Inc. v. Levinson*, 485 U.S. 224, 245-47 (1998), a case that Plaintiff makes no effort to address or distinguish.  (Opp. at 25.)  *See also Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 n.1 (D.C. Cir. 1994) (in an efficient securities market, all publicly available information regarding a company's prospects has been reflected in its shares' price ).  Plaintiff has made no allegations that the market was inefficient.  Accordingly, the price in PartyGaming's shares already reflected the risk of potential government enforcement activity.[6]  Therefore, the fact that PartyGaming's shares declined in price, despite the amount of information in the market about the *potential risk* of government enforcement, strongly indicates a new cause separate from that potential risk—it was the publicity of the government's decision to implement such enforcement activities that caught the market as a whole by surprise.  *Cf. Teachers' Ret. Sys. of La. v. Hunter*,

---

[6] As the analyst reports attached to the Institutional Defendants' Request for Judicial Notice show, sophisticated financial analysts were well-aware of the risks of government regulation and enforcement and still gave PartyGaming a "buy" or "overweight" rating.  *See* IDRJN, Exs. 1-16.

477 F.3d 162, 187 (4th Cir. 2007) (plaintiffs inadequately pled loss causation because facts

alleged in complaint had already been disclosed in prior public filings); *Krogman v. Sterritt*, 202

F.R.D. 467, 47-78 (N.D. Tex. 2001) (in an efficient market, a stock's price changes very rapidly

as the market receives new and unexpected information.) (citations and internal quotation marks

omitted).

      Finally, in an attempt to create a proximate cause issue where there is none, Plaintiff has

played fast-and-loose with the facts on the fluctuations in PartyGaming's stock price in a way

that is directly misleading.  Plaintiff argues that,

> Beginning after the public disclosures of the BetOnSports indictment, the
> share price[] of . . . PartyGaming . . . fell dramatically.  By the time
> PartyGaming was forced to withdraw from the US market in October 2006,
> PartyGaming['s] share price had dropped roughly 80% to approximately
> $0.60. . . .  There was no other material cause for the drop in PartyGaming's
> share price other than PartyGaming's anticipated loss of illegal U.S.-based
> gambling revenue due to law enforcement.  That drop was the direct,
> proximate, natural, probable, and reasonably foreseeable consequence of
> Defendants' actions in causing ACMF to invest in an illegal gambling
> business in violation of federal criminal law."

(Opp. at 18.) (citations to Amended Complaint and Pls' RJN omitted).  Plaintiff thus makes it

sound as if there were an 80% drop in the stock price of PartyGaming that is directly attributable

to the BetOnSports indictment on July 16, 2006.  In her Preliminary Statement, Plaintiff puts it

even stronger:

> PartyGaming's share price did *not* plummet approximately 80%
> (representing $7.6 billion in market value) because investors suddenly
> discovered that the company was engaged in illegal gambling. . . .
> **PartyGaming lost 80% of its value because the company lost 80% of its
> revenue stream—which disappeared when the DOJ shut down
> PartyGaming's illegal US operations**.

(Opp. at 6.) (emphasis added)

      This statement is utterly and demonstrably false.  As the stock price data Plaintiff herself

has submitted for judicial notice demonstrates, the "dramatic" plunge of PartyGaming's stock

price took place between September 29, 2006 (when the stock price closed at 107 pence) and

October 2, 2006 (when the stock price opened at 45 pence).  (PRJN, Ex. 3, at 13.[7])  Prior to that

drop, the price had remained, on average, relatively steady.  *This October 2 price drop—which*

*forms the centerpiece of Plaintiff's case—actually occurred two months after the date (July 31,*

*2006) by which Plaintiff alleges the Ultra Fund no longer owned PartyGaming stock*.  (Compl. ¶

53.)  Further, that price drop was directly attributable *not* (as Plaintiff states) to the BetOnSports

indictment or "law enforcement" activities, but to the fact that on September 29-30, 2006,

Congress both introduced and passed the Unlawful Internet Gambling Enforcement Act of 2006,

which for the first time banned United States-based financial institutions from transferring funds

to Internet gambling sites.  *See* H.R. Rep. No. 109-711 (Sept. 29, 2006).  Plaintiff's statements

that an 80% drop in share price is directly—or even remotely—attributable to the DOJ's

indictment of BetOnSports is thus patently false and entirely misleading.[8]

