**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

LAURA SEIDL, individually, derivatively and on
behalf of all others similarly situated,

                            Plaintiff,

        - against -

AMERICAN CENTURY COMPANIES, INC., AMERICAN
CENTURY INVESTMENT MANAGEMENT, INC., JAMES
E. STOWERS, JR., JAMES E. STOWERS, III, JONATHAN
S. THOMAS, THOMAS A. BROWN, ANDREA C. HALL,
DONALD H. PRATT, GALE E. SAYERS, M. JEANNINE
STRANDJORD, TIMOTHY S. WEBSTER, WILLIAM M.
LYONS, MARK MALLON, WADE SLOME, BRUCE
WIMBERLY, and JERRY SULLIVAN,

                      Defendants,

        - and -

AMERICAN CENTURY MUTUAL FUNDS, INC., doing
business as AMERICAN CENTURY ULTRA FUND,

               Nominal Defendant.

08 Civ. 8857 (DLC)

ECF Case

---

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**SIMMONS BROWDER GIANARIS**
**ANGELIDES & BARNERD LLC**
Greg Erthal
707 Berkshire Blvd.
East Alton, IL 62024
(618) 259-2222
gerthal@simmonsfirm.com

**HANLY CONROY BIERSTEIN SHERIDAN**
**FISHER & HAYES LLP**
Thomas I. Sheridan, III
Andrea Bierstein
112 Madison Avenue
New York, NY 10016-7416
(212) 784-6400
tsheridan@hanlyconroy.com
abierstein@hanlyconroy.com

*Attorneys for Plaintiff*

January 22, 2010

TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES.................................................................................................. iii

I.      THIS COURT'S PRIOR ORDER DISMISSING THE RICO CLAIMS IS LAW OF THE CASE ............2

II.     PLAINTIFF HAS PROPERLY PLEADED HER COMMON LAW CLAIMS .......................................2

        A.      Choice of Law ...............................................................................................2

        B.      Maryland Recognizes a Claim for Breach of a Corporate Fiduciary's Duties ........4

        C.      Plaintiff Has Sufficiently Pleaded That Defendants Breached Their Duties ...........7

                1.      Defendants Have Committed Negligence ......................................7

                2.      Defendants Have Breached Their Fiduciary Duties....................................9

                3.      The Directors Have Breached Their Additional Statutory Duties.............10

                4.      Plaintiff's Claims Are Not Based on Mere Hindsight..............................12

                5.      Criminal Enterprises Are Never Proper Investments ...............................13

                6.      The Efficient Market Theory Does Not Absolve Defendants of
                        Liability for Making Illegal Investments..................................................14

        D.      Whether Law Enforcement Was Foreseeable Is a Factual Question That
                Cannot Be Resolved In Defendants' Favor on a Motion to Dismiss....................15

        E.      Plaintiff Has Properly Pleaded Common Law Proximate Cause..........................19

                1.      The Court's Ruling on RICO Proximate Cause Is Not Dispositive of
                        Plaintiff's Common Law Claims..............................................................19

                2.      Plaintiff's Allegations Satisfies Common Law Proximate Cause..............20

        F.      Plaintiff Has Stated a Claim for Waste ................................................................25

        G.      Plaintiff Has Alleged Culpable Conduct on the Part of the Independent
                Directors..............................................................................................................27

III.    PLAINTIFF HAS PROPERLY PLEADED THAT SHE IS EXCUSED FROM MAKING A DEMAND ON
        THE DIRECTORS OF NOMINAL DEFENDANT AMCF..............................................................30

A.   Demand is Excused Because the Directors of ACMF Are So Directly
Conflicted or Committed That They Cannot Be Expected to Respond in Good
Faith ........................................................................................................32

1.   *The Directors Are Inherently Conflicted Because They Owe Fiduciary
Duties to All 18 Funds Separately Operating within the ACMF
Corporate Structure, and Recovery of the Fund's Losses in this Action
Would Be Contrary to the Best Interests of the Remaining 17 Funds
Within ACMF* ........................................................................................32

a)   Dismissal of the RICO Claims Does Not Resolve the
Directors' Irreconcilable Conflict of Interests ..............................36

b)   Maryland Law Requires that a Determination of Demand
Futility Must Focus on a Board's Ability to Respond to a
Demand in Good Faith ...................................................................37

c)   Defendants' Reliance on Cases Determining Demand Futility
Based on Directors' Compensation for Sitting on Multiple
Boards is Unavailing Because Defendants Misidentify the
Nature of the Directors' Conflict of Interest in this Case .............38

2.   *The Directors Are Conflicted Because of their Own Potential Liability* ...40

3.   *The Directors Are Committed to Their Decision Not to Pursue Claims
Arising from the Fund's Investments in PartyGaming* .............................47

a)   The Operative Date for Determining Futility Is the Date of the
Operative Pleading .........................................................................49

b)   Facts That Occur After the Operative Date May Be Relevant
to Establish Whether Demand Would Have Been Futile on the
Operative Date ...............................................................................49

B.   Demand Is Excused Because It Would Cause Irreparable Injury to the Fund ....... 52

C.   The Grounds Excusing Demand Must Be Considered Cumulatively ..................55

IV.   PLAINTIFF HAS PROPERLY PLEADED DIRECT CLAIMS IN THE ALTERNATIVE TO HER
DERIVATIVE CLAIMS ...........................................................................................55

CONCLUSION ..........................................................................................................58

ii

# TABLE OF AUTHORITIES

Page

## Cases

*ACandS, Inc. v. Asner,* 344 Md. 155, 686 A.2d 250 (1996) .............................. 20

*Aetna Ins. Co. v. Boon*, 95 U.S. 117 (1877)................................................. 22

*Agency Rent-A-Car, Inc. v. Gateway Industries, Inc.*, 1980 WL 3040 (Del. Ch. 1980).............. 26

*Ali v. Mukasey*, 529 F.3d 478 (2d Cir.2008) ............................................... 2

*Argiropoulos v. Kopp,* 2007 WL 954747 (D. Md. March 26, 2007)........................... 55

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), *overruled on other grounds*, *Brehm v. Eisner*,
746 A.2d 244 (Del. 2000) ................................................................. 45

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .................................................. 27

*Barber v. Jefferson County Racing Ass'n, Inc.*, 960 So.2d 599 (Ala. 2006) ................... 7

*Becker v. Poling Transp. Corp.,* 356 F.3d 381 (2d Cir. 2004) ................................. 20

*Benitez v. New York City Bd. of Educ.*, 73 N.Y.2d 650, 541 N.E.2d 29, 543 N.Y.S.2d 29
(1989)................................................................................... 24

*Blondell v. Littlepage*, 185 Md. App. 123, 968 A.2d 678 (Md. App. 2009)................... 4

*Bonsignore v. City of New York,* 683 F.2d 635 (2d Cir. 1982)................................ 23

*Booth v. Robinson*, 55 Md. 419 (1881) .................................................... 35

*Brehm v. Eisner,* 746 A.2d 244 (Del. 2000) ........................................... 27, 45

*Brody v. Chemical Bank*, 517 F.2d 932 (2d Cir. 1975) ..................................... 49

*Brooks v. Euclid Sys. Corp.*, 151 Md. App. 487 827 A.2d 887 (Md. App. 2003) .............. 5, 7

*Burks v. Lasker*, 441 U.S. 471 (1979)...................................................... 29

*Burns v. Frontier II Properties Limited Partnership,* 106 S.W.3d 1 (Mo. App. E.D. 2003) ......... 8

*Connell v. Hayden*, 443 N.Y.S.2d 383 (App. Div. 1981) .................................... 25

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984)................................... 31, 50

*Danielewicz v. Arnold,* 137 Md. App. 601, 769 A.2d 274 (2001) .................................................. 30

*DeBartolo v. Coccia,* 276 A.D.2d 663, 714 N.Y.S.2d 742 (2d Dept. 2000) ................................ 20

*Delmarva Sash & Door Co. of Maryland, Inc. v. Andersen Windows, Inc.*, 218 F. Supp. 2d 729 (D. Md. 2002) ........................................................................................................ 55

*Delta Star, Inc. v. Patton*, 76 F. Supp. 2d 617 (W.D. Pa. 1999)................................................ 26

*Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 414 N.E.2d 666, 434 N.Y.S.2d 166 (1980)............................................................................................................. 20, 23, 24

*DeSimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007)............................................................ 9, 27

*Dluhos v. Floating & Abandoned Vessel*, 162 F.3d 63 (2d Cir.1998)......................................... 49

*East Hampton Dewitt Corp. v. State Farm Mut. Auto. Ins. Co.*, 490 F.2d 1234 (2d Cir. 1973) .. 23

*Elliot v. City of New York*, 95 N.Y.2d 730 (2001) ...................................................................... 8

*Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830 (1996) ........................................................... 22

*Felker v. Anderson*, 2005 WL 602974 (W.D. Mo. Feb. 11, 2005)........................................ 42, 43

*Foley v. State*, 265 A.D. 682, 41 N.Y.S.2d 256 (4th Dept. 1943) ............................................ 24

*Froelich v. Senior Campus Living LLC*, 355 F.3d 802 (4th Cir. 2004) ....................................... 11

*Gerbino v. Tinseltown USA*, 13 A.D.3d 1068, 788 N.Y.S.2d 538 (4th Dept. 2004) ................... 22

*Grossman v. Johnson*, 674 F.2d 115 (1st Cir. 1982) ........................................................... 50, 52

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch 2003)...................................................................... 9

*Harashe v. Flintkote Co.,* 848 S.W.2d 506 (Mo.App. 1993)...................................................... 20

*Hausman v. Buckley*, 299 F.2d 696 (2d Cir. 1962)..................................................................... 3

*Hollander v. Breeze Corporations, Inc.*, 26 A.2d 507 (N.J. Ch. 1941) ...................................... 26

*In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 597 N.Y.S.2d 904 (1993)................................. 2

*In re American Intern. Group, Inc.*, 965 A.2d 763 (Del. Ch. 2009) ...................................... 50, 54

*In re Comverse Technology, Inc.*, 56 A.D.3d 49, 866 N.Y.S.2d 10 (1st Dept. 2008) ................. 50

*In re eBay S'holders Litig.*, 2004 WL 253521 (Del. Ch. Feb. 11, 2004)...................................... 39

*In re Ferro Corp. Derivative Litig.*, 511 F.3d 611 (6th Cir. 2008)................................................. 51

*In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451 (D.N.J. 2005) ............................. 38, 39

*In re Freeport-McMoran Sulphur, Inc. Shareholder Litig.*, No. A. 16729, 2005 WL 1653923
    (Del. Ch. June 30, 2005) ........................................................................................................ 35

*In re Kauffman Mutual Fund Actions*, 479 F.2d 257 (1st Cir. 1973) ........................................... 44

*In re MasterCard Internet Gambling Litig.*, 313 F.3d 257 (5th Cir. 2002) ................................. 18

*In re Merrill Lynch Focus Twenty Fund Inv. Co. Act. Litig.*, 218 F.R.D. 377 (E.D.N.Y.
    2003) .................................................................................................................................. 38, 39

*In re Nyfix, Inc. Derivative Litig.*, 567 F. Supp. 2d 306 (D. Conn. 2008) ................................... 45

*In Re September 11 Litigation*, Slip Op. filed July 16, 2009 at (S.D.N.Y)................................... 25

*In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27 (Del. 2006)........................................... 9, 27

*Ingham v. Eastern Air Lines, Inc.*, 373 F.2d 227 (2d Cir. 1967) ................................................. 23

*Ingrassia v. Lividikos*, 14 Misc. 3d 1236(A), 836 N.Y.S.2d 499 (Sup. Ct. Richmond Co.
    2007) .................................................................................................................................... 20

*Jarrett v. Jones,* 258 S.W.3d 442 (Mo. 2008)................................................................................. 4

*Jones v. Harris Assocs. L.P.*, 527 F.3d 627 (7th Cir. 2008), *reh'g and reh'g en banc denied,*
    537 F.3d 728, *cert. granted*, 129 S. Ct. 1579 (Mar. 9, 2009) ................................................ 31

*Jurado v. W. Gear Works*, 619 A.2d 1312 (N.J. 1993)................................................................. 25

*Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90 (1991)............................................... 30, 32, 50, 51

*Kann v. Kann*, 344 Md. 689, 690 A.2d 509 (1997) .................................................................... 5, 6

*Kikis v. McRoberts Corporation*, 225 A.D.2d 455, 639 N.Y.S.2d 346 (1st Dept. 1996) .............. 3

*Kimen v. False Alarm, Ltd.*, --- N.Y.S.2d ----, 2010 WL 28202 (2d Dep't 2010)........................ 22

*Kriz v. Schum*, 75 N.Y.2d 25, 549 N.E.2d 1155, 550 N.Y.S.2d 584 (1989) ............................... 24

*Kush by Marszalek v. City of Buffalo*, 59 N.Y.2d 26, 449 N.E.2d 725, 462 N.Y.S.2d 831 (1983) ................................................................................................................ 23

*Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir.1973) ................................................ 29

*Lapidus v. State*, 2008 WL 4742911 (2d Dept. 2008) ................................................ 4

*Leavy v. American Federal Sav. Bank*, 136 Md. App. 181, 764 A.2d 366 (Md. App. 2000)......... 5

*Lewis v. Biegel*, 204 S.W.3d 354 (Mo. App. 2006) ................................................ 23

*Lewis v. Graves*, 701 F.2d 245 (2d Cir. 1983)............................................................ 51

*Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209 (2d Cir.2002)..................................... 24

*M&J Savitt, Inc. v. Savitt*, 2009 WL 691278 (S.D.N.Y. 2009) ............................................ 49, 51

*Matter of Ideal Mut. Ins. Co.*, 140 A.D.2d 62, 532 N.Y.S.2d 371 (1st Dept. 1988) ................... 22

*McBrearty v. Vanguard Group, Inc.*, 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd by non-precedential summary order*, 2009 WL 4019799 (2d Cir. Nov. 23, 2009), *petition for rehearing denied*, No. 09-1445 (2d Cir. Jan. 12, 2010)................................................. 2, 19, 21

*McCullough v. United States*, 538 F. Supp. 694 (E.D.N.Y. 1982) ................................. 22, 23, 24

*McQuillen v. National Cash Register Co.*, 112 F.2d 877 (4th Cir. 1940) ..................................... 26

*MDS Investments, L.L.C. v. State*, 138 Idaho 456, 65 P.3d 197 (Id. 2003) ................................... 8

*Meinhard v. Salmon*, 249 N.Y. 458 (1928)................................................................. 29

*Metro Communication Corp. BVI v. Advanced Mobilecomm Techn., Inc.*, 854 A.2d 121 (Del. Ch. 2004) ........................................................................................... 9, 13

*Michelson v. Duncan*, 407 A.2d 211 (Del. 1979) ....................................................... 25

*Miller v. Am. Tel. & Tel. Co.*, 507 F.2d 759 (3d Cir. 1974) ..................................... 9, 27

*Mona v. Mona Elec. Group, Inc.*, 176 Md. App. 672, 934 A.2d 450 (Md. App. 2007)....... 5, 6, 51

*Moore v. Myers,* 161 Md. App. 349, 868 A.2d 954 (Md. App. 2005)......................................... 23

*Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 407 N.E.2d 451, 429 N.Y.S.2d 606 (1980) ..... 23

*Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 634 N.E.2d 189, 611 N.Y.S.2d 817 (1994) ........................................................................................................................ 24

*Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (N.Y. 1928) ........................................ 19

*Parish v. Maryland & Virginia Milk Producers Ass'n*, 250 Md. 24, 242 A.2d 512 (1968) ..................................................................................................... 11, 26, 42, 43

*Perales v. City of New York*, 274 A.D.2d 349, 711 N.Y.S.2d 9 (1st Dept.. 2000) ....................... 22

*Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184 (2d Cir. 2003) ............................ 34

*Piazza v. Regeis Care Center, L.L.C.*, 47 A.D.3d 551, 852 N.Y.S.2d 53 (1st Dept. 2008) .......... 20

*Pitman v. Aran*, 935 F. Supp. 637 (D. Md. 1996) ........................................................... 5

