UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
LAURA SEIDL, individually, derivatively :
and on behalf of all others similarly   :
situated,                               :
                                        :
                  Plaintiff,            :
                                        :
            -v-                         :
                                        :
AMERICAN CENTURY COMPANIES, INC.,       :
AMERICAN CENTURY INVESTMENT MANAGEMENT, :       08 Civ. 8857
INC., JAMES E. STOWERS, JR., JAMES E.   :          (DLC)
STOWERS, III, JONATHAN S. THOMAS,       :
THOMAS A. BROWN, ANDREA C. HALL, DONALD :       OPINION & ORDER
H. PRATT, GALE E. SAYERS, M. JEANNINE   :       ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
STRANDJORD, TIMOTHY S. WEBSTER, WILLIAM :
M. LYONS, MARK MALLON, WADE SLOME,      :
BRUCE WIMBERLY, and JERRY SULLIVAN,     :
                                        :
                  Defendants,           :
                                        :
            -and-                       :
                                        :
AMERICAN  CENTURY  MUTUAL  FUNDS,  INC.,:
doing  business  as  AMERICAN  CENTURY: 
ULTRA FUND,                             :
                                        :
                  Nominal  Defendant.:
                                        :
----------------------------------------X
APPEARANCES:

For plaintiff:

Gregory P. Erthal
SimmonsCooper, LLC
707 Berkshire Blvd., P.O. Box 521
East Alton, IL 62024

Thomas I. Sheridan, III
Andrea Bierstein
Hanly Conroy Bierstein Sheridan Fisher & Hayes, LLP
112 Madison Avenue
New York, NY 10016

For defendants American Century Companies, Inc., American
Century Investment Management, Inc., James E. Stowers, Jr.,
James E. Stowers, III, Jonathan S. Thomas, William M. Lyons,
Mark Mallon, Wade Slome, Bruce Wimberly, and Jerry Sullivan:

Gordon C. Atkinson
Cooley Godward Kronish LLP
114 Avenue of the Americas
New York, NY 10036

For defendants Thomas A. Brown, Andrea C. Hall, Donald H. Pratt,
Gale E. Sayers, M. Jeannine Strandjord, and Timothy S. Webster,
and nominal defendant American Century Mutual Funds, Inc., doing
business as American Century Ultra Fund:

David P. Langlois
Sutherland Asbil & Brennan, LLP
1114 Avenue of the Americas, 40th Flr.
New York, NY 10036

Marguerite C. Bateman
Steuart H. Thomsen
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, N.W.
Washington, DC 20004


DENISE COTE, District Judge:

    This lawsuit concerns a mutual fund's liability to its

shareholders for investments in an online gambling company.  The

investments declined in value after the United States government

stepped up law enforcement efforts against illegal online

gambling enterprises.  Plaintiff, a shareholder in the mutual

fund, brings this derivative and putative class action lawsuit

alleging violations of the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), as well as

state common law claims for breach of fiduciary duty,

negligence, and waste.  On December 18, 2009, the defendants
filed motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).
For the following reasons, the motions are granted.

<u>BACKGROUND</u>

The following facts are taken from the second amended
complaint ("SAC").  Plaintiff Laura Seidl ("plaintiff") is a
shareholder in nominal defendant American Century Mutual Funds,
Inc. ("ACMF"), a Maryland corporation, through its American
Century Ultra Fund (the "Ultra Fund").  Plaintiff purchased her
shares in the Ultra Fund sometime prior to 2005, and still owns
her shares.  ACMF is registered under the Investment Company Act
of 1940 as an open-end management investment company.  ACMF is a
"series" mutual fund that offers eighteen different series, or
classes of stock, to investors.  Each series of stock represents
a different group of shareholders with an interest in a separate
portfolio of securities, commonly referred to as a "fund."  The
Ultra Fund is one of the eighteen funds managed by ACMF; it is
not a separate legal entity from ACMF.

ACMF is controlled by an investment management company,
defendant American Century Companies, Inc. ("ACC"), through its
subsidiary, defendant American Century Investment Management,
Inc. ("ACIM").  ACC selects and appoints the executives and the
entire board of directors of ACMF.  ACIM serves as the

investment adviser to ACMF and is responsible for management of the Ultra Fund.  ACMF has a single board of directors which oversees all eighteen of its funds, including the Ultra Fund. At all times relevant to this action, ACMF's board of directors had nine members, of which six were independent directors (the "Independent Directors"), all of whom are named as individual defendants in this action.[1]  In addition to ACC, ACIM, ACMF, and the members of ACMF's board, plaintiff also names as defendants other officers of ACMF[2] and the co-portfolio managers of the Ultra Fund[3], who plaintiff alleges were also responsible for the investment decision at issue here.