Instead, the stock price data included by Plaintiff shows that prior to the July 16, 2009

indictment, the stock had been trading at 109.0 pence (July 14, 2006 close) and for the month

prior to that had been trading around 110 or above.  (PRJN, Ex. 3 at 13.)  On July 31, 2009, the

day by which Plaintiff alleges PartyGaming had sold all of its shares, the stock closed at 109.5

pence, a half-pence *higher* than the trading day prior to the indictment.  (*Id*.)  While in the

confusion following the BetOnSports indictment, the stock had dropped slightly for *two days*, it

quickly recovered as the market realized that the BetOnSports indictment was likely inapplicable

---

[7] Because the stock price chart submitted as Exhibit 3 to Plaintiff's Request for Judicial Notice does not itself contain unique page numbers, references to page numbers in that document refer to the numbers stamped in the header by the Court's ECF system.

[8] The Institutional Defendants note that, in addition to the stock price issue discussed here, Plaintiff has continually referred in her Opposition to events that took place well after July 16, 2006.  *See, e.g*., Opp. at 15-16 (12/16/08 guilty plea by A. Dikshit, 4/6/09 PartyGaming non-prosecution agreement), 44 (9/11/06 P. Dicks arrest, 12/16/08 guilty plea by A. Dikshit, 1/15/07 NETeller arrests and charges; 8/15/09 G. Kaplan guilty plea)).   Reference to these events is irrelevant to the issue of Defendants' knowledge at the time of the investments.

to non-sports gambling, and a few days later, the stock was trading back in the general range it had been at before the indictment.[9]   In fact, by early August, the stock was trading well above its 109.0 close on July 14. (*Id.*)  Apart from a minor blip in the week following the indictment, therefore, Plaintiff's stock price data shows that investors were completely unfazed by the BetOnSports indictment.

### D.    Plaintiff Has Not Stated a Legally Sufficient Waste Claim

The Institutional Defendants' moving brief described in great detail the proper test for waste of corporate assets based on well established Maryland and Delaware law.  (Inst. Defs.' Br. at 24-25.)  Against this test for waste, Plaintiff pulls a single quote from *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979), which states that "[t]he essence of a claim of waste of corporate assets is the diversion of corporate assets for improper or unnecessary purposes." (Opp. at 32) (emphasis in Opp. omitted.)  But this quotation from *Michelson* is only a loose statement of the *principles* underlying a waste claim by a court that was trying to explain the differences and similarities between a claim for waste and a claim for gift.  This statement by a single court cannot be read as a *test* for corporate waste, and the *Michelson* court ultimately found that both waste and gift were properly pled where plaintiff included allegations that no consideration was received for a corporate expenditure (a fact certainly not present in this case).

Plaintiff has not cited to any cases that suggest that the test for waste established in cases such as *Werbowsky v. Collomb*, 766 A.2d 123, 132 (Md. Ct. App. 2001), and *White v. Panic*, 783 A.2d 543, 554 (Del. 2001), should be altered here.  Plaintiff's citation to *Delta Star, Inc. v. Patton*, 76 F. Supp. 2d 617 (W.D. Pa. 1999), *Hollander v. Breeze Corps.*, 26 A.2d 507 (N.J. Ch. 1941) and *Agency Rent-A-Car, Inc. v. Gateway Indus., Inc.*, No. 6109, 1980 WL 3040 (July 21,

---

[9] For this reason, not only has Plaintiff not shown proximate cause, but even if Plaintiff were to proceed to discovery, Plaintiff's ability to prove damages appears limited, at best.

1980), do not help Plaintiff.  Those cases all involved situations where the corporation received inadequate consideration for expenditure of corporate assets, thus being in accord with the test for waste cited in the Institutional Defendants' cases.  Here, where the Ultra Fund paid market price for the shares of stock at issue, it simply cannot be said that they paid inadequate or no consideration.

## II.     Plaintiff Has Failed to Properly Plead Demand

As discussed in detail in the Institutional Defendants' moving brief (Inst. Defs.' Br. at 15-19) and in the Fund and Independent Directors' moving brief (Fund and Ind. Dirs.' Br. at 7-12), Plaintiff has insufficiently pled demand or demand futility.

Although Plaintiff raises arguments in her Opposition attempting to show why demand would have been futile (arguments not in her pleadings), those arguments are, in any case, unavailing, for the reasons set forth in detail in the Fund and Independent Directors' Reply Brief (Fund and Ind. Dirs.' Reply Br. at 6-10), which the Institutional Defendants adopt and incorporate herein by reference.