*Preston v. Cauldwell-Wingate Co.*, 176 F.2d 237 (2d Cir. 1949) ......................................... 23

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993) ............................................................ 45

Rattner v. Bidzos, 2003 WL 22284323 (Del. Ch. Sept. 30, 2003) ......................................... 45

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 765 N.Y.S.2d 575 (1st Dep't. 2003) ..................................................................................................... 3, 4

*Rivers v. Hagner Management Corp.*, 182 Md. App. 632, 959 A.2d 110 (Md. App. 2008) .......... 8

*Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007) ......................................................... 45, 46

*Sanders v. Wang*, 1999 WL 1044880 (Del. Ch. Nov. 10, 1999) ......................................... 46

*Scalisi v. Fund Asset Management, L.P.,* 380 F.3d 133 (2d Cir. 2004) ........................... 32, 38, 39

*Sekuk Global Enterprises Profit Sharing Plan v. Kevenides*, 2004 WL 1982508 (Md. Cir. Ct. May 25, 2004) ................................................................................................. 53, 54

*Seminaris v. Landa*, 662 A.2d 1350 (Del. Ch. 1995) ..................................................... 45

*Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 983 A.2d 408 (2009) ................................. passim

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir.1994) ......................................... 49

*SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352, 777 N.Y.S.2d 62 (1st Dept. 2004) ................... 3

*Spiegel v. Buntrock*, 571 A.2d 767 (Del. 1990) ....................................................... 50, 51

*Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir.1996) .................................................. 24

*Steiner v. Meyerson*, 1995 WL 441999 (Del. Ch. July 19, 1995)................................................. 27

*Storetrax.com, Inc. v. Gurland,* 397 Md. 37, 915 A.2d 991 (2007) ........................................... 5, 6

*Strigliabotti v. Franklin Resources, Inc.*, No. C-04-00883, 2005 WL 645529 (C.D. Cal. Mar. 7, 2005) ................................................................................................................................ 57

*Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002) ................................................................... 55, 56

*Strougo v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783 (S.D.N.Y.1997)............................ 39

*Sweeney v. Bruckner Plaza Associates*, 57 A.D.3d 347 (1st Dept. 2008) .................................... 20

*Tafflin v. Levitt*, 92 Md. App. 375, 381, 608 A.2d 817 (1992) .................................................. 55

*Tannenbaum v. Zeller*, 552 F.2d 402 (2d Cir. 1977) ................................................................. 29

*Toner v. Baltimore Envelope Co.,* 304 Md. 256, 498 A.2d 642 (1985)........................................ 56

*United States v. Ables*, 167 F.3d 1021 (6th Cir. 1999) ............................................................... 19

*United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001);............................................................. 15, 30

*United States v. Germosen*, 139 F.3d 120 (2d Cir.1998)............................................................ 50

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) .................................................................. 15

*United States v. Hawes*, 529 F.2d 472 (5th Cir. 1976) ............................................................... 19

*United States v. O'Brien*, 131 F.3d 1428 (10th Cir.1997) ......................................................... 19

*United States v. Ramirez*, 894 F.2d 565 (2d Cir.1990) .............................................................. 50

*United States v. Torres*, 68 Fed. Appx. 807 (9th Cir. 2003)....................................................... 19

*Van Gaasbeck v. Webatuck Cent. School Dist. No. 1*, 21 N.Y.2d 239 (1967)................................ 8

*Vinogradova v. Suntrust Bank, Inc.*, 162 Md. App. 495, 875 A.2d 222 (Md. App. 2005)......... 5, 6

*Wall v. CSX Transp., Inc.*, 471 F.3d 410 (2d Cir. 2006)............................................................... 2

*Waller v. Waller,* 187 Md. 185, 49 A.2d 449 (1946)............................................................. 55, 56

*Washentaw Cty. Employees' Retirement Sys. v. Wells Real Estate Inv. Trust*, 2008 WL 2302679 (N.D. Ga. 2008) ............................................................................ 54

*Weiss v. Temporary Inv. Fund, Inc.*, 516 F. Supp. 665 (D. Del. 1981) ....................... 51

*Wendt v. Fischer*, 243 N.Y. 439 (1926) ...................................................................... 29

*Werbowsky v. Collomb*, 362 Md. 581 766 A.2d 123 (2001) .............................. passim

*White v. ABCO Eng'g Corp.*, 221 F.3d 293 (2d Cir. 2000) ........................................ 4

*White v. Panic*, 783 A.2d 543 (Del. 2001) .................................................................. 26

*Wilkens Square, LLLP v. W.C. Pinkard & Co., Inc.*, --- A.2d ----, 2009 WL 4162004 (Md. App.,2009) ........................................................................................ 35

*Woodling v. Garrett Corp.*, 813 F.2d 543 (2d Cir.1987) ........................................... 23

**Statutes**

18 U.S.C. § 1084 ......................................................................................................... 18

18 U.S.C. § 1955 .................................................................................................... passim

18 U.S.C. § 1961(1)(B) .................................................................................................. 8

18 U.S.C. § 1963 ............................................................................................................ 8

720 ILCS 5/28-1(a)(12) ................................................................................................. 7

Ala. Code § 13A-12-20 ................................................................................................. 7

Fed. R. Evid. 201 .................................................................................................... 16, 17

Fed. R. Evid. 404(b) ..................................................................................................... 49

Fla. Atty. Gen. 95-70 (1995), 1995 WL 698073 .......................................................... 7

I.C. 35-45-5-2(c) ........................................................................................................... 7

LSA-R.S. 14:90.3 .......................................................................................................... 7

M.C.A. 23-5-112(18)(e)-(19) ........................................................................................ 7

Md. Code, Corporations and Associations § 2-405.1(a) ........................................ 10, 11

N.R.S. 463.016425 ........................................................................................................ 7

N.Y. Penal Law § 225.00 ........................................................................................... 7

O.R.S. § 167.109 ....................................................................................................... 7

Organized Crime Control Act of 1970, Pub. L. 91-452, 84 Stat. 922 ...................... 8, 9

RCWA 9.46.240 .......................................................................................................... 7

S.D.C.L. 22-25A ......................................................................................................... 7

Section 36(b) of the Investment Company Act, 15 U.S.C.A. § 80a-35(b) .................. 50

**Other Authorities**

A. Frankel, *Pain All Around:  The OxyContin Civil Suits Were a Bust*, American Lawyer,
    Vol. 29, No. 7 (July 2007) ................................................................................. 44

Am.Jur.2d, Negligence (1989) ................................................................................. 22

C. Doyle, *Internet Gambling: Overview of Federal Criminal Law*, Congressional Research
    Service (Updated February 27, 2006) ................................................................. 7

K. O'Malley, J. Grenig, W. Lee, Federal Jury Practice and Instructions (5th ed.) ...................... 24

Prosser, Law of Torts (4th ed. 1971) ...................................................................... 23

Restatement (Second) Torts ............................................................................... 23, 25

Restatement (Third) of Torts § 12 (1999) ................................................................ 8

S. Samuel Arsht, *The Business Judgment Rule*, 8 Hofstra L. Rev. 93, 129 (1979) ...................... 9

The Demand and Standing Requirements in Stockholder Derivative Actions, 44 U. Chi. L.
    Rev. 168, 180-82 (1976) ................................................................................... 52

W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts (5th
    ed.1984) ............................................................................................... 23, 25

## PRELIMINARY STATEMENT

Plaintiff is an investor in a mutual fund offered by Nominal Defendant American Century Mutual Fund, Inc. ("ACMF"). Defendants are the fiduciaries responsible for managing and advising the mutual fund, known as the American Century Ultra Fund (the "Fund"). Defendants knowingly caused the Fund unlawfully to invest over $75 million of investors' money in an illegal off-shore gambling business, PartyGaming Plc ("PartyGaming"). PartyGaming's shares traded on a foreign stock exchange but were not available in the United States. Defendants knew that the company earned nearly 90% of its revenue from gamblers in the U.S. PartyGaming's prospectus even warned Defendants that "the US Department of Justice considers that companies offering online gaming to US residents are in violation of existing US federal laws" and that law enforcement "could result in investors losing all or a very substantial part of their investment."

The Fund did, in fact, lose millions of dollars following a reasonably foreseeable increase in law enforcement actions directed against illegal off-shore gambling businesses that choked off their primary source of revenue. PartyGaming's founder, Anurag Dikshit, pleaded guilty in this district to federal criminal charges and agreed to forfeit $300 million in criminal proceeds. PartyGaming entered into a non-prosecution agreement with the United States Attorney's Office for the Southern District of New York in which it admitted to violating the criminal laws, including 18 U.S.C. § 1955, and agreed to forfeit $105 million in criminal proceeds.

In this action, Plaintiff asserts claims for racketeering, negligence, breach of fiduciary duty, and waste. She submits this memorandum in opposition to Defendants' motions to dismiss.

## FACTS

The facts are set forth in detail in Plaintiff's Second Amended Verified Derivative and Class Action Complaint ("SAC").

1

<center>ARGUMENT</center>

## I. THIS COURT'S PRIOR ORDER DISMISSING THE RICO CLAIMS IS LAW OF THE CASE

By order entered April 28, 2009, this Court, relying on *McBrearty v. Vanguard Group, Inc.*, 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd by non-precedential summary order*, 2009 WL 4019799 (2d Cir. Nov. 23, 2009), *petition for rehearing denied*, No. 09-1445 (2d Cir. Jan 12, 2010), dismissed Plaintiff's RICO claims, holding that Plaintiff could not satisfy the requirements of RICO proximate cause. To preserve Plaintiff's RICO claims pending appellate review in *McBrearty*, the SAC asserts those claims as well as Plaintiff's common law claims. While the complaint in this action has been amended twice since this Court's order of dismissal, Plaintiff does not contend that there has been any amendment that would change this Court's ultimate determination with respect to RICO proximate cause. Accordingly, this Court's prior order is the law of the case with respect to the RICO claims. *See Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008).

## II. PLAINTIFF HAS PROPERLY PLEADED HER COMMON LAW CLAIMS

### A. Choice of Law

Defendants assume that this Court should apply Maryland law to each of Plaintiff's common law claims, but that is not so. As a federal court sitting in diversity, this Court applies the choice-of-law rules of New York, the state in which it sits. *See Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006). Under New York law, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993); *accord Wall*, 471 F.3d at 416. If there is no conflict, "then the law of the forum state where the action is being tried should apply." *SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352, 354 (1st

<center>2</center>

Dept. 2004). Here, there are no material conflicts among the laws of Maryland (where ACMF and ACC are incorporated),[1] Missouri (where ACMF, ACC, and ACIM are located and where much of the conduct at issue took place), and New York with respect to the elements of Plaintiff's common law claims.[2]

New York also applies the "internal affairs" rule, under which issues relating to corporate governance are governed by the law of the state of incorporation. *See Hausman v. Buckley*, 299 F.2d 696, 702 (2d Cir. 1962); *Kikis v. McRoberts Corporation*, 225 A.D.2d 455 (1st Dept. 1996). But Plaintiff's common law claims do not all raise internal affairs or corporate governance issues. This is especially true with respect to Plaintiff's negligence claims. There is no basis to apply the law of the state of incorporation whenever a negligent defendant is a corporation. Plaintiff's negligence claim on behalf of ACMF against its investment advisor ACIM, for example, cannot possibly be characterized as pertaining to the internal affairs of either corporation. Nor do the breach of fiduciary duty claims on behalf of ACMF against (a) ACIM, (b) ACC, (c) the non-employee portfolio managers (*e.g.,* Slome, Wimberly and Sullivan) and (d) the remaining individual defendants (to the extent that they were providing services on behalf of

---

[1] Plaintiff uses defined terms consistent with the SAC. "ACC" is American Centuries Companies, Inc., which controls ACMF through its subsidiary, ACIM. "ACIM" is American Century Investment Management, Inc., which is the investment adviser to ACMF and its 18 series mutual funds.

[2] Although they do not say so directly, Defendants implicitly contend that there is a conflict between Maryland and New York law with respect to Plaintiff's claims for breach of fiduciary because Defendants assert that this claim does not exist under Maryland law. As discussed below, however, that is a misreading of Maryland law. Maryland recognizes a claim for breach of fiduciary that is not discernibly different from that available under New York law. To the extent there is any conflict, New York choice of law rules would select the laws of New York or Missouri over Maryland because New York and Missouri have greater interests than Maryland. *See Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 301 (1st Dept. 2003) This is particularly obvious with respect to the breaches of the fiduciary duties owed to ACMF by ACIM, ACC and co-portfolio managers Slome and Wimberly (because none of these defendants are internal employees or executives of the nominal defendant ACMF).

ACIM or ACC to ACMF) involve ACMF's internal affairs or corporate governance. *See Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 301 (1st Dept. 2003). Because the laws of Maryland, Missouri, and New York do not discernibly conflict on any issue material to whether Plaintiff has adequately pleaded her common law claims,[3] however, this Court need not resolve which state has the greatest interest with respect to those claims.[4]

### B.     Maryland Recognizes a Claim for Breach of a Corporate Fiduciary's Duties

Defendants claim that Maryland law does not recognize an independent claim for breach of fiduciary duty. (Memorandum of Law in Support of Institutional Defendants' Motion to Dismiss Second Amended Complaint dated December 18, 2009 ("Inst. Def. Br.") at 15) Even if this were so, Maryland law would not apply to the common law breach of fiduciary claims on behalf of ACMF against ACIM, ACC, the non-employee portfolio managers and the remaining individual defendants[5] (to the extent that they were providing services on behalf of ACIM or ACC to ACMF) because each of New York and Missouri have greater interests in, or relationship to, those claims. *See White v. ABCO Eng'g Corp.*, 221 F.3d 293, 301 (2d Cir. 2000); *Richbell*, 309 A.D.2d at 301.

Even assuming that Maryland law applies (which Plaintiff does not concede), Defendants are simply wrong: numerous Maryland cases recognize a claim for breach of the fiduciary duty owed by corporate officers and directors. *See, e.g., Shenker v. Laureate Educ., Inc.*, 411 Md.

---

[3] The elements of a claim for negligence under New York, Maryland, and Missouri law are the existence of a duty of care; a breach of that duty; and proximately caused injury. *See Akins v. Glens Falls City School Dist.,* 53 N.Y.2d 325, 333 (1981); *Rodriguez v. Budget Rent-A-Car Sys., Inc.,* 44 A.D.3d 216, 221 (1st Dept. 2007); *Blondell v. Littlepage*, 185 Md. App. 123, 136 n.11, 968 A.2d 678, 685 n.11 (Md. App. 2009); *Jarrett v. Jones,* 258 S.W.3d 442 (Mo. 2008)*.*

[4] Plaintiff does not dispute that Maryland law governs the questions whether Plaintiff was required to make a demand on the directors before filing her derivative suit, *see* Point III, and whether Plaintiff may bring direct, as opposed to derivative claims, *see* Point IV.

[5] In any event, the Directors would still have fiduciary and other duties imposed by statute under Md. Code, Corporations and Associations § 2-405.1(a).

317, 337, 983 A.2d 408, 420 (2009) ("It long has been established … that directors of Maryland corporations stand in a fiduciary relationship to the corporations that they manage and the shareholders of those corporations, a relationship that imposes on directors duties of care, loyalty, and good faith"); *Storetrax.com, Inc. v. Gurland,* 397 Md. 37, 915 A.2d 991 (2007) (affirming trial verdict in favor of director on corporation's claim for breach of fiduciary duty because evidence showed director's conduct did not breach his duties); *Mona v. Mona Elec. Group, Inc.*, 176 Md. App. 672, 934 A.2d 450 (Md. App. 2007) (affirming directed verdict on shareholder's claim for breach of fiduciary duty because director did not breach duty); *Brooks v. Euclid Sys. Corp.*, 151 Md. App. 487, 512, 827 A.2d 887, 901 (Md. App. 2003) (noting that an investment advisor has a fiduciary duty to act for the benefit of the investor, which served as the basis for the jury's finding that the plaintiff advisor breached his fiduciary duties to plaintiff investor); *Leavy v. American Fed. Sav. Bank*, 136 Md. App. 181, 764 A.2d 366 (Md. App. 2000) (affirming judgment in favor of bank on its claim for breach of fiduciary duty against former president and chairman of the board). *See also Pitman v. Aran*, 935 F. Supp. 637 (D. Md. 1996) (affirming summary judgment against officer/director for breach of fiduciary duty).