Plaintiff claims that "each of the [d]efendants knowingly developed, implemented, and continued" or "conspired to develop, implement, and continue" an investment strategy involving the

---

[1] The SAC identifies the following nine individuals as members of ACMF's board: James E. Stowers, Jr. ("Stowers, Jr."), the Chairman of ACMF; Jonathan S. Thomas ("Thomas"), the Executive Vice President of ACMF from November 2005 through February 2007, and President and Chief Executive Officer of ACMF since January 2007; James E. Stowers, III ("Stowers III"); Thomas A. Brown ("Brown"); Andrea C. Hall ("Hall"); Donald H. Pratt ("Pratt"); Gale E. Sayers ("Sayers"); M. Jeannine Strandjord ("Strandjord"); and Timothy S. Webster ("Webster").  The SAC identifies the following individuals as Independent Directors: Brown, Hall, Pratt, Sayers, Strandjord and Webster.

[2] These additional defendant officers are William M. Lyons, the President and Chief Executive Officer of ACMF from September 2000 through January 2007, and Mark Mallon, the Executive Vice President and Chief Investment Officer of ACMF.

[3] The co-portfolio managers of the Ultra Fund are defendants Wade Slome, Bruce Wimberly, and Jerry Sullivan.

purchase of shares in PartyGaming Plc ("PartyGaming"),[4] which
plaintiff contends was "an illegal gambling business" within the
meaning of 18 U.S.C. § 1955.[5]  Plaintiff alleges that beginning
in or around June 2005, defendants caused ACMF, through the
Ultra Fund, to purchase millions of shares of PartyGaming.  ACMF
continued to purchase shares of PartyGaming for the Ultra Fund
through at least January 2006.  The SAC states that as of April
30, 2006, ACMF owned 34,684,000 shares of PartyGaming through
the Ultra Fund.  Plaintiff alleges that prior to making these
investments, each of the defendants knew, or was reckless in not
knowing, that PartyGaming was taking bets from gamblers in the
United States and that United States law enforcement considered
PartyGaming's activities to be illegal gambling.

On June 1, 2006, a U.S. grand jury indicted London-based
BetOnSports Plc, an online gambling business similar to
PartyGaming, for racketeering, mail fraud, and running an

---

[4] The SAC indicates that PartyGaming is a Gibraltar company
listed on the London Stock Exchange.

[5] Section 1955 provides that "[w]hoever conducts, finances,
manages, supervises, directs, or owns all or part of an illegal
gambling business shall be fined under this title or imprisoned
not more than five years, or both."  18 U.S.C. § 1955(a).
"Illegal gambling business" is defined as a gambling business
which "(i) is a violation of the law of a State or political
subdivision in which it is conducted; (ii) involves five or more
persons who conduct, finance, manage, supervise, direct, or own
all or part of such business; and (iii) has been or remains in
substantially continuous operation for a period in excess of
thirty days or has a gross revenue of $2,000 in any single day."
Id. § 1955(b).

illegal gambling enterprise.  When the indictment was unsealed on July 16, 2006, the price of PartyGaming's stock fell "dramatically."  Sometime around late July 2006, ACMF sold all of the shares of PartyGaming held by the Ultra Fund, realizing millions of dollars in losses.[6]

Over two years later, on October 15, 2008, plaintiff filed a complaint against the defendants, alleging direct class action and derivative claims under RICO and state common law. Specifically, plaintiff alleged that defendants' repeated investments in PartyGaming, an illegal gambling business, constituted an "open-ended, continuous pattern of racketeering activity" that injured her "[a]s a direct, foreseeable, and proximate result."  The complaint also accused defendants of breach of fiduciary duty, negligence, and waste.  The defendants answered the complaint on April 6, 2009, and amended their answer on April 22.