## III.    Plaintiff Has No Standing to Pursue Direct Claims

Plaintiff maintains that in the alternative to bringing a derivative claim, she is entitled to bring a direct claims.  While the Institutional Defendants do not dispute that under Maryland law shareholders may sue directly when they "suffer an injury that is distinct from the corporation," this is not the case here.

Plaintiff argues that because of the structure of the ACMF "series" funds, "Plaintiff is essentially a minority class of shareholders of the Nominal Defendant" and therefore, the injury suffered by the minority shareholders, *i.e.*, loss in value, was not inflicted on the shareholders of the other 17 funds, who did not own any shares in PartyGaming.  This distinction is

inconsequential.  *See Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1027-28 (C.D. Cal. 2005)
(finding distinction between separate corporation and a "series" mutual fund is of no
consequence in the determination of whether claims should be brought directly or derivatively).
This is so for two reasons.  First, as explained in the Fund and Independent Directors' reply brief
(at 7-8), the SEC has determined that, in a series of mutual funds, "each series is to be treated as
a separate investment company."  Moreover, any recovery would go to the Ultra Fund and not to
the shareholders of other ACMF funds.  *See, e.g.*, Md. Corps. & Assocs. Code § 2-208.2 (the
assets and liabilities of each series are to be kept separate from the assets and liabilities of other
series and of the corporation generally).  Thus, Plaintiff's "minority shareholder" analogy fails.

Second, even if the Ultra Fund shareholders had suffered a different harm *vis-à-vis* the
remaining ACMF shareholders, the test under Maryland law is whether Plaintiff's injury is
distinct from the injury *to the corporation* (ACMF), not distinct from injury *to other
shareholders*.  Courts define a "distinct" injury as "an injury that does not derive from corporate
injury."  *See Struogo v. Bassini*, 282 F.3d 162, 172 (2d Cir. 2002).  Plaintiff has failed to plead
this distinction.  Plaintiff alleges that as a result of the Institutional Defendants' allegedly
negligent decision to invest in PartyGaming, she suffered a loss in share value.  This is precisely
the type of injury suffered by the corporation and pursued as a derivative suit.  *See e.g., Kramer
v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) ("[W]here a plaintiff shareholder claims
that the value of his stock will deteriorate and that the value of his proportionate share of the
stock will be decreased as a result of alleged director mismanagement, his cause of action is
derivative in nature") (citations omitted).

The fact that Maryland recognizes that officers and directors owe a duty to shareholders
as well as the corporation itself does not change the analysis.  Plaintiff's claims of negligence,

breach of fiduciary duty, and waste are not distinct from the corporation's.  Plaintiff must allege

that as a result of defendants' alleged conduct, she herself suffered an injury that is distinct and

different from the injury suffered by ACMF.  Thus these types of claims can only be brought

derivatively.  *See O'Donnell v. Sardegna*, 646 A.2d 398, 402-03 (Md. 1994) (plaintiffs whose

claims included breach of fiduciary duty held limited to derivative action); *Kramer*, 546 A.2d at

353.

**IV.     Plaintiff Cannot Establish RICO Liability**

    **A.     Plaintiff Has Failed to Allege a Predicate Act**

    Plaintiff has offered no compelling argument to rebut the notion that 18 U.S.C. § 1955

does not criminalize passive investors who buy publicly traded securities (a finding that would

render every single shareholder across the U.S.—including both private individuals and many of

the world's largest financial institutions—felons and/or subject them to civil RICO liability).

    Section 1955 was enacted as part of the Omnibus Crime Control Act of 1968, a statute

that was intended to target criminal enterprises and reach "only those persons who prey

systematically upon our citizens and whose syndicated operations are so continuous and so

substantial as to be of national concern" and are of "considerably greater magnitude than simply

meet[ing] the minimum definitions."  H.R. Rep. No. 91-1549, § 802 (1970), *reprinted in* 1970

U.S.C.C.A.N. 4007, 4029.  Plaintiff has failed to offer any plausible allegations (beyond baseless

insinuations that the defendants may commit a wide range of other "racketeering" acts) that,

through their ownership of PartyGaming, defendants were systematically preying upon citizens.