Although the Maryland intermediate appellate court appeared to say, in *Vinogradova v. Suntrust Bank, Inc.*, 162 Md. App. 495, 875 A.2d 222 (Md. App. 2005), that Maryland does not recognize a claim for breach of fiduciary duty, that case must be read in conjunction not only with the authorities cited above, but with *Kann v. Kann*, 344 Md. 689, 713, 690 A.2d 509, 521 (1997), the Maryland Court of Appeals case that the *Vinogradova* court cited and upon which it relied. *Kann* held that "there is no universal or omnibus tort for the redress of breach of fiduciary duty by any and all fiduciaries. *This does not mean that there is no claim or cause of action available for breach of fiduciary duty*." 344 Md. at 713, 690 A.2d at 509 (emphasis added). The

court was concerned that such a generic cause of action, applicable to all fiduciaries, would create conflicts with existing law relating to trusts and to probate, and could have unintended consequences arising from the failure to consider each type of fiduciary relationship to which such a claim might apply. 344 Md. at 712, 690 A.2d at 520.

Vinogradova applied this holding to a claim by a plaintiff investor against a bank where the investor maintained an investment account. The plaintiff's losses had been caused by the activities of plaintiff's attorney-in-fact who held power of attorney ("POA") to manage the plaintiff's investment accounts. The plaintiff claimed that the bank had breached its fiduciary duties to her by failing to advise her of suspicious activity in her accounts. The *Vinogradova* court relied on *Kann* in holding that while the plaintiff had a claim for negligence (which ultimately failed on summary judgment), she had no claim against the bank for breach of fiduciary duty. The court noted that the relationship between a bank and its depositor is that of debtor and creditor. 162 Md. App. at 510 n.10, 875 A.2d at 231 n.10. The Court also said that "even assuming that SunTrust ordinarily would have a duty to warn Ms. Vinogradova of suspicious activity in her accounts, the POA absolved SunTrust of such duty by the broad language that gave [the attorney-in-fact] every right to take the actions he took … and by fully protecting SunTrust while it relied on the POA." 162 Md. App. at 506, 875 A.2d at 228. Nothing in *Kann* – or in *Vinogradova* – can be read to alter the specific claim, traditionally recognized in Maryland, against a corporate officer or director for breach of the fiduciary duty owed to the corporation and its shareholders.

The *Shenker, Storetrax* and *Mona* decisions were all decided after *Kann* and *Vinogradova* and confirm that Maryland law continues to recognize this specific claim for breach of fiduciary duty by corporate officers and directors. There is also no reason to suppose that any Maryland

court would hold that an investment advisor like ACIM owes no fiduciary duties to the funds and investors whose money it manages. *See Brooks*, 151 Md. App. at 512, 827 A.2d at 901.

### C.   Plaintiff Has Sufficiently Pleaded That Defendants Breached Their Duties

Defendants treat Plaintiff's claims for negligence and breach of fiduciary duty together and argue that Plaintiff has not sufficiently pleaded a breach of duty with respect to either claim. On the contrary, the SAC sufficiently alleges that (a) ACIM; (b) ACMF's executives, management directors and portfolio managers; and (c) ACMF's Independent Directors each breached their duties to ACMF and the Fund's shareholders.  (SAC ¶¶ 46-128, 210-11, 243-44)

#### 1.   Defendants Have Committed Negligence

Plaintiff has sufficiently alleged under New York, Maryland and Missouri law that Defendants breached their duty of care to ACMF and its shareholders and that their breach proximately caused injury. The negligence claim is particularly strong here because Defendants' investments in an illegal gambling business also violated criminal statutes, including § 1955 and RICO. Under § 1955, an "illegal gambling business" is a gambling business that (i) violates state law; (ii) involves five or more persons who, *inter alia*, conduct or own all or part of such business; and (iii) has been continuously  for more than 30 days  or has a daily gross revenue of at least $2,000. The SAC alleges that PartyGaming satisfies these requirements.[6] (SAC ¶ 100)

---

[6] All 50 states have anti-gambling laws. *See* C. Doyle, *Internet Gambling: Overview of Federal Criminal Law*, Congressional Research Service (Updated February 27, 2006) at Exhibit A. At least eight states have explicit prohibitions of Internet gambling. *See* 720 ILCS 5/28-1(a)(12) (Illinois); I.C. 35-45-5-2(c) (Indiana); LSA-R.S. 14:90.3 (Louisiana); M.C.A. 23-5-112(18)(e)-(19) (Montana); N.R.S. 463.016425 (Nevada); O.R.S. § 167.109 (Oregon); S.D.C.L. 22-25A (South Dakota); RCWA 9.46.240 (Washington). States with general prohibitions against gambling have generally clarified, through caselaw or attorney general opinion, that the general laws prohibit Internet gambling. *See, e.g., U.S. v. Gotti*, 459 F.3d 296 (2d Cir. 2006) (upholding conviction under N.Y. Penal Law § 225.00); *Barber v. Jefferson County Racing Ass'n, Inc*., 960 So.2d 599 (Ala. 2006) (Internet gambling fits within definition of "slot machine" under Ala. Code § 13A-12-20); Fla. Atty. Gen. 95-70 (1995), 1995 WL 698073 (Florida does not make an
*(footnote continues on next page)*

Under § 1955 whoever "finances … or owns all or part of an illegal gambling business" is guilty of a felony. By causing ACMF, through the Fund, to purchase stock in illegal gambling businesses, Defendants caused ACMF to own part of an illegal gambling businesses in violation of § 1955. (SAC ¶ 5) In addition to violating § 1955, Defendants have also violated RICO because a violation of § 1955 is a predicate crime. 18 U.S.C. § 1961(1)(B). By causing the ACMF to violate § 1955 repeatedly and over a significant period of time, Defendants conducted the affairs of ACMF through a pattern of racketeering in violation of § 1962(c). Although this Court has determined that Plaintiff cannot pursue civil remedies under § 1964 because of RICO's proximate cause requirement, Defendants nevertheless violated § 1955, § 1962(b) and § 1962(c) and are potentially subject to criminal penalties under § 1963.

Violations of criminal statutes at a minimum constitute evidence of negligence. Depending on which state's law applies, they may constitute negligence *per se*, or give rise to absolute liability. *See Elliot v. City of New York*, 95 N.Y.2d 730, 734 (2001); *Van Gaasbeck v. Webatuck Cent. School Dist. No. 1*, 21 N.Y.2d 239, 243 (1967); *Rivers v. Hagner Management Corp.*, 182 Md. App. 632, 959 A.2d 110 (Md. App. 2008); *Burns v. Frontier II Properties Limited Partnership,* 106 S.W.3d 1, 3 (Mo. App. E.D. 2003).[7] Regardless of which state's law applies, Plaintiff adequately pleads negligence.

---

exception for gambling over the Internet); *MDS Investments, L.L.C. v. State*, 138 Idaho 456, 466, 65 P.3d 197 (Id. 2003) (Idaho law is broad enough to include personal computers, which can be used to connect to the Internet to gamble).

[7] Plaintiff and Nominal Defendant are within the class of individuals intended to be protected by the statutes that Defendants violated, a requirement for the application of negligence *per se*. Restatement (Third) of Torts § 12 (1999). Section 1955 was enacted as part of the Organized Crime Control Act of 1970, Pub. L. 91-452, 84 Stat. 922 (the "OCCA"). The statement of findings that prefaces the OCCA states:

> The Congress finds that … organized crime derives a major portion of its power through money obtained from such illegal endeavors as *syndicated gambling* …; [that] this money and power are increasingly used to infiltrate and *corrupt*
> (*footnote continues on next page*)

## 2.    Defendants Have Breached Their Fiduciary Duties

Defendants have also breached their fiduciary duties of loyalty, good faith, and due care. It is a "rather obvious notion … that it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully." *DeSimone v. Barrows*, 924 A.2d 908, 934-35 and n.89 (Del. Ch. 2007), *citing In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) ("A failure to act in good faith may be shown ... where [a] fiduciary acts with intent to violate applicable positive law."); *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch 2003) ("[O]ne cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey"); *Metro Communication Corp. BVI v. Advanced Mobilecomm Techn., Inc*., 854 A.2d 121, 131 (Del. Ch. 2004) ("a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity"); S. Samuel Arsht, *The Business Judgment Rule*, 8 Hofstra L. Rev. 93, 129 (1979) ("Bad faith may preclude application of the business judgment defense where directors knowingly violate a statute or comparable expression of public policy, even if such a violation is undertaken in the corporation's best interests"). *Accord Miller v. Am. Tel. & Tel. Co.*, 507 F.2d 759, 762 (3d Cir. 1974) (when corporate decision "is itself alleged to have been an illegal act, different rules apply" such that "the business judgment rule cannot insulate defendant directors from liability"). While Plaintiff is unaware of any Maryland case that expressly states

*legitimate business* and … corrupt our democratic processes; [and that] organized crime activities in the United States weaken the stability of the Nation's economic system, *harm innocent investors* and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation … .

84 Stat. 922-923 (emphasis added). The statute's statement of findings expressly refers to "harm to innocent investors" and the corruption of "legitimate businesses" in connection with "syndicated gambling." Plaintiff (an innocent investor) and Nominal Defendant (an otherwise legitimate business) that were harmed by Defendants' investments in syndicated gambling are therefore comfortably within the class of individuals intended to be protected by the OCCA.

this "rather obvious notion," as Defendants acknowledge, Maryland courts often look to Delaware decisions in the absence a controlling Maryland case. *See Shenker*, 411 Md. at 328, 983 A.2d at 420 n.14. Whether or not Defendants violated criminal laws, their investments in illegal gambling businesses breached their fiduciary duties.

### 3.   The Directors Have Breached Their Additional Statutory Duties

Defendants argue that any challenge to investment decisions by fiduciaries must allege a violation of Md. Code, Corporations and Associations § 2-405.1(a), which states:

> A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves: (1) In good faith; (2) In a manner he reasonably believes to be in the best interests of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

(Inst. Def. Br., 17-18)

Defendants are incorrect that an explicit statutory departure from § 2-405.1 is necessary for *all* claims involving any investment decision against *any* defendant. First, the statute on its face does not apply to non-director defendants. Plaintiff's claims against ACIM, ACC, and the other non-director individual defendants are therefore not governed by § 2-405.1. Second, the statute supplements, rather than displaces, the common law duties that directors already have. *Shenker,* 411 Md. at 339, 983 A.2d at 421) ("§ 2-405.1(a) does not provide the sole source of directorial duties, and that other, common law fiduciary duties of directors remain in place"). Third, as explained in Section II(A), Plaintiff's common law claims should be analyzed under New York or Missouri law and should therefore not be *limited* by a Maryland statute that sets forth *additional* statutory duties of Maryland directors.

In any event, the SAC adequately pleads that all Defendants have breached the duties listed in § 2-405.1(a). The duties under § 2-405.1(a) are conjunctive, not disjunctive.[8] A fiduciary fails in his duties if he fails to act consistent with any one of these principles. *See Werbowsky v. Collomb*, 362 Md. 581, 599, 766 A.2d 123, 133 (2001) (corporate fiduciary must act in good faith and best interests of corporation and with due care); *Parish v. Maryland & Virginia Milk Producers Ass'n*, 250 Md. 24, 74, 242 A.2d 512, 540 (1968) (directors liable if they act with gross or culpable negligence); *Froelich v. Senior Campus Living LLC*, 355 F.3d 802, 810 (4th Cir. 2004) ("The business judgment rule simply requires courts to defer to the decisions of corporate boards unless a challenger produces evidence establishing that the directors acted fraudulently or in bad faith … or with gross or culpable negligence").

The SAC alleges that Defendants are guilty, *inter alia*, of "crimes, bad faith, gross negligence, willful misfeasance, reckless disregard of duty, and violation of defendant Directors' duty of loyalty." (SAC ¶¶ 158; see 110-11, 128, 199, 211) The facts supporting those allegations are pleaded in great detail. (SAC ¶¶ 46-128, 210-11, 243-44) Plaintiff has also pleaded that the Independent Directors acted in breach of their "watchdog" roles as directors of a mutual fund and as members of the Performance Review Committee. (SAC ¶¶ 37-38 and 123-128) Based on these facts, a reasonable jury could conclude that: (a) Defendants acted in bad faith (since they were, for example, knowingly violating criminal laws, including § 1955 and § 1962); (b) they did not act in a manner that they *reasonably* believed was in the best interests of the corporation (because, for example, they were taking what a jury could conclude was an unreasonable risk by investing in an illegal enterprise); or (c) they did not act with ordinary prudence (for like

---

[8] In their prior submissions to this Court, Defendants argued that these requirements were disjunctive. They now appear to have abandoned that incorrect argument.

reasons). Any of the foregoing is independently sufficient to establish both negligence and breach of fiduciary duty.

### 4. Plaintiff's Claims Are Not Based on Mere Hindsight

Defendants argue that they cannot be found to have breached their duty of care because such a claim must be based what was known about the investment at the time it was made, not on hindsight. (Inst. Def. Br. at 18 and 19-21) However, the SAC alleges Defendants continuously purchased PartyGaming shares in dozens (if not hundreds) of separate transactions from June 2005 through January 2006 and continued to hold them through the end of July 2006. (SAC ¶¶ 51-64)

The SAC alleges that Defendants knew, prior to making these investments, that PartyGaming was an illegal gambling business and purchasing its shares was itself unlawful. (SAC ¶¶ 71-85) For example, there were (i) disclosures in PartyGaming's prospectus warning Defendants that the DOJ "considered [its activities] to be illegal" and in violation of numerous federal and state laws that carry "criminal and civil sanctions … [including] imprisonment of relevant individuals (such as directors)" (SAC ¶ 79-82); (ii) public warnings from the DOJ that Internet gambling companies such as PartyGaming violated the criminal laws and that supporting them was itself a crime (SAC ¶ 76); (iii) news articles that warned, as did *The New York Times* on June 26, 2005, that for PartyGaming, the "potential illegalities … are the *centerpiece* of its business plan" (emphasis added) (SAC ¶ 83); (iv) numerous, well-publicized prior prosecutions and law enforcement actions against Internet gambling companies and even those who supported them, including banks and media companies (SAC ¶ 84). No hindsight was required to know that

PartyGaming's business was illegal. It was reasonably foreseeable that the U.S. would enforce the criminal laws and that, if it did so, investments in PartyGaming would lose value.[9]

### 5.    Criminal Enterprises Are Never Proper Investments

Defendants object that they are never told how the investments were "too risky *in light of the Funds' other holdings.*" (Inst. Def. Br., 18 and 21-23) The risks associated with PartyGaming can never be justified on a risk/reward basis because the investments were *unlawful*. No amount of upside potential or hedging investments would render them appropriate. As the United States Attorney for the Southern District of New York stated in connection with the prosecution of NETeller Plc, another illegal gambling business (in which some of the Defendants *also* invested on behalf of *another* American Century mutual fund), "[s]upporting illegal gambling is not a business risk, it is a crime." (SAC ¶ 165(c)) In any event, given the amount of the investments, over $75 million, the question whether Defendants took unreasonable risks – even in light of the Fund's overall portfolio – would at a minimum be for the jury to decide, after discovery.