At a conference held April 28, the plaintiff and defendants agreed that the application of this Court's decision in McBrearty v. Vanguard Group, Inc., No. 08 Civ. 7650 (DLC), 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), aff'd, No. 09-1445, 2009 WL 4019799 (2d Cir. Nov. 23, 2009) ("McBrearty"), would result in

---

[6] Although the defendants have never disclosed the exact dates, purchase prices, or numbers of shares of PartyGaming purchased and sold by ACMF on behalf of the Ultra Fund, plaintiff estimates that the capital losses suffered by ACMF due to the Ultra Fund's investments in PartyGaming exceed $15 million.

dismissal of plaintiff's RICO claims due to the failure to adequately plead proximate causation as required by RICO.  By Order dated April 28, 2009, plaintiff's RICO claims were dismissed and plaintiff was granted leave to amend the complaint to allege diversity jurisdiction.

Plaintiff filed a first amended complaint on May 8, 2009. Defendants answered on June 25, and on July 2, moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  On August 28, plaintiff filed her opposition in which she requested leave to amend.  On October 20, defendants' motion for judgment on the pleadings was denied without prejudice to renewal and plaintiff was granted leave to amend.  Plaintiff filed the SAC on November 20, 2009.  The SAC reasserts plaintiff's purported direct class action, derivative, and individual claims under RICO, 18 U.S.C. § 1962(c)&(d), and under state common law.  On December 18, defendants filed motions to dismiss the SAC pursuant to Fed. R. Civ. P. 12(b)(6).  Plaintiff filed her opposition on January 22, 2010, and the motions became fully submitted on February 19.

DISCUSSION

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  Ashcroft v. Iqbal,

556 U.S. ----, 129 S.Ct. 1937, 1949 (2009).  A court considering
a motion to dismiss pursuant to Rule 12(b)(6) "must accept as
true all allegations in the complaint and draw all reasonable
inferences in favor of the non-moving party."  Vietnam Ass'n for
Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d
Cir. 2008) (citation omitted).  For a plaintiff's claim to
survive a motion to dismiss, "a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.'"  Iqbal, 129 S.Ct. at
1949 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570
(2007) (citation omitted)).  Applying this plausibility standard
is "a context-specific task that requires the reviewing court to
draw on its judicial experience and common sense." Iqbal, 129
S.Ct. at 1950.  "[T]hreadbare recitals of the elements of a
cause of action, supported by mere conclusory statements, do not
suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009).  A
complaint must "give[ ] the defendant fair notice of what the
plaintiff's claim is and the grounds upon which it rests."
Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009) (citation
omitted).


1.   RICO Claims

     The April 28, 2009 Order dismissed plaintiff's RICO claims
for the reasons stated in McBrearty, 2009 WL 875220, at *2-*4.

Since the dismissal of these claims, plaintiff has twice amended her complaint.  Plaintiff concedes, however, that there has been no amendment that would alter the conclusion that plaintiff has failed to plead proximate causation under RICO.  See id. Because the April 28, 2009 Order is the law of the case, and plaintiff has identified no "cogent" or "compelling" reason to revisit the Order, see Ali v. Mukasey, 529 F.3d 478, 490 (2d Cir. 2008), the RICO claims are dismissed.

2.   Shareholder Standing

     Plaintiff asserts two direct class-action claims under state common law for breach of fiduciary duty and negligence. Defendants argue that these claims should be dismissed because they can be brought only as derivative claims on behalf of ACMF. The issue of "shareholder standing," that is, whether claims should be brought directly or derivatively, is a question of state law.  A federal court adjudicating questions of state law must apply the choice of law principles of the forum state. Wall v. CSX Transp., Inc., 471 F.3d 410, 415 (2d Cir. 2006). Under New York law, courts look "to the law of the state of incorporation in adjudicating a corporation's 'internal affairs,' including questions as to the relationship between the corporation's shareholders and its directors," such as a shareholder derivative action.  Galef v. Alexander, 615 F.2d 51,

9

58 (2d Cir. 1980); see also In re BP plc Derivative Litig., 507
F. Supp. 2d 302, 307-09 (S.D.N.Y. 2007).  Because ACMF is a
Maryland corporation, Maryland law applies to the question of
shareholder standing.[7]