    In short, nothing Plaintiff has alleged or argued supports a conclusion that purchasing

securities on the secondary market of a company that itself might violate 18 U.S.C. § 1955

results in the stock owner becoming liable under that statute without more.  This conclusion is

consistent with the sparse case law interpreting section 1955, which suggests that some degree of active participation in the gambling business is required.  *See, e.g.*, *United States v. Sacco*, 491 F.2d 995, 1002-03 (9th Cir. 1974) (construing 18 U.S.C. § 1955 in accordance with 18 U.S.C. § 1511, which uses the same language, as "appl[ying] generally to persons who *participate* in the ownership, management, or conduct of an illegal gambling business" and "[e]ach person, whatever his function, who plays an integral part in the maintenance of illegal gambling, conducts an 'illegal gambling business' and is included within the scope of § 1955."). Furthermore, despite the intense focus on online gambling in recent years, no governmental authority has ever taken the position or held that mere ownership of shares of an online gambling company can be a violation of 18 U.S.C. § 1955.

### B.      Plaintiff Has Failed to Allege a RICO Pattern as a Matter of Law

Plaintiff's RICO claims must be dismissed because Plaintiff has not properly alleged a pattern of racketeering activity.  In their moving brief, the Institutional Defendants argued that Plaintiff had failed to allege a pattern for two separate reasons: *first*, Plaintiff had only specified one allegedly illegal act (the ownership of stock in PartyGaming) (*see* Inst. Defs.' Br. at 10-11) and, *second*, Plaintiff had not alleged the required continuity element for the finding of a pattern (*see* Inst. Defs.' Br. at 11-12).

### 1.      Plaintiff Has Only Alleged One Predicate Act

The Institutional Defendants' argued in their moving brief that Plaintiff has not alleged a legally sufficient pattern because Plaintiff has only alleged numerous *purchases* of PartyGaming stock, but it is not the "purchase" of stock that is allegedly illegal under Section 1955, but rather the "ownership" of an illegal gambling business.  (*See* Inst. Defs.' Br. at 10-11.)  Even if the mere passive ownership of the stock of a publicly traded company could be considered a violation of 18 U.S.C. § 1955, the ownership of a single company's stock cannot constitute a

"pattern" of 18 U.S.C. § 1955 violations.  Any subsequent purchases merely increased the

holdings of stock—*i.e.*, the size of the ownership interest—but did not change the nature or

quality of any ownership relationship that may have existed.

Plaintiff opposes this argument on the grounds that *Anisfeld v. Cantor Fitzgerald & Co.,*

*Inc.*, 631 F. Supp. 1461 (S.D.N.Y. 1986), is no longer good law.  (Opp. at 56-59.)  Although the

Institutional Defendants quote from *Anisfeld* only for its references to certain underlying

principles, they do not rely on the case for the purposes implied by Plaintiff.  Moreover, whether

or not *Anisfeld* has been implicitly overruled by the Second Circuit does not change the analysis.

The point of the Institutional Defendants' citation to *Anisfeld* is that Plaintiff has only alleged

repeated purchases, but that such purchases are not themselves illegal, and repeated purchases

cannot therefore constitute a "pattern" since a pattern requires "repeated criminal activity."  This

was and remains the law, with or without *Anisfeld.  See also H. J. Inc. v. Nw. Bell Tel. Co.*, 492

U.S. 229, 239 (1989) (quoting from the legislative history of RICO to hold that RICO is not

concerned with "isolated criminal offenses" constituting "sporadic activity").

The cases cited by Plaintiff do not help Plaintiff's argument and, in fact, support

dismissal for failure to allege a legally sufficient RICO pattern.  Plaintiff cites to *Beauford v.*

*Helmsley*, 865 F.2d 1386 (2d Cir. 1989) for the proposition that *Anisfeld* is no longer good law.

But while *Beauford* held that each mailing of thousands of fraudulent documents could constitute

a mail fraud RICO predicate act, it emphasized that this was because "each act of fraudulent

mailing is separately indictable."  865 F.2d at 1392.  *Beauford* therefore stands for the important

proposition that each act that is separately indictable—*i.e.*, each alleged illegality—can constitute

a RICO predicate act.  Similarly, although not directly concerning what constitutes a predicate

act *per se*, *United States v. Indelicato*, 865 F.2d 1370, 1384-85 (2d Cir. 1989) (cited by plaintiff)

involved three murders, each of which constituted a separately indictable murder, even though they occurred virtually simultaneously.