Defendants argue that they must be allowed to make a "risky investment" to obtain an "above-average return." (Inst. Def. Br., 21-23) This argument is legally flawed. "A fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity." *Metro Communication Corp.*, 854 A.2d at 131. Investing in General Motors while hoping for company's financial resurgence involves a business risk. Investing in criminal activity is different. Selling cocaine is potentially lucrative;

---

[9] Despite the allegations in Paragraphs 71-85 of the SAC establishing that Defendants knew PartyGaming was an illegal gambling business prior to making their investments (and which are more than sufficient to survive a motion to dismiss), Defendants request this Court to take judicial notice of 17 documents that purport to demonstrate that "the vast majority of credible information that was written and publicly available called into serious question whether PartyGaming's activities (as opposed to BetOnSport's activities) violated any laws at all." (Inst. Def. Br., 19 at n.11; *see* 19-21) These documents are addressed separately in Section II(D), *infra*.

but despite the potential rewards, Defendants would still not be allowed to invest in a foreign drug cartel. The risk associated with that type of investment is that the enterprise value (*i.e.,* the market's belief of what its ongoing operations are worth) is dependent and based on an illegal revenue stream – which may abruptly disappear if the government successfully enforces the law against the cartel. This is precisely the type of improper risk that Defendants took with respect to PartyGaming. (SAC ¶ 4, 7, 11)

> 6.    *The Efficient Market Theory Does Not Absolve Defendants of Liability for Making Illegal Investments*

Defendants say that even if they did breach their fiduciary duty, the "efficient market" theory would suggest that the unlawful investments could not have caused Plaintiff's injury because information establishing PartyGaming's illegality was already in the public domain. (Inst. Def. Br., 18 at n.10) According to Defendants, because it was well-known that PartyGaming was an illegal gambling entity, the "efficient market" would have caused such illegality to have been reflected in PartyGaming's share price when Defendants purchased them.

Even if an efficient market may have priced in the *risks* of illegality, an investor can still be injured because of the illegality. A simple example illustrates this. Assume there is a 10% chance that the government will successfully enforce the law against an illegal business whose enterprise value of $100 million is solely dependent on the continuation of an illegal revenue stream. If there is successful law enforcement, the company's illegal revenue stream will be shut down, and its entire enterprise value will be lost. If an "efficient market" believes that there is only a 10% chance that authorities will successfully enforce the law, the company's shares should trade at $90 million – a $10 million discount from what their collective value would have been if the company's revenue stream were legitimate and not subject to a risk of loss from law enforcement. But a fiduciary who purchases on behalf of its investors all the shares of the

company at a theoretically "fair" market price (*i.e.,* the $90 million discounted enterprise value) is subjecting his beneficiaries to a risk that the company will suffer a $90 million loss upon successful law enforcement – even though the "efficient market" has "priced in" the illegality with a $10 million discount. Once there is successful law enforcement, the investors' loss will be $90 million, because the market value of the stock will decline commensurate with the loss of the company's enterprise value.

### D. Whether Law Enforcement Was Foreseeable Is a Factual Question That Cannot Be Resolved In Defendants' Favor on a Motion to Dismiss

Although the SAC expressly alleges that PartyGaming was an illegal gambling business and that criminal enforcement was reasonably foreseeable (*see, e.g.*, SAC ¶¶ 2-11), Defendants argue that the SAC must be dismissed because, according to them, "at the time of ACMF's investment in PartyGaming, it was still very much an open question as to whether the company was an illegal gambling business at all and completely unknown that the government was going to step up its enforcement efforts." (Inst. Def. Br. at 19) The short answer to this argument is that Defendants' knowledge of the law is presumed, and the foreseeability that successful law enforcement would effectively shut down PartyGaming's principal source of revenue cannot be resolved against Plaintiffs on a motion addressed to the pleadings.

The question whether Internet gambling is illegal where one party to the wager is in the U.S. is established as a matter of law, *inter alia*, by controlling Second Circuit decisions. *United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001); *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006).

That PartyGaming was an illegal gambling business is established beyond a reasonable doubt, *inter alia*, by (a) the admissions in PartyGaming prospectus, (b) the guilty plea of PartyGaming's founder and (c) the non-prosecution agreement entered into by PartyGaming in which the company admits violating, among other criminal statutes, § 1955. (SAC ¶¶ 77-82)

15

The reasonable foreseeability of criminal enforcement is established, *inter alia*, by PartyGaming's prospectus, which predicted what actually happened. The prospectus states that because PartyGaming's "activities are considered to be illegal by relevant authorities" in the United States, "any action by US authorities that succeeds" in "materially restricting PartyGaming from offering online gaming in the US would have very serious consequences for [PartyGaming] and could result in investors losing all or a very substantial part of their investment." (SAC ¶¶ 7, 79-82) Reasonable foreseeability of law enforcement is also established by the very documents of which Defendants ask the Court to take judicial notice, which likewise anticipated what actually happened. (*E.g.*, Institutional Defendants' Request for Judicial Notice ("DRJN"), Ex. 2 at 28 of 34)

In the face of these compelling and undisputed facts – and numerous other supporting allegations in Paragraphs 2-7, 71-85 and 165 of the SAC – Defendants ask this Court to take judicial notice of 17 exhibits for the purpose of establishing that "the vast majority of credible information … called into question whether PartyGaming's activities … violated any laws at all." (Inst. Def. Br. at 19 and at n.11)

Defendants have not even begun to satisfy the requirements of Fed. R. Evid. 201(b) for judicial notice:

> A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

The threshold problem with the request for judicial notice is that Institutional Defendants ask the Court to take judicial notice of various documents that supposedly support their argument, but they fail to properly identify the documents. The documents appear to be European/British stock analysts' reports addressed primarily to non-U.S. institutional investors.

The Court should not take judicial notice of these documents for *any* purpose without knowing more about their provenance and purpose, and whether they are even representative of the "vast majority of credible information."

While the DRJN Exhibits *might* support judicial notice of *certain* facts (assuming *arguendo* that Defendants can show that they otherwise qualify under Rule 201(b)), they will not support the purpose for which Institutional Defendants request the Court take notice of them. Many of these exhibits expressly confirm that the DOJ considered PartyGaming's activities to be illegal. For example, DRJN Exhibit 1 states that "the US Department of Justice is of the opinion that offering online gambling to people in the US from outside is illegal." (DRJN Ex. 1 at 6 of 34; *see* Ex. 2 at 28 of 34; 4 at 23 of 29; 5 at 5 of 8; 7 at 4 of 20, 18 of 20 (referring to RICO); 8 at 4 of 17; 13 at 10 of 23; *see also* Ex. 17 at 21 of 23 ("The Justice Department and numerous state attorneys general maintain that providing the opportunity for online gambling is against the law in the United states – and PartyGaming does it anyway.")) Thus, Defendants' proffered exhibits for judicial notice can only warrant the Court in taking judicial notice that, as alleged in the SAC, it was well known and publicized that the DOJ considered PartyGaming's activities to be illegal before Defendants made their investments. That being the case, a reasonable jury could reasonably conclude that Defendants acted negligently and breached their fiduciary duties, notwithstanding the fact that a few foreign stock analysts of unknown qualifications may have questioned the DOJ's opinion.

To the extent these foreign stock analysts offer any actual opinion on the legal issues, they are hardly "credible" sources that could justify a U.S. mutual fund asset manager reasonably to question the DOJ's interpretation of U.S. criminal laws or the published decisions of the Second Circuit. Indeed, a careful reading of the DRJN Exhibits demonstrates that the documents'

authors were not actually disagreeing with the DOJ's conclusions that PartyGaming was an illegal gambling business. Instead, they noted: (i) the apparent reluctance of the DOJ to "test its position in the US courts," (ii) the "apparent unwillingness or inability on the part of the authorities to bring actions against businesses with no physical presence in the US," and (iii) "[m]ajor jurisdictional issues, as [PartyGaming] is neither incorporated nor has any physical presence in the US." (DRJN Ex. 7 at 19 of 20) These analysts did not actually raise a "serious question" about the DOJ's substantive legal position. Rather, they questioned whether the DOJ could or would take effective action against criminals who were apparently good at evading the law. The possible reluctance or inability of the DOJ to enforce the criminal laws outside the U.S. does not give U.S. mutual fund fiduciaries license knowingly to aid and abet off-shore criminal activities.[10]

Even assuming, *arguendo*, that the DRJN Exhibits show that some credible legal authority held a reasonably grounded opinion that Internet gambling is illegal, reliance on such an opinion would not be a defense to liability. The crime of illegal gambling under § 1955 is one

---

[10] Defendants emphasize references in the DRJN Exhibits to *In re MasterCard Internet Gambling Litig.*, 313 F.3d 257 (5th Cir. 2002). (*E.g.,* DRJN Ex. 7 at 18 of 20) (Inst. Def. Br., 20-21) This is cited as calling into question the legal position of the DOJ that PartyGaming violated various criminal statutes, including § 1955. *MasterCard* was a civil suit by gamblers to recover their gambling losses from credit card companies that processed losing bets they placed over the Internet. The case was based on the Wire Act, 18 U.S.C. § 1084. The court held that the Wire Act applies to gambling on sporting events or contests but does not reach casino games. In the SAC, Plaintiff does not rely on the Wire Act. She relies on § 1955, which is not even arguably limited to sports betting. PartyGaming admitted to having violated § 1955 in its non-prosecution agreement with the United States. (SAC ¶ 78) Assuming, *arguendo*, that *MasterCard* was correctly decided – which is debatable – the decision would be limited to whether PartyGaming's activities violated the Wire Act. This raises no genuine issue about the position of the DOJ that PartyGaming was an illegal gambling business under § 1955. In any event, Defendants' argument is belied by the fact that Dikshit, who was one of the founders of PartyGaming, pleaded guilty to violating the Wire Act, and that Judge Rakoff accepted his plea to that offense. (SAC ¶ 77) Thus, there is ample basis to support the allegations in the SAC that PartyGaming was an illegal gambling business.

of general intent. A defendant therefore "cannot evade conviction under that section by establishing that he unwittingly or unknowingly" committed a gambling crime under state law. *United States v. Ables*, 167 F.3d 1021 (6th Cir. 1999), *citing United States v. O'Brien*, 131 F.3d 1428, 1430 (10th Cir.1997) (holding that, to be convicted under § 1955, a defendant need not know that the gambling business, among other things, violated state law). *Accord United States v. Torres*, 68 Fed. Appx. 807 (9th Cir. 2003); *United States v. Hawes*, 529 F.2d 472, 481 (5th Cir. 1976) (holding that intent to violate state law is not an essential element of a § 1955 violation). Plaintiff does not need to prove that Defendants knew gambling was illegal in the U.S. because Defendants are *presumed as a matter of law* to know that gambling is illegal in the U.S. All Plaintiff needs to prove is that Defendants knew PartyGaming was taking wagers from gamblers in the U.S. (which they knew from the PartyGaming prospectus). Ignorance of the criminal law is no defense; nor is reliance on unsubstantiated expressions of legal uncertainty by foreign stock analysts.

### E.   Plaintiff Has Properly Pleaded Common Law Proximate Cause

#### 1.   *The Court's Ruling on RICO Proximate Cause Is Not Dispositive of Plaintiff's Common Law Claims*

Defendants argue that *McBrearty* is dispositive of the issue of proximate cause with respect to Plaintiff's common law claims. In affirming this Court's judgment in *McBrearty*, the Second Circuit held that the RICO requirement of proximate cause is different from and more demanding than the common law requirement of proximate cause, saying, "[a]lthough foreseeability is often the test of proximate causation at common law, *see Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 100 (N.Y. 1928), RICO causation is a concept distinct from 'proximate causation as that term is used at common law.'" 2009 WL 4019799 *1 n.2. Thus, *McBrearty* is not dispositive of the issue of common law proximate causation. *See Lerner v.*

*Fleet Bank, N.A.*, 459 F.3d 273, 283-85 (2d Cir. 2006) (district court's dismissal of common law claims based on the dismissal of the RICO claims on proximate cause grounds was error).

<div align="center">

2.    *Plaintiff's Allegations Satisfies Common Law Proximate Cause*

</div>

Plaintiff satisfies common law proximate cause if Defendants' investments in PartyGaming "substantially contributed" to the investment losses of which Plaintiff complains. *See Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 314 (1980) ("To carry the burden of proving a prima facie case, the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury"); *Piazza v. Regeis Care Center, L.L.C.*, 47 A.D.3d 551, 554 (1st Dept. 2008) (same); *DeBartolo v. Coccia*, 276 A.D.2d 663 (2d Dept. 2000) ("It is well settled that a defendant's negligence does not have to be the sole cause of the injury, but merely a substantial factor in bringing about the injury").[11]

The question whether proximate cause has been shown is an issue of fact for the jury unless reasonable people could not differ. *Sweeney v. Bruckner Plaza Associates*, 57 A.D.3d 347, 348 (1st Dept. 2008). *See Becker v. Poling Transp. Corp.,* 356 F.3d 381, 392 (2d Cir. 2004); *Ingrassia v. Lividikos*, 14 Misc.3d 1236(A) (Sup. Ct. Richmond Co. 2007) (collecting New York cases). On these motions to dismiss, the question is not whether Plaintiff has established that the investments in PartyGaming substantially contributed to her loss but only whether she has sufficiently pleaded it.

The facts alleged in the SAC establish that Defendants' unlawful investments in PartyGaming substantially contributed to Plaintiff's investment losses and were foreseeable. Plaintiff alleges that Defendants knowingly invested in PartyGaming despite warnings in the company's prospectus that the DOJ considered 87% of its revenue to be illegal (SAC ¶¶ 6-8, 11,

---

[11] Maryland and Missouri law are the same. *See ACandS, Inc. v. Asner,* 344 Md. 155, 686 A.2d 250 (1996); *Harashe v. Flintkote Co.,* 848 S.W.2d 506 (Mo. App. 1993).

81-82, 90, 116). Defendants ignored wide-spread media coverage of actual prosecutions of illegal offshore Internet gambling. (SAC ¶¶ 83-84) The risk that PartyGaming would be shut down or forced to cease accepting bets from U.S. residents was the primary and most foreseeable risk associated with Defendants' unlawful investments. It could fairly be described as obvious.

In answer to Plaintiff's prior complaints, Defendants interposed as an affirmative defense that "[a]ny alleged damages suffered on the part of Plaintiffs were a direct and proximate result of a superseding intervening cause on the part of third parties and/or the Plaintiff, such that the intervening superseding cause bars any recovery by Plaintiff against these answering Defendants." (Answers ¶ 144) Based on this, Institutional Defendants argue in their motion to dismiss that because Plaintiff's losses resulted from the "reaction of the stock price to the publicity following the government's investigation," the law enforcement crackdown was a "superseding, intervening" cause. (Inst. Def. Br., 7 and 16-17, *quoting McBrearty*, 2009 WL 875220, at *3) This argument confuses how this Court's RICO proximate cause determination in *McBrearty* applies to Plaintiff's common law claims.

The SAC alleges that PartyGaming's enterprise value (and thus share price) was based on the continuation of an illegal revenue stream from the U.S. that represented almost 90% of the company's total revenues. (SAC ¶ 4) Increased law enforcement in the U.S. threatened to choke off PartyGaming's illegal revenue stream. The market value of PartyGaming's stock declined commensurate with the expected loss of the company's enterprise value based on this illegal revenue source. (SAC ¶ 4, 7, 11) In this way, the "publicity" concerning the law enforcement crackdown against illegal gambling businesses was the *means by which the market learned* PartyGaming's illegal revenue stream was actually being threatened. The market re-priced the value of PartyGaming's shares accordingly. (*See generally* Section II(C)(3)(c), *supra* and n.11)

While this causal sequence failed to satisfy the requirement for "direct" RICO injury, it is not so attenuated so as to "supersede" Defendants' liability under established common law principles.

Defendants are correct to treat the alleged existence of a superseding cause as an affirmative defense. *See McCullough v. United States*, 538 F. Supp. 694 (E.D.N.Y. 1982); *Kimen v. False Alarm, Ltd.*, --- N.Y.S.2d ----, 2010 WL 28202 (2d Dept. 2010) (defendants failed to establish defense *prima facie*); *Gerbino v. Tinseltown USA*, 13 A.D.3d 1068 (4th Dept. 2004) (trial court properly dismissed comparative negligence and superseding cause defenses); *Perales v. City of New York*, 274 A.D.2d 349 (1st Dept. 2000); *Matter of Ideal Mut. Ins. Co.*, 140 A.D.2d 62 (1st Dept. 1988).