Under Maryland law, a shareholder's right to bring a direct
action depends on whether the shareholder alleges an injury that
is "distinct" from that suffered by the corporation.  Strougo v.
Bassini, 282 F.3d 162, 170 (2d Cir. 2002) (citation omitted);
Waller v. Waller, 49 A.2d 449, 452 (Md. 1946).  In Shenker v.
Laureate Educ., Inc., 983 A.2d 408 (Md. 2009), the Maryland
Court of Appeals recently reaffirmed that "a shareholder may
bring a direct action, either individually or as a
representative of a class, against alleged corporate wrongdoers
when the shareholder suffers the harm directly or a duty is owed
directly to the shareholder, though such harm also may be a
violation of a duty owing to the corporation."  Id. at 424
(emphasis added).  "That the plaintiff suffered his or her
injury in common with all other shareholders is not
determinative of whether the injury suffered is direct or
indirect."  Id. (citing Tooley v. Donaldson, Lufkin & Jenrette,
Inc., 845 A.2d 1031, 1033 (Del. 2004)); see also Strougo, 282
F.3d at 171.  "Where the rights attendant to stock ownership are

---

[7] The parties do not dispute that Maryland law applies to the
question of shareholder standing.

adversely affected, shareholders generally are entitled to sue directly, and any monetary relief granted goes to the shareholder." <u>Shenker</u>, 983 A.2d at 424.

Plaintiff's first direct class-action claim is that the defendants breached fiduciary duties owed to shareholders of the Ultra Fund by causing ACMF to invest in PartyGaming. Specifically, plaintiff alleges that defendants "acted (a) in bad faith, (b) in a manner that they did not reasonably believe to be in the best interests of the shareholders of ACMF who invested in the Ultra Fund, or (c) without the care that an ordinarily prudent person in a like position would use under similar circumstances." In Maryland, the fiduciary duties owed to a corporation by its directors and officers are codified in Md. Code Ann., Corps. & Ass'ns § 2-405.1(a) (1975, 2007 Repl. Vol.).[8] <u>See</u> <u>Shenker</u>, 983 A.2d at 419. Subsection (g) of § 2-405.1 provides that "[n]othing in this section creates a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation." Md. Code Ann., Corps. & Ass'ns § 2-405.1(g). The <u>Shenker</u> court held that the

---

[8] Section 2-405.1 states in pertinent part: "A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves: (1) In good faith; (2) In a manner he reasonably believes to be in the best interests of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances." Md. Code Ann., Corps. & Ass'ns § 2-405.1(a).

"plain mean[ing]" of subsection (g) is that "to the extent § 2-405.1 creates duties on directors such as the duty of care contained in § 2-405.1(a), <u>those duties are enforceable only by the corporation or through a shareholders' derivative action</u>." <u>Shenker</u>, 983 A.2d at 426 (emphasis added). Because plaintiff's claim is premised solely on defendants' purported breach of fiduciary duties imposed by § 2-405.1(a), this claim belongs to ACMF pursuant to § 2-405(g), and must therefore be brought through a derivative action.

Plaintiff's second direct class-action claim is that defendants breached their duty to exercise reasonable care with respect to investments made by the Ultra Fund and are therefore liable for negligence. Plaintiff's claim that defendants negligently invested in an illegal gambling operation is essentially a claim that the defendants mismanaged the Ultra Fund's assets. Like plaintiff's claim that defendants breached their fiduciary duties, her negligence claim based on a duty to exercise reasonable care belongs to ACMF. <u>See</u> <u>Shenker</u>, 983 A.2d at 420 ("It is without question that § 2-405.1(a) governs the duty of care owed by directors when they undertake managerial decisions on behalf of the corporation."); <u>see also</u> <u>Strougo</u>, 282 F.3d at 170 (finding that under Maryland law, "[i]ll-advised investments by a corporation . . . constitute an impairment or destruction of the corporation's business" that give rise to

claims belonging to the corporation) (citation omitted).  Thus, plaintiff's second class-action claim must be brought through a derivative action.[9]


3. Plaintiff's Demand Failure is Not Excused

        Plaintiff asserts derivative claims for breach of fiduciary duty, negligence, and waste.  "The derivative form of action permits an individual shareholder to bring suit to enforce a corporate cause of action against officers, directors, and third parties."  Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95 (1991) (citation omitted).  Under Fed. R. Civ. P. 23.1, the complaint of a shareholder bringing a derivative action must "state with particularity . . . any effort by the plaintiff to