Each of these cases, then, supports the argument that Plaintiff has alleged but one RICO predicate act: the ownership of PartyGaming stock, which Plaintiff argues is a violation of 18 U.S.C. § 1955.  The purchase of an ownership interest in an illegal gambling operation is not one of the enumerated violations in section 1955, and each separate purchase would not be separately indictable, since the proof required (illegal gambling operation plus ownership) would not differ. *See Texas v. Cobb*, 532 U.S. 162, 173 (2001)  ("the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.").

**2.      Plaintiff Has Not Alleged the Required Continuity to
            Establish a RICO Pattern**

In opposition to the Institutional Defendants' argument that Plaintiff has not alleged the required continuity element for a RICO pattern (*see* Inst. Defs.' Br. at 11-12), Plaintiff argues that she has alleged an open-ended conspiracy to violate section 1955, despite the fact that she alleges that the Institutional Defendants sold all their shares in PartyGaming in July 2006 (over two years prior to Plaintiff's lawsuit) and has not alleged further activity under the pattern in the three years since that time.

Plaintiff argues that "the allegations of the Complaint suggest that [the Institutional Defendants'] regular way of conducting their business was to invest the mutual funds' money without regard to the legality of the investments, so long as the expected rate of return was sufficiently high."  (Opp. at 57.)  But Plaintiff's Complaint does not either contain or suggest allegations that the Institutional Defendants' "regular way of conducting their business" is to invest in illegal businesses—whether gambling businesses or otherwise—and, even if such an

allegation were included or implied into the Complaint, such allegations are conclusory and implausible on their face and would need to be supported in the Complaint with extensive factual allegations in order to be considered.

In fact, Plaintiff alleges that the Ultra Fund sold its stock in PartyGaming as soon as the executive branch began to enforce its view of the illegality of online gambling, and Plaintiff does not allege any renewed ownership of online gambling stocks since that time.  Plaintiff's own allegations, therefore, suggest that defendants paid great attention to government actions that might affect the Ultra Fund's investments.

Nor do the cases relied on by Plaintiff in this respect help her argument that she has properly alleged an open-ended conspiracy.  Plaintiff cites *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991), and *Ikuno v. Yip*, 912 F.2d 306, 309 (9th Cir. 1990), apparently to argue that the threat of continuing racketeering activity would have continued if it were not for the executive branch crackdown.  But *Busacca* only stands for the proposition that a RICO defendant cannot argue lack of threat of continuity based on having been found guilty of related RICO violations.  936 F.2d at 238.  In *Busacca*, prior to and while being tried for RICO violations, defendant had undertaken a separate RICO scheme to convince his board of trustees to advance legal fees for his defense in the first RICO lawsuit.  He argued against the second RICO charges that at the time he was convicted of the first RICO charges, the threat of continuity was cut off, since his legal representation as to the first charges ended as of that conviction (thus ending his need for legal fees) and he was also thereupon removed from the board of trustees.  The court rejected this argument, holding that a defendant cannot rely on such involuntary interruption of his pattern of racketeering activity to argue lack of continuity.  936 F.2d at 238.  *Ikuno* similarly held only that where a company is forced out of business and

exposed as a sham corporation due to a government investigation, seizure of corporate records and indictments against employees, a defendant cannot argue lack of continuity based on the fact that the company necessarily stopped doing business.  912 F.2d at 309.  These cases say nothing about a case like this one, where Plaintiff has alleged—at most—that the Institutional Defendants voluntarily sold their stock in PartyGaming at a time when it appeared that the legality of such businesses was more seriously in question and, in the intervening three years, they have not repurchased any stock, even though capable of doing so.

### Conclusion

For the reasons stated above, Plaintiff has failed to state a claim, and the Institutional Defendants respectfully submit that the Complaint should therefore be dismissed with prejudice and without leave to amend.

Dated: September 18, 2009

Respectfully submitted,

COOLEY GODWARD KRONISH LLP
GORDON C. ATKINSON (GA-8337)
BENJAMIN KLEINE (BK-1975)

By:   /s/ Gordon C. Atkinson
          Gordon C. Atkinson (GA-8337)

1114 Avenue of the Americas
New York, NY  10036-7798
Telephone:  (212) 479-6000
Facsimile:   (212) 479-6275
E-mail:        atkinsongc@cooley.com
                  bkleine@cooley.com

Attorneys for Defendants
American Century Companies, Inc.,
American Century Investment Management,
Inc., James E. Stowers, Jr., James E.
Stowers, III, Jonathan S. Thomas, William
M. Lyons, Mark Mallon, Wade Slome,
Bruce Wimberly, and Jerry Sullivan