Certain intervening events – also called "superseding causes" – may sever the causal nexus between a defendant's wrongdoing and a plaintiff's injury for liability purposes. *See Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996) ("'The doctrine of superseding cause … [refers to] a later cause of *independent origin that was not foreseeable*'") (emphasis added); 57A Am.Jur.2d, Negligence § 790, p. 701 (1989) ("The intervention … of a new, independent, and efficient cause, or of a superseding cause … renders the negligence of the defendant a remote cause of the injury"). If a "defendant is negligent and his negligence combines with that of another, or with any other independent, intervening cause, he is liable, although his negligence was not the sole negligence or the sole proximate cause, and although his negligence, without such other independent, intervening cause, would not have produced the injury." *Sundermeyer v. SSM Regional Health Services*, 271 S.W.3d 552, 555 (Mo. 2008) (*en banc*) (quotations and citations omitted).

For a later cause to *supersede* the original cause, it must be *independent* of the original cause. *Aetna Ins. Co. v. Boon*, 95 U.S. 117, 130 (1877) (emphasis added). For a cause nearer in

time to be an "independent" cause it must be neither foreseeable nor part of the risk created by

the defendant's wrongful act. As Judge Friendly explained:

> not every new force insulates a negligent defendant from liability or a plaintiff
> guilty of contributory fault from the consequences. The principle is limited to
> "intervening causes which could not reasonably be foreseen, and which are no
> normal part of the risk created."

*East Hampton Dewitt Corp. v. State Farm Mut. Auto. Ins. Co.*, 490 F.2d 1234, 1240 (2d Cir.

1973) ), *quoting* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of

Torts § 44, p. 281 (5th ed.1984) (hereinafter Keeton). *Accord Woodling v. Garrett Corp.*, 813

F.2d 543, 556 (2d Cir.1987); *Bonsignore v. City of New York,* 683 F.2d 635, 638 (2d Cir. 1982)

("'[a]n intervening act may not serve as a superseding cause, and relieve an actor of

responsibility, where the risk of the intervening act occurring is the very same risk which renders

the actor negligent'"), *quoting Derdiarian,* 51 N.Y.2d at 316.

   The "doctrine has no application when the intentional or criminal intervention of a third

party or parties is reasonably foreseeable." *Kush by Marszalek v. City of Buffalo*, 59 N.Y.2d 26,

33 (1983), *citing Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507 (1980); Restatement (Second)

Torts §§ 448, 449). *Accord McCullough*, 538 F. Supp. at 699 ("if the intervening cause, whether

negligent or not, is foreseeable, it cannot supersede the original negligence"), *citing Ingham v.

Eastern Air Lines, Inc.*, 373 F.2d 227, 237 n.11 (2d Cir. 1967); *Preston v. Cauldwell-Wingate

Co*., 176 F.2d 237, 241 (2d Cir. 1949) (L. Hand, J.); *Derdiarian,* 51 N.Y.2d at 315; Prosser, Law

of Torts, s 44 (4th ed. 1971).[12]

---

[12] The laws of Maryland and Missouri are the same. *See Moore v. Myers,* 161 Md. App. 349, 868
A.2d 954 (Md. App. 2005) (intervening event not a superseding cause when it "might, in the
natural and ordinary course of things, be anticipated as not entirely improbable, and the
defendant's negligence is an essential link in the chain of causation"); *Lewis v. Biegel*, 204
S.W.3d 354, 362-63 (Mo. App. 2006) ("an intervening or superseding act will only be
considered to have severed the causal connection when it is independent of the original actor's
(*footnote continues on next page*)

To avoid liability, "an intervening cause must 'so entirely supersede (the first actor's) negligence that it alone without his negligence contributing thereto in any degree produces the injury.'" *McCullough*, 538 F. Supp. at 699, *quoting Foley v. State*, 265 A.D. 682 (4th Dept. 1943). Here, Defendants cannot satisfy that test, because the alleged superseding cause (law enforcement) could not possibly have caused injury to Plaintiff had it not been for Defendants' illegal investments, which were the efficient cause of the loss.

A leading treatise on federal jury instructions recommends the following jury instruction with respect to intervening actions by third parties:

> If you find that defendant was negligent but that the plaintiff's injuries were caused by the act of a third person, defendant may be liable for such injuries, if you further find that a reasonably prudent person, situated as defendant was prior to the happening of the incident, would have foreseen an act of the kind committed by the third person as a probable consequence of defendant's negligence.

3 K. O'Malley, J. Grenig, W. Lee, Federal Jury Practice and Instructions § 120.62 (5th ed.) (emphasis added). *See also Stanford v. Kuwait Airways Corp.*, 89 F.3d 117, 127 (2d Cir.1996); *Benitez v. New York City Bd. of Educ.*, 73 N.Y.2d 650, 659 (1989).

Here, the risk of government enforcement was not merely within the scope of the risk created by Defendants' conduct. It was the single most obvious risk of the illegal investments.

This Court cannot properly resolve Defendants' affirmative defense of superseding cause *against* Plaintiff on a motion addressed to the pleadings. "[F]oreseeability and causation ... are issues generally and more suitably entrusted to fact finder adjudication." *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 216 (2d Cir.2002) (*quoting Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579 (1994)). *Accord Kriz v. Schum*, 75 N.Y.2d 25 (1989); *Derdiarian*, 51 N.Y.2d at 315 ("[b]ecause questions concerning what is foreseeable and what is normal may be

---

negligence and eclipses the role of the original actor's negligence in the plaintiff's injury).

the subject of varying inferences, [whether the plaintiff's actions supersede the defendant's negligence] generally [is] for the fact finder to resolve"). *See generally*, Restatement (Second) of Torts §§ 440; Keeton § 44.

If anything, this issue must be resolved *in Plaintiff's favor* as a matter of law, because no reasonable jury could conclude that enforcement of the criminal law was not reasonably foreseeable. The court in *In Re September 11 Litigation*, 621 F. Supp.2d 131, 148 (S.D.N.Y. 2009), rejected a superseding cause defense as a matter of law, saying:

> Just as an employer should foresee that his employee may perform negligently, *see, e.g., Connell v. Hayden*, 443 N.Y.S.2d 383, 395 (App. Div. 1981), and a product designer should foresee that a user may misuse a designed product, *see, e.g., Jurado v. W. Gear Works*, 619 A.2d 1312, 1319 (N.J. 1993), so the Aviation Defendants had to have foreseen that government-supplied intelligence and warnings might have been incomplete, insufficient, or not heeded.

Likewise, Defendants must be deemed to have foreseen as a matter of law that the government would seek to enforce the criminal laws against off-shore Internet gambling companies taking wagers from gamblers in the U.S., particularly since they had been warned about that very risk.

### F.     Plaintiff Has Stated a Claim for Waste

Plaintiff has adequately pleaded waste because using Fund assets to illegally purchase shares of unlawful gambling organizations constitutes a waste of assets. (SAC ¶ 218-24) Defendants argue that the Complaint does not allege waste because there are no allegations that "the Fund 'received no consideration at all' for its investment … or even that they paid too much." (Inst. Def. Br. at 24 (citation omitted)) While asserting that Maryland law governs and that Maryland courts look to Delaware law on the issue of waste, Defendants read Delaware law too narrowly as to the scope of a claim for waste. In *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979), the Supreme Court of Delaware stated that "[t]he essence of a claim of waste of corporate assets is the diversion of corporate assets for *improper or unnecessary* purposes."

(Emphasis added). Thus, in *Parish v. Maryland & Virginia Milk Producers Ass'n*, 250 Md. 24, 242 A.2d 512 (1968), the Maryland Court of Appeals held that the plaintiff adequately alleged waste when the defendants sold dairy assets for less than cost to a purchaser without security and which put up no upfront cash.

In *Delta Star, Inc. v. Patton*, 76 F. Supp. 2d 617 (W.D. Pa. 1999), the court, applying Delaware law, found that the corporate plaintiff's former president committed corporate waste by awarding himself salary increases and bonuses that bore no reasonable relationship to his services or contributions to the financial performance of the company. The Court did not require the plaintiff to prove that the services and contributions of the executive had been worthless. *Accord, Hollander v. Breeze Corporations, Inc.*, 26 A.2d 507 (N.J. Ch. 1941) (directors committed waste by permitting corporate funds to be withdrawn by the corporation's president without supporting documentation) *Cf. Agency Rent-A-Car, Inc. v. Gateway Industries, Inc.*, 1980 WL 3040 (Del. Ch. 1980) (plaintiff sufficiently alleged corporate waste where the president of the defendant used corporate credit cards for personal reasons).

Defendants' reliance on *White v. Panic*, 783 A.2d 543 (Del. 2001), is misplaced. In that case, corporate assets were not used for an *ultra vires* purpose. *See McQuillen v. National Cash Register Co.*, 112 F.2d 877, 884 (4th Cir. 1940) (applying Maryland law and finding that challenged contract did not constitute waste where, *inter alia*, "there was nothing in the charter of the corporation or the corporation laws of the State of Maryland which would render this contract illegal or ultra vires.") The court merely declined to "weigh the 'adequacy' of consideration" for a *lawful* corporate transaction. *Id.* at 554. Here, Plaintiff does not merely argue that Defendants paid too much for the PartyGaming stock. Nor does she ask this Court to "second guess" the business judgment of Defendants. Use of corporate proceeds in violation of

federal and state criminal laws requires no such balancing because it is *per se ultra vires* and outside the realm of business judgment. *See DeSimone v. Barrows*, 924 A.2d 908, 934-35 and n.89 (Del. Ch. 2007), *citing In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006); *Miller*, 507 F.2d 759, 762. For similar reasons, *Brehm v. Eisner,* 746 A.2d 244 (Del. 2000) and *Steiner v. Meyerson*, 1995 WL 441999, at *1 (Del. Ch. July 19, 1995), are inapposite.

### G. Plaintiff Has Alleged Culpable Conduct on the Part of the Independent Directors

The Independent Directors argue that the Complaint fails plausibly to allege their involvement in the wrongdoing by the other defendants. (Ind. Dir. Br., 5-9) They imply that because they are "independent" directors, it is not plausible that they were culpably involved in the scheme to invest in illegal gambling companies, in the absence of specific allegations of their individual participation in the scheme. They liken this case to *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), where the Supreme Court rejected as conclusory allegations that the Attorney General of the United States had been involved in the plaintiff's torture.

In making their argument, these directors would have this Court ignore what *they* represented to the SEC and the Fund's investors in ACMF's October 2006 Statement of Additional Information (the "SAI"). ACMF disclosed that all of the Independent Directors served on a "Fund Performance Review" committee. (SAC ¶ 37) That Committee reviewed on a quarterly basis the "investment activities and strategies used to manage fund assets[, and it] regularly receive[d] reports from portfolio managers and other investment personnel concerning the funds' investments." (SAC ¶ 38) Defendants also seem to have forgotten what they alleged in this case. The Independent Directors alleged in their answers – which are judicial admissions even though they have been superseded by an amended complaint – that they (or someone acting in their behalf) performed due diligence in connection with these investments. (Answer ¶ 158;

SAC ¶ 144) These facts demonstrate, consistent with the Investment Company Act of 1940, that the role of these Independent Directors extended to knowledge and oversight the Fund's investment "activities" and securities selection.

The Independent Directors say that Plaintiff merely "speculates" that the information they received while serving on the Fund Performance Review Committee was sufficient to put them on notice that PartyGaming derived revenue from the U.S. (*See* Fund and Independent Directors' Memorandum of Law in Support of Their Motion to Dismiss Plaintiff's Second Amended Verified Derivative and Class Action Complaint dated December 18, 2009 ("Ind. Dir. Br.") at 6 and 9) For purposes of the present motions, however, the Court must draw all reasonable inferences in favor of Plaintiff. It is reasonable to infer that the investment advisor's reports to the Fund Performance Review Committee about the Fund's "activities and strategies" would have discussed the nature of and primary risks associated with a $75 million "speculative" investment in a company the principal business of which was taking wagers in violation of U.S. criminal laws. Anything less would expose the Fund Performance Review Committee as a sham, and the statements about it in the SIA as a fraud. Plaintiff's allegations are not based on implausible speculation; they are based on a reasonable, indeed compelling, inference.

Even if the Independent Directors managed to remain ignorant of Defendants' $75 million investment in PartyGaming, they would nevertheless be liable as if they had actual knowledge. Given the facts alleged in the SAC, such ignorance would be tantamount to recklessness, which is the legal equivalent of actual knowledge. *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1301 (2d Cir.1973) (*en banc*).

The SAC also alleges that the Independent Directors were "responsible for protecting [the Fund's] investors under a unique "watchdog" role. (SAC ¶ 123) This allegation is neither

"implausible" nor "conclusory." The watchdog role of these directors is well established as a matter of law:

> Thus what was then section 10 of the Investment Company Act of 1940, 54 Stat. 806 … was designed to place the unaffiliated directors in the role of "independent watchdogs" who would assure that, in accordance with the preamble of the Investment Company Act, mutual funds would operate in the interest of all classes of their securities holders, rather than for the benefit of investment advisers, directors, or other special groups.

*Tannenbaum v. Zeller*, 552 F.2d 402, 406 (2d Cir. 1977), *quoted with approval* in *Burks v. Lasker*, 441 U.S. 471, 484 (1979).

The Fund and Independent Directors argue that Plaintiff has misunderstood the "watchdog" function. (Ind. Dir. Br. at 8-9) They claim that the role of independent directors is somehow limited to merely providing "oversight of the management process." (Ind. Dir. Br. at 1 n.1. Contrary to their argument, however, there is no reason to suppose that the "watchdog" role of Independent directors is a narrow and confined duty. Instead, the "watchdog" role is a wide-ranging "responsibility for looking after the interests of the funds' shareholders." *Burks*, 441 U.S. at 484-85. A good watchdog is expected to bark at all unwelcome intruders. This Court should be wary of Independent Directors' attempts to circumscribe scope of their own fiduciary duties through "the 'disintegrating erosion' of particular exceptions." *Meinhard v. Salmon*, 249 N.Y. 458, 463-64 (1928), *quoting Wendt v. Fischer*, 243 N.Y. 439, 444 (1926). Thus, while the "watchdog" function *includes* the responsibility to focus on direct conflicts between the investment advisor and the investor, it is also broad enough to encompass actions by the investment advisor that are not in the best interests of the shareholders – such as investing their money in illegal gambling businesses in violation of federal and state criminal laws.

Where, as here, (i) the pleading is governed by Rule 8(a)(2) and not Rule 9(b), (ii) the defendants are mutual fund directors charged with a "watchdog" role and other responsibilities

as members of a special committee overseeing investments, and (iii) the claims involve facts solely within the defendants' knowledge, group pleading is allowed.

## III.   PLAINTIFF HAS PROPERLY PLEADED THAT SHE IS EXCUSED FROM MAKING A DEMAND ON THE DIRECTORS OF NOMINAL DEFENDANT AMCF

The purpose of the derivative action is to "place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 342, 983 A.2d 408, 420 (Md. 2009), *citing Danielewicz v. Arnold,* 137 Md. App. 601, 769 A.2d 274 (2001), *quoting Cohen v. Beneficial Indus Loan Corp.*, 337 U.S. 541, 548 (1949)); *accord Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95-96 (1991).

Rule 23.1 of the Federal Rules of Civil Procedure provides that a derivative plaintiff must plead that she has made a pre-suit demand on the board of directors to commence the action or plead with particularity the reasons why such efforts were not made. In this case, the SAC alleges with particularity that such efforts would have been futile.

Because nominal defendant ACMF is a Maryland corporation, demand futility is governed by Maryland law. *Kamen*, 500 U.S. at 108-109. Under Maryland law, demand on the board of directors of the nominal defendant is excused when a plaintiff alleges:

> either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly [a] conflicted or [b] committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

*Werbowsky v. Collomb*, 362 Md. 581, 620, 766 A.2d 123, 144 (2001).

The Supreme Court has cautioned courts to consider with a healthy dose of realism the willingness and ability of *mutual fund directors* to protect the interests of investors against wrongdoing by fund managers: "Because the [mutual fund] adviser generally supervises the

daily operation of the fund and often selects affiliated persons to serve on the company's board of directors, the relationship between investment advisers and mutual funds is fraught with potential conflicts of interest." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984). Based in part on the conflicts inherent in the mutual fund industry, the Supreme Court in *Fox* held that, despite the statutory language in the ICA, 15 U.S.C. § 80a-35 (providing that lawsuits claiming that a fund manager has charged excessive fees must be brought "on behalf of" the fund), courts should *not* require a mutual fund investor to make a prior demand on the board of directors for ICA § 36(b) claims, even though such an action is derivative in nature.