---

[9] Plaintiff alleges that she and the other shareholders of the Ultra Fund suffered "special injuries not suffered by shareholders in ACMF who were not investors in the Ultra Fund." The fact that ACMF is a series fund and that the shareholders of ACMF's other funds did not suffer the same injury as the shareholders of the Ultra Fund does not transform plaintiff's claims into direct claims.  The individual series of a registered investment company are, for all practical purposes, treated as separate investment companies, see In re Mutual Funds Inv. Litig., 519 F. Supp. 2d 580, 588-89 (D. Md. 2007), and therefore any recovery in a derivative suit would go to the shareholders of the Ultra Fund, not to the shareholders of ACMF's other funds.  Moreover, under Maryland law, the test for shareholder standing is whether a plaintiff's alleged injury is distinct from the injury to the corporation, not distinct from the injury to other shareholders.  See Shenker, 983 A.2d at 424; Strougo, 282 F.3d at 171.  Plaintiff's attempt to convert her derivative claims into direct claims based on alleged "special injuries" suffered by the shareholders of the Ultra Fund is thus unavailing.

obtain the desired action from the directors or comparable authority" and "the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3); see Lewis v. Graves, 701 F.2d 245, 248 (2d Cir. 1983) ("The reasons advanced for a claim of futility must be pled with particularity in the complaint itself.").  Rule 23.1 is a "rule of pleading that creates a federal standard as to the specificity of facts alleged with regard to efforts made to urge a corporation's directors to bring the action in question."  Halebian v. Berv, 590 F.3d 195, 211 (2d Cir. 2009) (citation omitted).  "The federal rule merely requires that the complaint in such a case allege the facts that will enable a federal court to decide whether such a demand requirement has been satisfied." Id.; see also Kamen, 500 U.S. at 96.  The substance of the demand requirement, and any exception to the demand requirement, is analyzed by looking to the law of the state where the entity on whose behalf the plaintiff seeks relief is incorporated. Halebian, 590 F.3d at 211; see also Scalisi v. Ultra Fund Asset Mgmt., L.P., 380 F.3d 133, 138 (2d Cir. 2004).  Because ACMF is a Maryland corporation, Maryland law applies to the demand requirement analysis.[10]

---

[10] The parties do not dispute that Maryland law applies to the issue of whether the demand requirement has been satisfied in this case.

In Werbowsky v. Collomb, 766 A.2d 123 (Md. 2001), the Maryland Court of Appeals performed an exhaustive review of the demand requirement under Maryland law.[11]  Observing that a shareholder's derivative suit "necessarily intrudes upon the managerial prerogatives ordinarily vested in the directors," and that such actions may be "abus[ed]" by "disgruntled shareholders," the court held that a shareholder must "first make a good faith effort to have the corporation act directly and explain to the court why such an effort either was not made or did not succeed." Werbowsky, 766 A.2d at 133.  The court noted that in most instances, presuit demand "is not an onerous requirement" and "gives the directors -- even interested, non-independent directors -- an opportunity to consider, or reconsider, the issue in dispute." Id. at 144.  The court recognized, however, a "very limited" exception to the demand requirement based on futility.  Id.  The court held that under Maryland law, demand is futile "only when the allegations or evidence clearly demonstrate, in a very particular manner," that:

> (1) a demand, or a delay in awaiting a response to a
> demand, would cause irreparable harm to the

_____

[11] In Scalisi, the Second Circuit noted that while many states have codified in whole or in part the rules governing derivative actions, Maryland has not.  Scalisi, 380 F.3d at 138 n.8. "However, Maryland courts recognize derivative actions even in the absence of a specific statute or court rule." Id.

corporation, or

(2) a majority of the directors are so personally and
directly conflicted or committed to the decision in
dispute that they cannot reasonably be expected to
respond to a demand in good faith and within the ambit
of the business judgment rule.

Id. at 144; see also Scalisi, 380 F.3d at 138-39.[12]  This very
narrow exception to the demand requirement was intended to
"focus[] the court's attention on the real, limited, issue —
the futility of a pre-suit demand — and avoid[] injecting into
a preliminary proceeding issues that go more to the merits of
the complaint."  Werbowsky, 766 A.2d at 144.[13]

---

[12] Plaintiff suggests that a more lenient standard for proving
demand futility should apply to the directors of mutual funds.
Plaintiff provides no legal authority under Maryland law (or the
law of any other jurisdiction) to differentiate between
investment companies and other corporations for purposes of
assessing demand futility.  Indeed, the Second Circuit rejected
a similar argument in Scalisi.  See Scalisi, 380 F.3d at 140
("Werbowsky sets forth at length Maryland's standards for
determining whether demand on a corporation's directors is
excused.  We see no reason to believe that Maryland would depart
from those standards in the case of a registered investment
company.").  Finding no merit in plaintiff's proposition, the
Werbowsky standard shall be applied here.