As noted by Judge Posner in his opinion dissenting from a 5-5 vote by the Seventh Circuit denying rehearing *en banc* in *Jones v. Harris Assocs. L.P.*, 527 F.3d 627 (7th Cir. 2008), *reh'g and reh'g en banc denied,* 537 F.3d 728, *cert. granted*, 129 S. Ct. 1579 (Mar. 9, 2009), compelling empirical evidence exists that the structure of the mutual fund industry has lead to increasingly "rampant" favoritism and abuses enabled by the failure of mutual fund boards to look after the best interests of investors. 537 F.3d 728, 730-31 (Posner, *J.*, dissenting) (collecting evidence that mutual fund boards of directors do not adequately protect shareholders from the funds' executives and asset managers).

For the reasons relied on by the Supreme Court in *Fox*, and for the reasons explained by Judge Posner in his dissent in *Jones*, we submit that the Maryland Court of Appeals would apply its demand futility rules with less solicitude for *mutual fund* board discretion than it would in a case involving a normal corporation. Further, in evaluating demand futility, we submit that the Maryland Court of Appeals would be mindful of the practical consequences of not excusing demand in this action. As Defendants acknowledge, a failure to excuse demand empowers the Directors to "waive a legal right vested in the corporation … ." (Inst. Def. Br. at 10-11, *quoting*

*Kamen*, 500 U.S. at 96) That is exactly what Defendants are trying to do: waive legal rights worth tens of millions of dollars to unsuspecting mutual fund investors to whom they owe a duty of undivided loyalty – even though the misfeasance and malfeasance of these faithless directors and managers are plainly demonstrated in publicly-available documents and can be easily established and proven by facts of which this Court can take judicial notice.[13]

As we demonstrate below, the SAC adequately alleges that demand is excused in this case under all three prongs of *Werbowsky*.

### A. Demand is Excused Because the Directors of ACMF Are So Directly Conflicted or Committed That They Cannot Be Expected to Respond in Good Faith

#### 1. The Directors Are Inherently Conflicted Because They Owe Fiduciary Duties to All 18 Funds Separately Operating within the ACMF Corporate Structure, and Recovery of the Fund's Losses in this Action Would Be Contrary to the Best Interests of the Remaining 17 Funds Within ACMF

The Directors of Nominal Defendant ACMF have an inherent conflict of interest in determining any demand relating to the claims in this action. Defendants admit that, although the 18 funds within ACMF are not separate legal entities, they nevertheless should be "treated" as such. (Ind. Dir. Br. at 18; *see also* SAC ¶¶ 24, 171-72) Accordingly, the Directors have duties of undivided loyalty to *all 18* of the funds that compose ACMF – and not only to the Fund at issue here. (SAC ¶¶ 170, 176)

While recovery of the Fund's losses and management fees paid to ACIM are in the best interest of the Fund's investors, the prosecution of these claims is not in the best interests of the

---

[13] Plaintiff does not argue that the inherent conflicts within the mutual fund industry are sufficient, standing alone, to excuse demand. *See Scalisi v. Fund Asset Management, L.P.,* 380 F.3d 133, 141-42 (2d Cir. 2004). Rather, she submits that this Court should consider the realities of the mutual fund industry and the practical consequences to investors of allowing the board to waive legitimate, well-documented claims having significant value to investors. This is especially true where, as here, the wrongdoings were *per se ultra vires* acts that could never be subject to board ratification or be protected by the business judgment rule.

other 17 funds within ACMF that did not invest in illegal gambling companies, and to which the Directors have separate and independent fiduciary duties. Any significant judgment against defendants ACC or ACIM will adversely affect those 17 other funds. (SAC ¶¶ 177-185)

The SAC alleges, based on information obtained from Defendants' SEC filings, that defendant "ACIM [the investment advisor for all of the "series" mutual funds that compose ACMF] is responsible for providing or arranging for all services necessary for the operation of all the separate funds that compose ACMF. ACIM obtains the funds to pay for all such operation expenses in large part from the fees allocated to the Fund." (SAC ¶ 179)

The SAC also alleges that in ACMF's Annual Report as of October 31, 2006, Defendants disclosed that the Fund shouldered *half of all the fees* that ACMF paid to ACIM. (SAC ¶ 182) Because of the large amount of fees that ACIM allocated to the Fund, "Defendants were able to subsidize the fees and expenses of at least two underperforming ACMF series funds between 2004 through 2008 (*e.g.*, the Mid Cap Growth Fund from 2004 through 2006; and the Small Cap Growth Fund from 2006 through 2008) and at least one such fund in 2004 (*i.e.,* the Giftrust Fund for over $4 million in subsidized management fees). (SAC ¶ 182)[14]

Defendants subsidize the other series funds that compose ACMF primarily with the fees paid by the Fund as a regular way of doing business and for the purpose of boosting the performance of the other series funds. (SAC ¶ 182) For example, Defendants' subsidies to the Giftrust Fund, using fees primarily allocated to the Fund, boosted the performance of the Giftrust Fund by approximately 50 basis points. (*Id.*) Accordingly, but for the successful prosecution of this suit for the benefit of the investors in the Fund, the shareholders of the other funds within

---

[14] According to the cited October 2006 annual report, the Fund was allocated and paid over $178 million in management fees to ACIM on behalf of ACMF. These fees are used in part to subsidize other underperforming funds within ACMF to boost their returns. (SAC ¶ 183)

ACMF would "have reasonable expectation of continued subsidies from the large amount of fees that the Fund pays to ACIM on behalf of ACMF." (SAC ¶ 181)

The SAC also alleges (consistent with the argument raised by Plaintiff in her previous opposition brief to Defendants' prior motions for judgment on the pleadings) that the fees the Fund paid to ACIM on behalf of ACMF from the time that Defendants first breached their fiduciary duties to Plaintiff are subject to forfeiture in this action. *See Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 199-200 (2d Cir. 2003); SAC ¶ 181. Defendants did not in their first set of moving and reply papers – and do not now – refute that the management fees allocated to and paid for by the Fund would be subject to forfeiture if Plaintiff prevails in her breach of fiduciary duty claims against ACIM and ACC.

Forfeiture of ACIM's fees would adversely affect the shareholders of all the other series funds that compose ACMF because those funds were subsidized by, and have a reasonable expectation of continued subsidies from, the large amount of fees that the Fund pays to ACIM on behalf of ACMF. Were Plaintiff to prevail in this litigation, the subsidies would cease and prior subsidies would be liable to reallocation. (SAC ¶¶ 181, 183) This presents an irreconcilable conflict of interest between (a) the Fund and (b) all the other 17 funds in ACMF with respect to the outcome of this litigation. (SAC ¶ 183) The Independent Directors are therefore disqualified from determining, on behalf of Nominal Defendant ACMF, whether to pursue claims against ACIM and its parent ACC.

The conflict of interest faced by ACMF's board with respect to the claims in this litigation are therefore of an entirely different character than the typical allegations of director conflict that courts sometimes reject and upon which Defendants rely. This branch of Plaintiff's argument does not turn on the unwillingness or inability of the directors of ACMF to put aside

*personal* considerations to honor their fiduciary duties. On the contrary, assuming *arguendo* that the Directors will take their fiduciary obligations seriously, *their fiduciary obligations to the 18 different funds create an absolute and irreconcilable conflict. Cf. Wilkens Square, LLLP v. W.C. Pinkard & Co., Inc.*, --- A.2d ----, 2009 WL 4162004 (Md. App., 2009) (absolute conflict exists when a broker represents both parties to the sale of real estate); *accord Booth v. Robinson*, 55 Md. 419 (1881) (board's obligation to act with *uberrima fides* disallows them attempting to "serve two masters, or do their duty equally to two antagonists").

Demand here would have been futile because no amount of good faith, fair-mindedness or independence can overcome the Directors' obligation to act in the best interest of the other 17 funds, which may prevent them from acting in the best interests of the Fund at issue. This common-sense rule is illustrated by *In re Freeport-McMoran Sulphur, Inc. S'holder Litig.*, No. A. 16729, 2005 WL 1653923 (Del. Ch. June 30, 2005). In that case, plaintiffs were shareholders in Sulphur, Inc., which merged with an oil and gas company called MOXY. The plaintiffs complained that the merger exchange ratio was unfair to them. The court held, not surprisingly, that the "Common Directors" who sat on the boards of both Sulphur, Inc. and MOXY had conflicting loyalties. The Directors here are even more conflicted because adversarial litigation presents a more acute conflict than in a merger.

Defendants *never dispute* Plaintiff's allegations that the Directors face an irreconcilable conflict of interest in considering a demand. Defendants offer *no response* to the following facts: (1) the Directors owe separate and undivided loyalties to each of the 18 funds within ACMF; (2) if Plaintiff prevails in her claim that ACIM or ACC breached their fiduciary duties to the Fund, the management fees that were allocated to and paid by the Fund are subject to forfeiture; (3) forfeiture will benefit the Fund and its investors; and (4) forfeiture is contrary to the interests of

the investors in the other 17 funds that comprise ACMF to whom the Directors owe separate duties of undivided loyalty.

Instead of addressing these critical factual allegations, Defendants interpose three objections that are either based on inaccurate factual assumptions or irrelevant matters. (Ind. Dir. Br. at 16-18; Inst. Def. Br. at 14) None of these withstand scrutiny.

<p style="padding-left:2em;">a) Dismissal of the RICO Claims Does Not Resolve the Directors' Irreconcilable Conflict of Interests</p>

Defendants first argue that the unavailability of RICO trebling eliminates the Directors' insoluble conflict of interest. This argument mistakenly assumes that the Directors' conflict is based solely on treble damages under RICO. (Ind. Dir. Br. at 16; Inst. Def. Br. at 14) This is incorrect. The Directors' conflict arises from the substantial liability that ACC and ACIM face on Plaintiff's state law claims. By itself, forfeiture of the management fees charged to the Fund exceeds the entire amount allocated to and paid by the remaining 17 funds (without trebling). Such forfeiture would be contrary to the interests of the other funds that are part of ACMF, and to which the directors owe equal fiduciary duties. The elimination of treble damages reduces the amount at stake, but it does not make the conflict any less irreconcilable – and in any event the amount at stake remains very substantial.

> b)   Maryland Law Requires that a Determination of Demand Futility Must Focus on a Board's Ability to Respond to a Demand in Good Faith

The Fund and the Independent Director defendants[15] argue that the Directors must be alleged to be conflicted with respect to the decision to invest in PartyGaming – and not in responding to a demand. (Ind. Dir. Br. at 17) Defendants claim to find support for this position in *Werbowsky*, which holds that demand is excused when "a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." 362 Md. at 620. Based on a tortured interpretation of that language, Defendants insist that only a "conflict" that is related to the "decision in dispute" is material. Defendants are wrong. Any conflict that might have a bearing on their ability "to respond to a demand" is material.

Defendants' argument is based on a grammatically incorrect reading of *Werbowsky*. One cannot be "conflicted *to*" a "decision". If the Court had meant to relate the words "conflicted" and "decision" to one another, it would have said "conflicted with respect to or committed to the decision." Defendants' interpretation cannot be reconciled with the plain language of *Werbowsky*.

Defendants' strained interpretation contradicts every single case on which they rely in addressing this point, which are more fully analyzed in Section III(A)(1)(c), immediately below.

---

[15] The Institutional Defendants only assert the first argument (concerning RICO treble damages set forth in Section III(A)(1)(a), *supra*) in their brief. *Compare*, Ind. Dir. Br. at 17, with Inst. Def. Br. at 14. However, because the Institutional Defendants incorporate the arguments raised by the other defendants, Plaintiff will refer to the Fund and Independent Directors' arguments here and in the next section as Defendants' arguments.

In each of these "remuneration" cases cited by Defendants,[16]   the courts considered whether demand was excused under *Werbowsky* based *solely* on the fact that the fund directors received high compensation (generally between $100k to $400k per year) for sitting on multiple boards. Every one of these cases considered whether the directors, in light of their high compensation, would be (i) conflicted in deciding how to respond to a demand or (ii) committed to an adverse position in responding to a demand. The courts in these cases did *not* rely on potential conflicts or commitments with respect to the underlying conduct for which the plaintiffs sued.

Finally, Defendants' unprecedented and ungrammatical interpretation violates common sense. The *Werbowsky* court clarified that the focus of a demand futility inquiry centers on whether a board can "reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." 362 Md. at 620. Where, as here, the Directors cannot possibly determine a demand without violating at least one of several competing fiduciary duties, it necessarily follows that "they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Id.*

       c)    Defendants' Reliance on Cases Determining Demand Futility Based on Directors' Compensation for Sitting on Multiple Boards is Unavailing Because Defendants Misidentify the Nature of the Directors' Conflict of Interest in this Case

Defendants' third argument relies exclusively on "remuneration" cases where courts determined whether the high compensation that directors often receive from sitting multiple boards may, by itself, excuse demand. (Ind. Dir. Br. at 17-18) The nature of the Directors' conflict of interest in this case, however, is between *the interests of the separate funds to whom the Directors owe separate duties of undivided loyalty*. This is completely different from the

---

[16] *Scalisi v. Fund Asset Mgt., L.P.,* 380 F.3d 133(2d Cir. 2004); *In re Merrill Lynch Focus Twenty Fund Inv. Co. Act. Litig.*, 218 F.R.D. 377 (E.D.N.Y. 2003); *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451 (D.N.J. 2005).

conflicts analyzed in Defendants' cited cases. Those pitted the (a) financial self-interest of directors in continuing to receive *high remuneration* from sitting on multiple boards against (b) the best interests of all investors as a group. Those cases merely held that receiving *high compensation* from multiple board membership *by itself* does not excuse demand. As such, they have no relevance to Plaintiff's allegations here.

For example, in *Scalisi v. Fund Asset Mgt., L.P.,* 380 F.3d 133 (2d Cir. 2004), the directors' $160,000 to $260,000 in yearly remuneration earned from sitting on multiple fund boards did not by itself create a sufficiently "powerful self-interest not to authorize a suit [arising from] fear they would lose their highly remunerative position." *Id.* at 136 and 140. The conflict alleged in *Scalisi* was between the interest of the fund in question and the directors' self-interest in maintaining their positions with the various funds, not between the interests of the various funds. The *Scalisi* court had no occasion to consider whether the board members' conflicting duties of loyalty to the various funds would affect their ability to address a specific issue that could benefit a single fund, but damage the rest, as is specifically alleged here. *See also In re Merrill Lynch Focus Twenty Fund Inv. Co. Act. Litig.*, 218 F.R.D. 377 (E.D.N.Y. 2003) (same); *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp.2d 451 (D.N.J. 2005) (multiple board memberships that provided each director cumulative remuneration ranging from $140,000 to $370,000 did not, by itself, create sufficient director self-interest to excuse demand). *Compare In re eBay S'holders Litig.*, 2004 WL 253521 (Del. Ch. Feb. 11, 2004) (millions of dollars may be sufficient).[17]

---

[17] These cases not only fail to support Defendants' argument, they also demonstrate the weakness of Defendants' position on demand futility. "Remuneration" cases such as the ones that Defendants cite trace their history to legislative responses to *Strougo v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783, 795 (S.D.N.Y.1997). *Strougo* held that service on multiple boards for significant remuneration *by itself* could excuse demand. While *Strougo* was later superseded
(*footnote continues on next page*)

### 2.     *The Directors Are Conflicted Because of their Own Potential Liability*

As a second independently sufficient basis for excusing demand, Plaintiff alleges that ACMF's directors are conflicted because of the potential that they themselves would face civil or criminal liability. (*See* SAC ¶¶ 165-68) This is not the usual circular allegation Defendants parody, whereby a plaintiff baldly asserts that the directors are wrongdoers and then asserts demand futility based on the directors' status as defendants. The issue here is not just that the directors might have had to sue themselves; the issue here is that they faced (and still face) the serious potential for civil and criminal liability based on well-supported and particularized allegations. Indeed, in this case the potential for *criminal* liability is not fanciful, given the criminal prosecutions that have already occurred. (SAC ¶ 165)

The Directors had duties to monitor and ensure that the Fund did not invest in illegal enterprises, and they received regular reports regarding the Fund's investments. (SAC ¶¶ 159-63). Paragraph 165 of the SAC specifies why, in light of the Directors' duties and access to relevant information, they would face a substantial risk of criminal liability, including (among others listed):

> (a) As reported by the *New York Times*, one of the primary Congressional sponsors of the [Unlawful Internet Gambling Enforcement Act] (Rep. Goodlatte of VA) has warned that if "investment houses are knowingly supporting and promoting illegal [Internet gambling] enterprises [that would be] very bad, and the Congress ought to investigate it."