[13] Given this limited exception, it is not surprising that there
has been only one case, Felker v. Anderson, No. 04 Civ. 0372,
2005 WL 602974 (W.D. Mo. 2005), where demand was deemed futile
under Maryland law since Werbowsky.  See Washtenaw County
Employees' Retirement System v. Wells Real Estate Inv. Trust,
No. 07 Civ. 862 (CAP), 2008 WL 2302679, at *14 (N.D. Ga. Mar.
31, 2008).  Felker has been criticized, however, by other courts
as an improper application of Maryland law and as generally
unpersuasive.  See In re CNL Hotels & Resorts, Inc. Secs.
Litig., No. 04 Civ. 1231, 2005 WL 2219283, at *5 n.18 (M.D.
Fla. Sept. 13, 2005); Washtenaw, 2008 WL 2302679, at *14; Caston
v. Hoaglin, No. 08 Civ. 200, 2009 WL 3078214, at *6-7 (S.D. Ohio
Sept. 23, 2009).

Plaintiff concedes in the SAC that she did not make a presuit demand on ACMF's board.  Plaintiff contends, however, that a demand would be futile in this case under both prongs of the <u>Werbowsky</u> test.  With respect to the irreparable harm prong, plaintiff alleges that the legal positions advanced by the Independent Directors and ACMF in defending this lawsuit have "foreclosed any possibility of redress for [her] claims . . . except through this derivative lawsuit."  Plaintiff is essentially arguing that if she were forced to make a demand upon ACMF's board, and the board decided to file suit on behalf of ACMF, such a lawsuit would be hampered by the legal positions taken by the defendants in this suit, thereby causing ACMF "irreparable harm."  Plaintiff's argument misapprehends the nature of the irreparable harm prong of the test for demand futility under <u>Werbowsky</u>.  Plaintiff argues that irreparable harm will arise <u>not from having to make a demand</u>, but rather from the possibility that ACMF's board <u>would accede to her demand</u>.  This argument is without merit.[14]

---

[14] Plaintiff also argues that any delay caused by making a demand would irreparably harm ACMF because dismissal of the present action would bolster a defense based on statute of limitations. Again, this argument misapprehends the nature of the irreparable harm prong of the <u>Werbowsky</u> test because it is premised on an injury that might occur if the board acceded to plaintiff's demand.  Moreover, plaintiff's argument is spurious given that she waited until August 2008 -- more than two years after the events about which she complains -- to file the original

With respect to the second prong of the <u>Werbowsky</u> test,
plaintiff alleges that a majority of ACMF's directors cannot be
expected to respond to a demand in good faith and within the
ambit of the business judgment rule because: (1) they are so
committed to the decision not to pursue the claims on behalf of
ACMF as evidenced by their inaction after learning of
plaintiff's claims and their actions in defending this lawsuit;
(2) they are personally conflicted because they are exposed to a
substantial risk of criminal and civil liability; (3) they are
inherently conflicted because any decision to vindicate the
rights of investors in the Ultra Fund would be contrary to the
interests of the shareholders of ACMF's other funds to whom the
directors owe an "undivided" duty of loyalty; and (4) the
wrongdoing of which plaintiff complains constitutes "inherently
illegal criminal activity that is <u>ultra</u> <u>vires</u> and a per se
violation of the business judgment rule."

None of plaintiff's allegations are sufficient to
demonstrate that a presuit demand would have been futile in this
case.  First, the fact that ACMF's directors took no legal
action in the two years between the decline in value of the
Ultra Fund following the BetOnSports indictment and the filing
of plaintiff's original complaint does not suggest that the

complaint in this action.  As such, this argument is also
without merit.

directors were so committed to the decision not to bring suit
that they could not respond in good faith to a demand.  To the
contrary, the fact that the directors took no action
demonstrates the importance of bringing a demand in order to
make directors aware of potential legal claims.  As the
Werbowsky court noted, a demand "may be [directors'] first
knowledge that a decision or transaction they made or approved
is being questioned, and they may choose to seek the advice of a
special litigation committee of independent directors . . . or
they may decide, as a business matter, to accede to the demand
rather than risk embarrassing litigation." Werbowsky, 766 A.2d
at 144.  Further, the legal positions taken by the directors in
this litigation, even if adverse to plaintiff's claims, in no
way demonstrate that a presuit demand would have been futile.
The futility of making a demand must be gauged at the time the
derivative action is commenced, not afterward with the benefit
of hindsight.  See Lewis, 701 F.2d at 250 (applying Rule 23.1
and finding that "post-complaint events are not relevant").
Moreover, even if the legal positions adopted by ACMF's
directors in this case could be interpreted as evidence of their
hostility to bringing a suit on behalf of ACMF, the "failure to
make demand simply because a majority of the directors . . .
would be hostile to the action" is not excused under Maryland
law.  Werbowsky, 766 A.2d at 143-44.