> (b) The DOJ issued public warnings that Internet gambling companies are criminal organizations and that supporting such criminal organizations was itself a crime.

---

by statute, it illuminates the severity of the structural conflicts facing fund boards. *Strougo* and the cases cited by Defendants – by merely raising the question whether the structure of mutual funds *by itself* could excuse demand – demonstrate the appropriateness of treating mutual funds differently from ordinary corporations with respect to demand futility.

(c) The United States Attorney for the Southern District of New York stated, in connection with the prosecution of NETeller PLC, an Internet payment processing company that provided services to Internet gambling companies such as PartyGaming, that "[s]upporting illegal gambling is not a business risk, it is a crime."

(d) On January 15, 2007, NETeller's founders, Stephen Lawrence and John Lefebvre, were arrested and charged with conspiracy to violate various anti-gambling laws, including § 1955. Lawrence and Lefebvre pleaded guilty to various felonies in connection with operating NETeller, including § 1955. They also agreed to personally forfeit an additional $100 million;

(e) Jay Cohen, the CEO of World Sports Exchange, was convicted and sent to prison for operating an illegal gambling business, because his company, although legal in Antigua where it was based, solicited bets from U.S. residents;

(f) Peter Dicks, the independent, non-executive chairman of Sportingbet was arrested in New York on gambling charges;

(g) David Carruthers, the chief executive of BetOnSports, was arrested in Dallas and charged with racketeering fraud, tax evasion, and conspiracy;

(h) Anurag Dikshit, a major shareholder, director, and officer of PartyGaming, pleaded guilty to charges of illegal gambling;

(i) Gary Kaplan, the founder of BetOnSports, pleaded guilty to RICO charges arising from illegal Internet gambling; he agreed to serve 41 to 51 months in prison and forfeit $43.65 million;

(j) Discovery Communications was subject to a large asset seizure by the DOJ merely for taking advertising money from PartyGaming.

When CEOs and directors of illegal gambling businesses are being prosecuted, and when companies that did business with illegal gambling businesses are being pursued civilly and criminally, and when at least one member of Congress has called for an investigation of investment houses that invested in gambling companies, it would only be natural for the Directors of ACMF to be concerned about whether they, too, might face prosecution were the circumstances surrounding ACMF's investment in these activities fully aired.

It is of little moment that Plaintiff's civil RICO claims have been dismissed. The dismissal of civil RICO claims *for lack of proximate cause* has no bearing on whether the

Directors might face criminal liability for the same conduct, because proximate cause is not an element of criminal liability. Moreover The SAC establishes that the investments in PartyGaming violate criminal statutes other than RICO, including 18 U.S.C. § 1955.

The Independent Directors assert that the prospect of criminal liability cannot, as a matter of Maryland law, excuse demand, but they cite no authority for that proposition. Rather, they assert that they have "found no decision" applying *Werbowsky* to these precise facts. (Ind. Dir. Br. at 14) In *Felker v. Anderson*, 2005 WL 602974 at *3 (W.D. Mo. Feb. 11, 2005), however, the court applied *Werbowsky* and excused demand where, as here, plaintiff made factually supported allegations that the defendants "violated state law and the fiduciary duties they owed to [the plaintiff.]"

Defendants seem to assume that under *Werbowsky*, allegations of wrongdoing directed against the directors to whom a demand would otherwise be made should be disregarded for purposes of considering demand futility. That is incorrect.

*Parish v. Maryland & Virginia Milk Producers Ass'n*, 250 Md. 24, 242 A.2d 512 (1968), was a derivative action by members of an incorporated cooperative association against the association and a number of individual officers and directors, complaining of fraud, mismanagement, and self-dealing on the part of the officers and directors. The trial court dismissed the complaint for failure to state a cause of action. The Court of Appeals held that the complaint adequately alleged those and other claims. The Court also held that because the complaint adequately alleged those wrongs, and that a majority of the current board participated in some of those acts, the complaint sufficiently alleged that "it would be futile for the plaintiffs to make demand upon those directors to cause the Association to sue them to recover for their own wrongful injuries to the Association." 250 Md. at 83, 242 A.2d at 545. The Court's

determination of futility was based on two somewhat different precepts: (1) it was not likely that the culpable directors would, in fact, agree to permit the company to sue them; and (2) even if they would so agree, a court should not permit them to decide because of their conflicted status. *Parish* remains good law where, as here, the complaint contains well supported allegations of wrongdoing, as *Felker v. Anderson*, 2005 WL 602974 at *3 (W.D. Mo. Feb. 11, 2005), shows.

In *Werbowsky*, the Maryland Court of Appeals appears to have adopted an approach to demand futility that is less tolerant of the derivative suits brought minority members or stockholders than the approach reflected in *Parish*. The Court of Appeals did not, however, overrule *Parish* or abolish the futility exception. On the contrary, the *Werbowsky* the Court expressly preserved the futility exception and, in articulating it, expressly recognized that director conflicts excuse demand.

Significantly, the *Werbowsky* Court did not hold that the complaint in that case failed to adequately *allege* futility. In fact, the Court of Appeals left undisturbed the decision of the Circuit Court holding that the complaint in that case was adequate to allege futility. The Court of Appeals affirmed on the ground that the Circuit Court had properly granted *summary judgment* on the issue where plaintiffs failed to produce sufficient evidence to prove the allegations of the complaint. Under the Court of Appeals decision in *Parish*, under the Circuit Court's decision in *Werbowsky*, and under the district court's decision in *Felker*, Plaintiff's factually supported allegations of director wrongdoing are sufficient to *plead* demand futility. Whether she will be able to *prove* those allegations after an opportunity for discovery is a separate question that cannot be decided on motions addressed to the pleadings.

Defendants suggest that they face no material prospect of criminal prosecution because the "crackdown" happened years ago and was not directed at them. (Inst. Def. Br. at 12-13 &

n.8) It is irrelevant that the Defendants have not yet been the subject of government criminal or civil proceedings. The question is whether the prosecution of this litigation could expose them to a risk of such proceedings. While it is probably more common for civil litigation to follow on the heels of criminal prosecutions, it is hardly unusual for criminal prosecutions to be based on evidence developed in the course of civil litigation. To cite but one example, the criminal convictions of Purdue Pharma executives with respect to OxyContin was based on evidence that had been developed by plaintiffs' counsel in earlier personal injury litigation. The evidence that the civil lawyers had developed was later subpoenaed by federal prosecutors. *See* A. Frankel, *Pain All Around:  The OxyContin Civil Suits Were a Bust*, American Lawyer, Vol. 29, No. 7 (July 2007). Moreover, even if the risk of prosecution were relatively small, the consequences if it occurs are sufficiently severe that even a small possibility could be expected to influence Defendants' decision whether to pursue civil litigation. The issue is not whether Defendants would in fact be prosecuted. Rather, the issue is whether the possibility that the Directors might face criminal charges could reasonably be expected to affect their judgment in deciding whether to pursue this civil litigation. To find that demand would be futile, this Court need only conclude that Defendants would prefer not even to start down a road that could eventually lead them to prison rather than gamble that they will not be prosecuted.

The present case calls to mind what Judge Coffin said in his concurring opinion in *In re Kauffman Mutual Fund Actions*, 479 F.2d 257 (1st Cir. 1973):

> I also note that the management fee contracts are not attacked as simply ultra vires or as the product of mere negligence or even of "unsound" or "erroneous business judgment". They are alleged to be illegal under federal antitrust laws. If I were to calibrate a scale to measure the impact of varying improprieties, I would rate such an allegation fairly high. I find it hard to imagine that a director, however, unaffiliated, who had participated, or under these circumstances knowingly acquiesced, in a major transaction, albeit for a corporate purpose, would authorize a suit, effectively against himself, claiming that the transaction violated the

federal antitrust laws. Even independent watchdogs cannot be thought ready to sign a confession of that magnitude.

479 F.2d at 269.

Defendants claim that Delaware law provides persuasive guidance and assert that under Delaware law, potential civil or criminal liability does not excuse demand. (Inst. Def. Br. at 13) Even if Delaware law applied, however, Defendants are wrong. A director's potential civil or criminal liability also excuses demand under Delaware law.

Delaware law excuses demand when "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Demand may also be excused under *Rales v. Blasband*, 634 A.2d 927 (Del. 1993), even if the directors or trustees are not involved in the challenged transactions, if there exists "reasonable doubt" that a majority of the directors are disinterested or independent. The Delaware Chancery Court's opinion in *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007) applies this standard and demonstrates why demand is excused in this case.[18]

---

[18] The cases relied on by Defendants to the contrary are inapposite. For example, *Seminaris v. Landa*, 662 A.2d 1350 (Del. Ch. 1995), concerned claims that the defendant directors released misleading and inaccurate information regarding the corporation. 662 A.2d at 1351. Crucial to the *Seminaris* court's decision was that "plaintiff virtually concede[d] that the threat of personal liability … was not substantial enough to render the directors interested." *Id.* at 1355. It is hardly surprising, therefore, that the court held that the threat of liability in other, related actions could not remedy this deficiency as they could have no "greater impact" than the claims directly asserted in the derivative action. *Id.* The court also noted that any threat of spillover liability was mitigated by the directors "seeking to stay" the derivative lawsuit until the completion of the related cases, thereby obviating any extraneous influences on the board's decision in responding to a demand. *Id.* None of these factors is present here. *In re Nyfix, Inc. Derivative Litig.*, 567 F. Supp. 2d 306, 315 (D. Conn. 2008), is not persuasive precedent because a majority of the board at the time of the alleged wrongdoing in that case had been replaced by the time of the operative pleading. Finally, *Rattner v. Bidzos*, 2003 WL 22284323 (Del. Ch. Sept. 30, 2003), does not

*(footnote continues on next page)*

In *Ryan*, the plaintiff filed a derivative action on behalf of Maxim Integrated Products, Inc. The plaintiff alleged that the members of Maxim's compensation committee, which included three members of the six then current members of Maxim's board of directors, had approved back-dated options for Maxim's chairman and CEO. The court held that the challenged conduct satisfied *Aronson*. In particular, the directors had "a disabling interest for pre-suit demand purposes when 'the potential for liability is not a mere threat but instead may rise to a substantial likelihood.'" *Ryan*, 918 A.2d at 355. The court noted that because backdating options violated the express grant of power under a shareholder-approved compensation plan, a "director who approves the backdating of options faces at the very least a substantial likelihood of liability." 918 A.2d at 355. *See also Sanders v. Wang*, 1999 WL 1044880 (Del. Ch. Nov. 10, 1999).

The facts alleged in the SAC raise an even more compelling case for demand futility. Instead of mere violation of a shareholder compensation plan, Plaintiff here alleges that the Directors violated § 1955 and RICO, breached their fiduciary duties, were negligent, and committed waste.

Moreover, the *Ryan* court specifically noted that "[w]ere the board to pursue a derivative suit, it might unearth facts that would subject directors to further civil and criminal liability." 918 A.2d at 356, n.38. The threat of unearthing additional facts that could expose the Directors to criminal and civil liability is particularly strong in this case. (SAC ¶ 167) We note that arguably less culpable third-parties – including, for example, Discovery Communications – have been subject to large asset seizures by the DOJ merely for taking advertising money from the illegal gambling company in which Defendants invested. (SAC ¶¶ 84(f), 167(j))

---

support Defendants' theory that potential liability in a separate action cannot excuse demand. Rather, the *Rattner* court merely pointed out that plaintiffs left "the court to guess at which of the individual defendants, indeed if any of the Director defendants are defendants in the federal securities class action lawsuits." *Id.*, at 14.

46

Finally, Directors cannot be indemnified for their personal financial liability under RICO or for other serious wrongdoing because that would be contrary to public policy, magnifying their conflict of interest in responding to a demand. (SAC ¶ 168)

### 3. The Directors Are Committed to Their Decision Not to Pursue Claims Arising from the Fund's Investments in PartyGaming

The third independently sufficient reason why demand should be excused is because, by their inactions after learning of the existence of the claims asserted by Plaintiff, and by their affirmative conduct in this case, the Directors have shown that they are so committed to the position that the claims should not be pursued that they cannot be expected to respond in good faith to a demand that those claims be pursued. (SAC ¶ 133)

The SAC alleges that after the Fund suffered losses from its investments in PartyGaming and the Directors became aware of them, they did not do anything to vindicate ACMF's rights in the two years before this action was commenced. (SAC ¶ 134) Since litigation was commenced in September 2008, the Directors still have done nothing to vindicate those rights. (SAC ¶ 136)

In responding to the original complaint in this action, the Directors could have moved to dismiss under Rule 23.1 based on the lack of a demand. Instead, they filed responsive pleadings on April 6, 2009. In their Answer, the Directors denied, and caused ACMF to deny, virtually all of the substantive allegations of the complaint. They also asserted, and caused ACMF to assert, substantive defenses and affirmative defenses. This demonstrates that they are committed against ever bringing suit on behalf of ACMF. (SAC ¶ 138)

On May 8, 2009, Plaintiff filed her Amended Complaint to plead this Court's diversity jurisdiction over her common law claims. (SAC ¶ 140) Again, Directors could have moved to dismiss under Rule 23.1, but they chose to answer the Amended Complaint. (SAC ¶ 141) They

interposed, and caused ACMF to interpose, virtually the same denials, substantive defenses and affirmative defenses that they previously interposed.

Thus, the Directors have self-servingly committed themselves – and ACMF – to a decision that the claims asserted by Plaintiff should not be pursued and that the interests of the shareholders to whom they own a duty of undivided loyalty should be abandoned.

In responding to either of Plaintiff's complaints, the Directors could have made a motion pursuant to Fed. R. Civ. P. 23.1 without prejudice to their ability to pursue other procedural and substantive defenses if such motion was denied. They could have also left the substantive attack on Plaintiffs' claims to the other defendants, whose assertions would not have been judicial admissions that would burden ACMF itself should ACMF wish to pursue its claims on its own. They chose not to do so. The only rational explanation for their decision to *answer* the original and then the amended complaint, rather than moving to dismiss, is that Directors wished to commit ACMF as fully as possible to the substantive position that the Directors cannot be held liable to ACMF. Given the Directors' inactions and actions prior to the SAC, it is clear that "a majority of the directors are so personally and directly … committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Werbowsky*, 362 Md. at 620, 766 A.2d at 144.

Directors do not deny that, through their conduct, they *in fact* have already committed themselves, and ACMF, to a position against any future prosecution of the claims in the SAC. Instead, they argue that this Court should ignore the truth because, in making a determination of demand futility, the Court should ignore events after the action is commenced. (Ind. Dir. Br. at 13-14; Inst. Def. Br. at 14-15)

Defendants' arguments muddle two separate issues. First, what is the operative date for determining whether demand would have been futile? Second, what evidence may be considered in determining whether demand would have been futile on the operative date? We address these separately.

        a)      The Operative Date for Determining Futility Is the Date of the Operative Pleading

"[I]t is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." *Dluhos v. Floating & Abandoned Vessel*, 162 F.3d 63, 68 (2d Cir.1998) (*citing Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994)). The operative date for determining demand futility is the date of the amended pleading. *See Brody v. Chemical Bank*, 517 F.2d 932, 934 (2d Cir. 1975) (when board in place changed between the filing of first and second complaint, proper board for assessing demand and demand futility of the new operative complaint was the new board); *M&J Savitt, Inc. v. Savitt*, 2009 WL 691278 at *6. (S.D.N.Y. 2009).