Second, plaintiff fails to demonstrate that a majority of
ACMF's directors were so personally conflicted that they could
not respond to a demand in good faith and within the ambit of
the business judgment rule.  "Directors are presumed to act
properly and in the best interest of the corporation," and will
not be considered conflicted based on "non-specific or
speculative allegations of wrongdoing."  Werbowsky, 766 A.2d at
144.  Plaintiff has not alleged with sufficient particularity
which of ACMF's directors -- the vast majority of whom are
independent -- were involved in the decision to invest in
PartyGaming.  Although plaintiff alleges that all of ACMF's
directors received "regular reports" regarding the Fund's
investments, this allegation does not adequately demonstrate the
directors' awareness of, much less their approval of, the
challenged transaction.  See, e.g., Scalisi, 380 F.3d at 141
(demand not excused under Maryland law where the complaint
"provide[d] no specific information relating the directors'
conduct to the challenged decision to invest in Enron").  Nor
does plaintiff allege any facts to show that any of the
directors were self-interested and thus unable to consider a
demand in good faith.  For instance, the complaint does not
allege that any director received any personal benefit because
of the Ultra Fund's investment in PartyGaming or was involved in
any sort of self-dealing.  In any event, demand is not excused

under Maryland law based on a plaintiff's speculation that "a majority of the directors approved or participated in some way in the challenged transaction or decision," Werbowsky, 766 A.2d at 143, or would be forced to sue themselves.  Id. at 143-144; Scalisi, 380 F.3d at 140.  The fact that ACMF's directors previously approved transactions subsequently challenged in a derivative suit does not inevitably lead to the conclusion that those directors, bound by their fiduciary obligations to ACMF, would refuse to pursue the suit.

Third, plaintiff has failed to demonstrate demand futility based on her conclusory allegation that ACMF's directors may be exposed to civil or criminal liability.  While no Maryland court has directly addressed this issue, Delaware courts -- applying Delaware's more permissive standard for demand futility[15] -- have specifically rejected the argument advanced by plaintiff here. See, e.g., Aronson v. Lewis, 473 A.2d 805, 815 (Del. 1984)

---

[15] Maryland courts have found Delaware cases holding that demand was not excused are instructive because the Delaware standard is more permissive and excuses demand where Maryland would not. See Sekuk Global Enter. Profit Sharing Plan v. Kevenides, Nos. 24-C-03-007496, 24-C-03-007876, 24-C-03-008010, 2004 WL 1982508, at *5 n.3 (Md. Cir. Ct. May 25, 2004).  Under the Delaware standard, a court must determine "whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984).  Thus, if a plaintiff's allegations fail to meet the Delaware standard for demonstrating demand futility, such allegations necessarily fail the stricter Maryland standard.

("[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors."), overruled on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del. 2000); see also Seminaris v. Landa, 662 A.2d 1350, 1355 (Del.Ch. 1995).[16]   Thus, plaintiff's conclusory allegation that ACMF's directors will be exposed to civil and criminal liability is inadequate to excuse demand under Maryland law.   Furthermore, plaintiff cannot circumvent the demand requirement by alleging that the directors engaged in inherently criminal activity.   Maryland law does not recognize an exception to the demand requirement based on a naked allegation that the directors engaged in "inherently illegal" activities that were "per se" violations of the business judgment rule.   To hold otherwise would render the demand requirement a nullity.

---

[16] In Aronson, the Delaware Supreme Court acknowledged that a challenged board transaction might be "so egregious on its face" that a "substantial likelihood" of liability exists, thereby rendering directors conflicted.  Aronson, 473 A.2d at 815.   In this case, plaintiff's allegations concerning the potential liability of ACMF's directors fall far short of the particularized showing required under Aronson.   The SAC provides no specific facts as to which, if any, of the directors had knowledge of or approved the Ultra Fund's investments in PartyGaming, much less which directors actively "conspired" to invest the Ultra Fund's assets in "illegal gambling operations." Plaintiff's conclusory allegations thus fall far short of demonstrating that the ACMF directors face a "substantial likelihood" of personal liability.