Because all of the facts alleged in the SAC are facts prior to November 9, 2009, they all may be considered. Therefore, this Court need not address at this time the question of what, if any, post-SAC facts might be relevant to the issue of futility because all of the relevant facts that Plaintiff asks this Court to consider occurred *before* the date the SAC was filed.

        b)      Facts That Occur After the Operative Date May Be Relevant to Establish Whether Demand Would Have Been Futile on the Operative Date

Even if Defendants were correct that the operative date for determining futility is some date prior to November 9, 2009, facts that occurred after such date would still be relevant to establish that demand would have been futile as of such date. "Subsequent act" evidence is routinely admitted under Fed. R. Evid. 404(b) to prove the existence of facts at an earlier time.

*See, e.g., United States v. Germosen*, 139 F.3d 120, 128 (2d Cir.1998) (allowing evidence of a similar scheme perpetrated after the charged offenses to show intent at the time of the charged offenses); *United States v. Ramirez*, 894 F.2d 565, 569 (2d Cir.1990).

Courts in other cases have considered acts subsequent to the operative pleading in determining demand futility. *See, e.g.*, *In re American Intern. Group, Inc.*, 965 A.2d 763, 808-09 (Del. Ch. 2009) (court determined that demand would be futile based on post-suit conduct (*e.g.,* the board's delay in deciding whether to support or oppose the litigation)); *Mona*, 176 Md. App. at 700, 934 A.2d at 466 (demand futility may be determined based on post-suit events, such as a subsequent demand by the plaintiff); *Spiegel v. Buntrock*, 571 A.2d 767, 776 (Del. 1990) (same); *In re Comverse Technology, Inc.*, 56 A.D.3d 49 (1st Dept. 2008) (court considered evidence of special committee's willingness to take appropriate action to protect the corporation after the complaint).

Defendants rely on *Grossman v. Johnson*, 674 F.2d 115, 123 (1st Cir. 1982). The *Grossman* court refused to credit a post-suit statement by the directors that allegedly evidenced their opposition to the suit. However, the directors' statement expressly provided that they were "anxious … to evaluate any information which [plaintiff] has" and therefore did not preclude their fair consideration of a demand. Because the post-commencement statement that plaintiff sought to rely on did not actually evidence futility, it is unclear from *Grossman* whether the court would have refused to consider post-commencement evidence that actually did.[19]

---

[19] *Grossman* has been overruled by at least two separate Supreme Court cases. First, its holding on whether demand is even required for claims under Section 36(b) of the Investment Company Act, 15 U.S.C.A. § 80a-35(b), has been overruled by *Fox*, 464 U.S. 523, 536 (1984). Second, the *Grossman* court purported to apply federal law to the demand futility inquiry. This has been overruled by the Supreme Court in *Kamen*, 500 U.S. 90, 108-09. Third, the *Grossman* plaintiff made a demand *after* filing suit. *Id.* It is now generally accepted that making such a demand would effectively waive a demand futility argument, even if facts would have supported a

(*footnote continues on next page*)

Similarly, in *Lewis v. Graves*, 701 F.2d 245 (2d Cir. 1983), the Court said it agreed with the district court that the post-complaint evidence cited by the plaintiff "do not necessarily lead to the conclusion that demand would have been futile here." 701 F.2d at 250. The Court's statement about the relevance of that evidence was therefore *dicta*. It is simply unclear what the Court would have done if presented with post-complaint events that actually tended to prove that demand would have been futile.

Defendants also cite *Weiss v. Temporary Inv. Fund, Inc.*, 516 F. Supp. 665 (D. Del. 1981). They neglect to mention, however, that this case made it to the Supreme Court, which granted *certiorari* and vacated the Third Circuit's original decision affirming. 465 U.S. 1001 (1984). The Third Circuit, on remand, reversed the district court. 730 F.2d 939 (3d Cir. 1984). Even if this decision had not been reversed, the court also purported to apply federal law to its demand futility inquiry, contrary to *Kamen*. Like Defendants' other authorities, *Weiss* is neither authoritative nor persuasive on Maryland demand futility law. Furthermore, *Weiss* expressly recognized "that clear evidence of the directors' opposition to an action urged by a shareholder will in some circumstances excuse demand." 516 F.2d at 673; Note, The Demand and Standing Requirements in Stockholder Derivative Actions, 44 U. Chi. L. Rev. 168, 180-82 (1976).

Finally, Defendants rely on *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 621 (6th Cir. 2008). This decision applied Ohio law and did not address whether a defendant's answers filed before the plaintiff's operative pleading could be considered in weighing demand futility. *Ferro* concerned whether events (other than responsive pleadings filed by defendants) that occur

---

finding of futility. *See, e.g., Mona*, 176 Md. App. at 700, 934 A.2d at 466 (if a plaintiff makes a demand after filing suit, demand cannot be excused *regardless of the facts at the time the complaint was filed*); *Spiegel,* 571 A.2d at 776 (same). Finally, *Grossman* is contrary to this Court's decision in *M&J Savitt* on the "operative date" issue. *Grossman* is simply an outdated decision that managed to arrive at the wrong answer to all four demand futility questions it addressed. *Grossman* is neither authoritative nor persuasive.

*after* the operative pleading may be considered. With respect to that conclusion, the *Ferro* court simply relied on *Grossman*. *Id.* at 621. This Court should therefore reject *Ferro* in determining Maryland demand futility law under the facts alleged in the SAC.

Due consideration of all relevant facts, including facts subsequent to the operative pleading, is more likely to lead the Court to a truthful factual determination of futility. By ignoring relevant facts, particularly positions taken in formal court filings, a court runs the hazard of relying on a fiction.

### B. Demand Is Excused Because It Would Cause Irreparable Injury to the Fund

The SAC also alleges that "[d]emand is … excused to avoid irreparable harm to ACMF. (SAC ¶ 149) Specifically, the SAC alleges that "the positions taken by the Independent Directors' in their pleadings and motion for judgment were intended in part to insulate them from personal liability to ACMF by committing ACMF to the legal position that ACMF has no valid claims against any Defendant." (SAC ¶ 151) By asserting substantive defenses on behalf of the Fund in two responsive pleadings, the Directors have self-servingly hobbled ACMF's ability to ever pursue redress for the injuries alleged in the SAC, even if the board were now to change its position and decide to pursue such claims – which is obviously what the Directors intended to accomplish. Because the Directors caused ACMF to take substantive positions on the merits in a responsive pleading – instead of simply moving to dismiss for failure to make a demand – the Directors have foreclosed any reasonable possibility of redress for the claims alleged in the SAC except through this derivative lawsuit.

In these circumstances, ACMF will be irreparably harmed if Plaintiff is not allowed to pursue these claims on a derivative basis. Demand is therefore excused. *See Werbowsky*, 362 Md. at 620, 766 A.2d at 144.

Defendants' say that there will be no irreparable harm because the SAC only requests monetary damages. (Ind. Dir. Br. at 19; Inst. Def. Br. at 12) Defendants are confused. *Werbowsky* asks whether insistence on a prior "demand, <u>or</u> a delay in awaiting a response to a demand, would cause irreparable harm to the corporation" (emphasis added) – not whether the complaint seeks equitable relief to avoid irreparable harm to the plaintiff. *Id.* It may be true that when a plaintiff alleges irreparable harm from a "*delay* in awaiting a response" to a demand, it may be relevant to consider whether the complaint requests only monetary damages or instead seeks equitable relief to halt a challenged transaction by a certain date.

Here, Plaintiff alleges irreparable harm from losing forever the ability to recover money damages. Defendants fail to explain why it would even make sense in this context to link a demand futility inquiry to the type of relief requested in the complaint.

Not surprisingly, all of the precedents that Defendants rely on are "delay" cases and are therefore irrelevant to the specific allegations of irreparable harm in the SAC. Defendants cite *Sekuk Global Enterprises Profit Sharing Plan v. Kevenides*, 2004 WL 1982508 (Md. Cir. Ct. May 25, 2004), for the proposition that Plaintiff must allege irreparable harm in her complaint. This is a misreading of *Sekuk,* which involved a shareholder derivative action challenging the business judgment of directors who approved the imminent sale of the company's assets. The court's discussion concerning the "irreparable harm" prong of *Werbowsky* focused on whether a *delay* occasioned by a demand (that would allow the challenged transaction to be completed before the challenge could be decided) would irreparably harm the plaintiffs. The court held that such a delay would cause no irreparable harm because the plaintiffs could be made whole with money damages even if they did not timely halt the challenged transaction. Nothing in *Sekuk* purported to restrict the permissible categories of irreparable injury that a court may consider.

Indeed, the court stated that it was "unclear" as to whether the plaintiffs were even making an argument for demand futility under the "irreparable harm" prong of *Werbowsky*. 2004 WL 1982508, at *4.

Defendants also cite *Washentaw Cty. Employees' Retirement Sys. v. Wells Real Estate Inv. Trust*, 2008 WL 2302679 (N.D. Ga. 2008). Like *Sekuk*, the *Washentaw* decision involved a pending transaction deadline that the plaintiff alleged might lapse if a demand were required. *Washentow* cited *Sekuk* in holding that "the lack of time to file the required demand [is] insufficient to meet the *Werbowsky* standard." 2008 WL 2302679, at*13. The court reasoned that even if demand were not excused and the transaction deadline passed while the plaintiff waited for an answer from the board, the corporation could still be "compensated through monetary damages." *Id.* This is inapplicable to Plaintiff's allegations in the SAC.

Directors do not dispute that their conduct prior to November 6, 2009 has undermined the ability for ACMF to vindicate its rights except through the continuation of this litigation. Defendants never refute that if Plaintiff were required to make a demand, the ability of ACMF to pursue its claims has been materially, if not fatally, compromised based on the substantive defenses that the Directors have self-servingly and unnecessarily caused ACMF to assert. Because the demand requirement does not exist for the benefit of defendants in derivative suits, *In re American Intern. Group, Inc.*, 965 A.2d 763, 808 (Del. Ch. 2009), this Court should consider the practical consequences to the Fund's investors of allowing the Directors to scuttle any chance for the investors to be compensated. The Director's conduct prior to November 6, 2006, as alleged in the SAC, establishes that requiring Plaintiff to make a demand will "cause irreparable harm to the corporation" and should therefore be excused. *Werbowsky*, 362 Md. at 620, 766 A.2d at 144.

### C.    The Grounds Excusing Demand Must Be Considered Cumulatively

Each of the grounds excusing demand discussed above is independently sufficient to excuse demand. However, even if each, standing alone, would be insufficient to excuse demand, they are, considered cumulatively, more than sufficient to plead that the directors "cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Werbowsky*, 362 Md. at 620, 766 A.2d at 144.

## IV.    PLAINTIFF HAS PROPERLY PLEADED DIRECT CLAIMS IN THE ALTERNATIVE TO HER DERIVATIVE CLAIMS

Plaintiff's standing to pursue direct claims is governed by Maryland law. *Strougo,* 282 F.3d at 167-69, 176-77. Defendants claim that Maryland courts have failed to address the issue and that this Court should, therefore, look to Delaware law, *see* Inst. Def. Br. at 8 n.5, but this is not so. As the Second Circuit has recognized, *see Strougo*, 282 F.3d at 169-176, Maryland has a well-developed body of law for determining when a shareholder pursue direct, as opposed to derivative, claims. *See, e.g., Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 983 A.2d 408 (2009). Under Maryland, law, shareholders may sue directly when they "suffer an injury that is distinct from that of the corporation." *Strougo*, 262 F.3d at 171; *Argiropoulos v. Kopp,* 2007 WL 954747, *5 (D. Md. March 26, 2007) ("Where a shareholder alleges an injury that is distinct from the corporation . . . the individual shareholder has standing to redress that injury); *Delmarva Sash & Door Co. of Maryland, Inc. v. Andersen Windows, Inc.*, 218 F. Supp. 2d 729 (D. Md. 2002) (same); *see also Waller v. Waller,* 187 Md. 185, 49 A.2d 449 (1946) (shareholders may not sue for injury to the corporation itself); *Tafflin v. Levitt*, 92 Md. App. 375, 381, 608 A.2d 817, 820 (1992) (depositors could not sue directly where their alleged injury was not "distinct" from the injury to the savings & loan).

Because of the structure of the ACMF "series" funds, Plaintiff is essentially a member of a minority class of shareholders of the nominal defendant ACMF. The injury suffered by the holders of the shares of the Fund was not inflicted on holders of the other 17 series of shares issued by the ACMF. Nor was it ultimately inflicted on ACMF, because ACMF merely passed the losses through to shareholders of the Fund. Plaintiff's interests are thus materially different from the interests of the holders of other series of shares and distinct from the interests of ACMF.

Moreover, Maryland law recognizes that officers and directors owe a duty to the shareholders of the corporation, as well as to the corporation itself. *Strougo*, 282 F.3d at 173 ("Maryland courts have clearly established the proposition that directors and officers owe fiduciary duties to both the corporation and the shareholders."), *citing Toner v. Baltimore Envelope Co.,* 304 Md. 256, 268-69, 498 A.2d 642, 648 (1985) (collecting cases)*; Waller, 187* Md. at 194, 49 A.2d at 454. Where, as here, "a shareholder's action is based on breach of a duty owed directly to the shareholder, a direct action may be filed against the directors." *Shenker,* 411 Md. at 344, 983 A.2d at 423.

Relying on Delaware law, Defendants claim that Plaintiff may not assert her claims directly because she alleges that all of the Fund's shareholders "were injured in exactly the same way." (Inst. Def. Br. at 14) To make this assertion, Defendants must not only ignore the law, they must also muddle the facts alleged in the SAC. Throughout their papers, Defendants fail to distinguish between the terms "ACMF" and "Fund". The Fund is just one of 18 series mutual funds offered by ACMF. Plaintiff does *not* allege that all shareholders of *ACMF* were injured in exactly the same way, or that any other group of shareholders was even injured at all. Nor does she seek to represent a class consisting of all of ACMF's shareholders. Rather, Plaintiff asserts

that *only* the shareholders of the one particular *fund* at issue here were injured – and that is the class she seeks to represent.

Defendants cite *Hogan v. Baker*, 2005 WL 1949476, at *4 (N.D. Tex. Aug. 12, 2005). However, that case merely rejected the plaintiffs' arguments that their claims should be considered as direct instead of derivative claims because their losses were "passed through" to them due to the way that mutual funds calculate the net asset value of its shares. *Hogan* plaintiffs alleged a loss that was commonly shared by *all* seventy of the funds managed by the defendant investment adviser. The Court did not specifically consider whether an injury suffered exclusively by the holders of a particular mutual fund "series" could be brought as a direct claim.

Similarly, Defendants' reliance on *Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1027-28 (C.D. Cal. 2005), is unavailing. Like *Hogan*, the court in *Mutchka* rejected the plaintiff's claims of direct injury based on an argument that mutual funds "pass through" the losses directly to the investors. But the alleged losses in *Mutchka* were, like those in *Hogan,* shared by *all* relevant shareholders. In contrast, Plaintiff's injuries here were not suffered by *all* relevant shareholders of the nominal defendant. Indeed, the investment losses were not shared by any of the other mutual fund series shareholders within ACMF. In these circumstances, *Strigliabotti v. Franklin Resources, Inc.*, No. C-04-00883, 2005 WL 645529 *8 (C.D. Cal. Mar. 7, 2005), is the better precedent. There the court held that state law claims brought based on individual injuries suffered by shareholders, not injury to the Funds themselves, were direct claims because of the unique nature and structure of mutual funds.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss Plaintiff's common law claims should be denied.

Dated: January 22, 2010

                                              _____

Thomas I. Sheridan, III
Andrea Bierstein
HANLY CONROY BIERSTEIN
SHERIDAN FISHER & HAYES, LLP
112 Madison Avenue
New York, NY 10016-7416
Telephone: 212-784-6400
tsheridan@hanlyconroy.com
abierstein@hanlyconroy.com

                  - and -

Gregory P. Erthal
SIMMONS BROWDER GIANARIS ANGELIDES &
BARNERD LLC
707 Berkshire Blvd.
East Alton, Illinois 62024
(618) 259-6479
gerthal@simmonsfirm.com

*Attorneys for Plaintiff*

58