Lastly, plaintiff's allegation that ACMF's directors are inherently conflicted because a lawsuit on behalf of the Ultra Fund's shareholders might harm the interests of the shareholders of ACMF's seventeen other funds is without merit. Plaintiff alleges that ACMF's directors would not bring suit because any significant judgment against defendants ACC and ACIM would adversely affect the shareholders of the other funds to whom the directors owe an "undivided" duty of loyalty. Plaintiff fails to plead with sufficient particularity the harm that would befall the other funds if a lawsuit were brought on behalf of ACMF. While plaintiff claims that the Ultra Fund would no longer be able to subsidize the investment management fees paid by the other funds to ACIM, it is by no means clear why such a result would flow from a successful lawsuit brought on behalf of the Ultra Fund. Thus, plaintiff fails to establish the factual predicate underlying the conflict of interest argument she attempts to make.

In any event, plaintiff's allegation essentially amounts to a claim that ACMF's directors lack the requisite independence to assess a demand within the ambit of the business judgment rule. "Werbowsky, however, emphasized the significant value of pre-suit demand in allowing 'directors -- even interested, non-independent directors -- an opportunity to consider, or reconsider, the issue in dispute.'" Scalisi, 380 F.3d at 141

(quoting Werbowsky, 766 A.2d at 144) (emphasis added).  Further,
the central premise of plaintiff's argument -- that service on
the boards of multiple funds managed by the same investment
adviser renders a director unable to consider a demand in good
faith -- has been rejected repeatedly by courts applying
Maryland law.  See, e.g., Scalisi, 380 F.3d at 138-42 (holding
that demand was not futile where mutual fund's directors also
served on the boards of 49 other funds managed by the same
investment management company); In re Franklin Mut. Funds Fee
Litig., 388 F. Supp. 2d 451, 470 (D.N.J. 2005) (holding that
directors were not conflicted even though they served on more
than one hundred mutual fund boards).  Thus where, as here, a
derivative suit brought on behalf of one fund might have some
adverse impact on other funds managed by the same investment
adviser and overseen by the same board of directors, it cannot
be held that, as a matter of law, directors are so personally
conflicted that they could not consider a demand in good faith
and within the ambit of the business judgment rule.[17]  To hold
otherwise would essentially nullify the demand requirement in
situations where the corporation is an investment firm with

---

[17] The fact that ACMF is a series fund and that each fund is not
a separate legal entity does not alter this conclusion given
that, as noted above, each series is treated as a separate
investment company.

multiple related funds.  Werbowsky does not countenance such a
result.[18]

     As the Maryland Court of Appeals in Werbowsky observed, the
demand requirement is not particularly onerous and any refusal
of demand can subsequently be reviewed under the business
judgment rule.  Werbowsky, 766 A.2d at 144.  Because plaintiff
has failed to show that a demand would be futile in this case,
her derivative claims must be dismissed for failure to make a
presuit demand on ACMF's board.

---

[18] Plaintiff also suggests that demand should be excused because
the investment advisor selects the Ultra Fund's board of
directors and therefore the "relationship between ACC, ACIM,
ACMF and the directors is fraught with conflicts of interest."
Not only is this allegation not pled with sufficient
particularity, it fails to demonstrate futility as a matter of
law.  See Scalisi, 380 F.3d at 133 (demand is not excused under
Maryland law where fund board members chosen by parent company
and investment advisor); see also Franklin, 388 F. Supp. 2d at
469-70 (demand not excused where directors appointed by
investment advisor).  In addition, the Second Circuit has
explicitly rejected the notion that demand is excused under
Werbowsky based on "general criticisms of the investment company
industry" like those alleged in the SAC.  See Scalisi, 380 F.3d
at 142 ("[G]eneralized allegations do not suffice under
Maryland's Werbowsky standard to justify excusing a demand . . .
on grounds of futility.").

## CONCLUSION

Defendants' December 18, 2009 motions to dismiss are granted. The second amended complaint is dismissed with prejudice. The Clerk of Court shall close the case.

SO ORDERED:

Dated:    New York, New York
          May 7, 2010

DENISE COTE
United States District Judge